1   **LEWIS BRISBOIS BISGAARD & SMITH LLP**
CARY L. WOOD, SB# 146598
2     E-Mail: Cary.Wood@lewisbrisbois.com
ANKUR TARNEJA, SB# 262593
3     E-Mail: Ankur.Tarneja@lewisbrisbois.com
633 West 5th Street, Suite 4000
4   Los Angeles, California 90071
Telephone: 213.250.1800
5   Facsimile: 213.250.7900

6   Attorneys for Defendants LEON'S
QUALITY ADJUSTERS, INC., and
7   TONY RODRIGUEZ

8              UNITED STATES DISTRICT COURT

9      EASTERN DISTRICT OF CALIFORNIA, BAKERSFIELD DIVISION

10

11  JIMMIE R. BROOKS,                     CASE NO. 1:15-CV-00965-JLT

12           Plaintiff,                   **DECLARATION OF ANKUR
                                          TARNEJA WITH EXHIBITS A TO
13      vs.                               G IN SUPPORT OF DEFENDANTS'
                                          MOTION FOR SUMMARY
14  LEON'S QUALITY ADJUSTERS,             JUDGMENT, OR,
    INC., TONY RODRIGUEZ, and DOES        ALTERNATIVELY, PARTIAL
15  1 through 10, inclusive,              SUMMARY JUDGMENT**

16           Defendant.                   Judge:  Hon. Jennifer L. Thurston
                                          Date:   August 9, 2016
17                                        Time:   9:30 a.m.

18                                        Action filed:  June 25, 2015
                                          Trial:         December 13. 2016
19

20

21

22

23

24

25  / / /

26  / / /

27  / / /

28
    ─────────────────────────────────
    4837-2181-6372.1                    1
                     DECLARATION OF ANKUR TARNEJA

1 || **DECLARATION OF ANKUR TARNEJA**

2 || I, Ankur Tarneja, declare:

3 || 1.   I am an attorney duly admitted to practice in all of the courts of the

4 || State of California and the United States District Court, Eastern District of

5 || California. I am associate at Lewis Brisbois Bisgaard & Smith LLP, attorneys of

6 || record for Defendants Leon's Quality Adjusters, Inc. ("Leon's") and Tony

7 || Rodriguez ("Rodriguez") (collectively "Defendants"). This declaration is made in

8 || support of Defendants' motion for summary judgment, or, alternatively, motion for

9 || partial summary judgment. The facts set forth herein are of my own personal

10 || knowledge, and if sworn, I could and would competently testify thereto.

11 || 2.   Attached hereto as Exhibit A are true and correct copies of the cited

12 || pages of the Deposition of Plaintiff Jimmie R. Brooks ("Plaintiff").

13 || 3.   Attached hereto as Exhibit B is a true and correct copy of Plaintiff's

14 || First Amended Complaint.

15 || 4.   Attached hereto as Exhibit C are true and correct copies of the cited

16 || pages of the Deposition of Defendant Anthony Rodriguez.

17 || 5.   Attached hereto as Exhibit D are true and correct copies of the cited

18 || pages of the Deposition of Amanjot Bajwa.

19 || 6.   Attached hereto as Exhibit E are true and correct copies of the cited

20 || pages of the Deposition of Lucia Jimenez.

21 || 7.   Attached hereto as Exhibit F are true and correct copies of photos

22 || attached as Exhibits 2-4 from the Deposition of Plaintiff Jimmie R. Brooks.

23 || 8.   Attached hereto as Exhibit G are true and correct copies of the cited

24 || pages of the Deposition of Sabrina McEntire.

25 || 9.   Plaintiff has not produced the screen capture of a video that he and his

26 || counsel have seen.

27

28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1    I declare under penalty of perjury under the laws of the United States of

2 America that the contents of this declaration are true and correct to the best of my

3 knowledge. Executed on July 1, 2016 at Los Angeles, California.

4

5

6

7                              Ankur Tarneja

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4837-2181-6372.1

3

DECLARATION OF ANKUR TARNEJA

# EXHIBIT "A"

```
 1                  UNITED STATES DISTRICT COURT

 2          EASTERN DISTRICT OF CALIFORNIA, FRESNO DIVISION

 3

 4

 5    JIMMIE R. BROOKS,              )
                                     )
 6                Plaintiff,         )
                                     )
 7        vs.                        )  Case No.
                                     )  1:15-CV-00965-JLT
 8    LEON'S QUALITY ADJUSTERS,      )
      INC., TONY RODRIGUEZ, and      )
 9    DOES 1 through 10,             )
      inclusive,                     )
10                                   )
                  Defendants.        )
11    _____)

12

13

14                      DEPOSITION OF

15                  JIMMIE RANDALL BROOKS

16                 Bakersfield, California

17                Tuesday, January 26, 2016

18

19

20    ATKINSON-BAKER, INC.
      COURT REPORTERS
21    (800) 288-3376
      www.depo.com
22

23

24    Reported by:  Terri L. Haupt, CSR No. 6111

25    File No.:  AA005D1
```

1

```
 1                    UNITED STATES DISTRICT COURT

 2         EASTERN DISTRICT OF CALIFORNIA, FRESNO DIVISION

 3

 4

 5    JIMMIE R. BROOKS,              )
                                     )
 6                  Plaintiff,       )
                                     )
 7         vs.                       ) Case No.
                                     ) 1:15-CV-00965-JLT
 8    LEON'S QUALITY ADJUSTERS,      )
      INC., TONY RODRIGUEZ, and      )
 9    DOES 1 through 10,             )
      inclusive,                     )
10                                   )
                    Defendants.      )
11    _____)

12

13

14

15

16

17          Deposition of JIMMIE RANDALL BROOKS, taken on

18    behalf of Defendants, at 1430 Truxtun Avenue,

19    Fifth Floor, Bakersfield, California, commencing at

20    1:00 p.m., Tuesday, January 26, 2016, before

21    Terri L. Haupt, CSR No. 6111.

22

23

24

25
```

2

Atkinson-Baker Court Reporters
www.depo.com

```
 1             Please tell me when you bought it.
 2      A.    May 2014.
 3      Q.    Where did you buy it?
 4      A.    Oxnard, California.
 5      Q.    Did you buy it at a dealership?
 6      A.    Yes.
 7      Q.    Do you remember the name of it?
 8      A.    No.
 9      Q.    Do you remember how you paid for it?
10      A.    Yes.
11      Q.    Tell me how you paid for it.
12      A.    Down payment and arranged payments through a
13 loan.
14      Q.    Okay.  Was that through the car dealership?
15      A.    Yes.
16      Q.    Do you remember how much your down payment was?
17      A.    No.
18      Q.    Do you remember how much your monthly payments
19 were?
20      A.    Yes.
21      Q.    Could you tell me, please.
22      A.    $372.
23      Q.    Okay.  Did the original -- the people you took
24 the loan from, the dealership, did that eventually get
25 transferred to a different lender?
```

10

1      A.   I don't know.

2      Q.   Did you always make your payments to the same

3    place?

4      A.   Yes.

5      Q.   Where did you send your payments?

6      A.   Gateway One Auto Lending.

7      Q.   Okay.  And so you had this truck from May 2014

8    until April -- when did -- when did your truck get

9    repossessed?

10     A.   April of 2015.

11     Q.   Do you remember the exact date?

12     A.   April 22nd.

13     Q.   So you had it for approximately a little less

14   than one year?

15     A.   Correct.

16     Q.   The payments that you had on this truck, you

17   said they were $375?  Sorry.  I forgot.

18     A.   No.  $372.

19     Q.   $372 a month.

20          Did you make these -- at what frequency did you

21   make these payments?

22     A.   Monthly.

23     Q.   What time of the month did you usually pay it?

24     A.   The first of the month.

25     Q.   Did you mail a check?

11

1          A.    No.

2          Q.    Did you pay cash?

3          A.    No.

4          Q.    How did you make the payments?

5          A.    It was electronic, debit card.

6          Q.    Okay.  So did you log on to an online system to

7     make your payment?

8          A.    Yes.

9          Q.    Did you do that through an automatic payment or

10    did you have to do that every month?

11         A.    Automatic.

12         Q.    Okay.  At some point did you not make a

13    payment?

14         A.    Yes.

15         Q.    And when was that?

16         A.    January.

17         Q.    So from May 2014 until January 2015 you had

18    made every payment timely?

19         A.    Yes.

20         Q.    And so that was -- do you remember in

21    January -- you missed $372 in January; is that correct?

22         A.    Yes.

23         Q.    At that time did you call someone or notify

24    someone that you would not be able to make a payment?

25         A.    No.

```
 1      A.    I don't recall.

 2      Q.    Did they email you?

 3      A.    Yes.

 4      Q.    Do you recall what the email said?

 5      A.    I don't off the top of my head, no.

 6      Q.    Did you make any type of arrangement to make up

 7   for that lost payment?

 8      A.    No.

 9      Q.    What was your plan of action after you missed

10   that payment?

11            MR. TRUEBLOOD:  Assumes he had a plan.

12   BY MR. TARNEJA:

13      Q.    Did you have a plan after you missed that

14   payment?

15      A.    Yes.

16      Q.    Can you tell me what your plan was?

17      A.    To catch it on the next month.  I was just

18   going to double my payment the following month.

19      Q.    So in February 2015 you intended to make a

20   payment of $372 times two?

21      A.    Yes.

22      Q.    And in February did you do that?

23      A.    No.

24      Q.    Okay.  Did you make any payment in February?

25      A.    No.
```

14

1     the first of March?

2         A.    Attempted to, yes.

3         Q.    And your plan was to make up by paying three

4     payments in March?

5         A.    Yes.

6         Q.    Okay.  Did you make three payments in March?

7         A.    No.

8         Q.    Did you make any payment in March?

9         A.    No.

10        Q.    Did Gateway contact you after you missed the

11    March payment?

12        A.    Yes.

13        Q.    Was that again approximately two weeks after

14    the first of March?

15        A.    Yes.

16        Q.    Was that by email?

17        A.    Yes.

18        Q.    Did they also call you?

19        A.    Yes.

20        Q.    So they did -- they did not call you after --

21    sorry.

22              They did not call you after January or

23    February; is that correct?

24        A.    Correct.

25        Q.    But they did call you in March?

17

1     Q.    Did you make any payments to get caught up in
2     the month of March 2015?
3     A.    No.
4     Q.    Okay.  Now we're going to April 1st.
5           You had another payment due April 1st; correct?
6     A.    Correct.
7     Q.    Did you make a payment April 1st?
8     A.    I did not.
9     Q.    Did you make -- excuse me.
10          Did you have any communication with Gateway
11    after April?
12    A.    Yes.
13    Q.    So was this again April, about two weeks --
14    April 15th?
15    A.    Yes.
16    Q.    Thereabouts?
17    A.    Yes.
18    Q.    How did they communicate with you in April?
19    A.    Email.
20    Q.    Did they also call you?
21    A.    No.
22    Q.    Could you -- if you remember, what did the
23    email say?
24    A.    The email referred to the past due balance and
25    said it was due immediately.

```
 1      Q.   Okay.  So at this point in April we have -- you
 2   had four missed payments; is that right?
 3      A.   Yes.
 4      Q.   So it was $372 times four?
 5      A.   Yes.
 6      Q.   Then they had additional fees for the missed
 7   payments?
 8      A.   Yes.
 9      Q.   In April did you have a plan for repaying the
10   four missed months?
11      A.   Yes.
12      Q.   Could you tell us what that is, please.
13      A.   To get caught up on all four missed payments.
14      Q.   Did you make any payments in April?
15      A.   No.
16      Q.   So April 15th, about, that's when you had
17   communication with Gateway about your truck?
18      A.   Yes.
19      Q.   Did Gateway ever tell you if you don't make a
20   payment we're going to repossess your truck?
21      A.   Yes.
22      Q.   And when did they tell you that?
23      A.   In an email around that time.
24      Q.   Okay.
25      A.   Just among the consequences for not making
```

20

```
 1        A.    Yes.

 2        Q.    At that time did you have a plan?

 3              MR. TRUEBLOOD:  You mean for payment?

 4              MR. TARNEJA:  For the --

 5   BY MR. TARNEJA:

 6        Q.    The fact that they may repossess your truck,

 7   did you have a plan as to what you would do with the

 8   truck?

 9        A.    Yes.  The same plan as before, to try to get

10   caught up on all past due payments.

11        Q.    Okay.  Now, at that time could you tell me

12   where you worked in April of 2015?

13        A.    Yes.

14        Q.    What was the name of it?

15        A.    Bolthouse Farms.

16        Q.    What did you do at Bolthouse Farms?

17        A.    I'm a warehouse lead.

18        Q.    What does that mean?

19        A.    An assistant to warehouse supervisors in their

20   shipping department.

21        Q.    So you assisted in --

22        A.    Making sure orders got shipped out on trucks.

23        Q.    Got it.

24              Were you employed at Bolthouse Farms when you

25   initially bought the truck in May 2014?
```

                                                              22

```
 1        A.    No.

 2        Q.    When did you start your employment with

 3   Bolthouse Farms?

 4        A.    December 2014.

 5        Q.    Okay.  Where did you work before

 6   Bolthouse Farms?

 7        A.    Mission Produce.

 8        Q.    What were the dates that you worked at

 9   Mission Produce?

10        A.    As far back as when?

11        Q.    If you remember the start date.

12        A.    June 2004 through December 2014.

13        Q.    Okay.  So on April -- I want to focus on -- now

14   I want to shift to April 22nd.  This is the day that

15   your truck was repossessed; correct?

16        A.    Correct.

17        Q.    So as we just discussed, up to that point you

18   had missed four months of payments; is that right?

19        A.    Yes.

20        Q.    And Gateway had notified you up to that point

21   that it -- that a possibility was that they would

22   repossess your truck?

23        A.    Yes.

24        Q.    So I want to focus on April 22nd, that specific

25   day.  Okay?
```

23

```
 1        A.    Okay.

 2        Q.    Could you tell me on that day what time you

 3   began work, if you remember?

 4        A.    3:30 p.m.

 5        Q.    Okay.   What time -- what was your shift that

 6   day?

 7        A.    3:30 p.m. to 1:00 a.m.

 8        Q.    Do you normally -- did you have a lunch break

 9   that day?

10        A.    Yes.

11        Q.    When do you normally take your lunch break that

12   day?

13        A.    8:00 p.m.

14        Q.    Did you take a lunch break that day?

15        A.    Yes.

16        Q.    Did you leave the Bolthouse Farms' property for

17   your lunch break?

18        A.    Yes.

19        Q.    So you took that at eight o'clock?

20        A.    Yes.

21        Q.    So the day that you started your job,

22   April 22nd, the time that you started was at 3:30?

23        A.    Yes.

24        Q.    I want to -- let's -- let's first start off

25   with this.   I'm sorry.   I just want to show you what I'm
```

                                                          24

1    Bolthouse Farms?

2        A.    Yes.

3        Q.    Okay.  What I would like for you to do first

4    is -- is 7200 East Brun- -- how do you say that word?

5        A.    Brundage.

6        Q.    7200 East Brundage Lane, is that the address

7    for Bolthouse Farms?

8        A.    Yes.

9        Q.    On April 22nd at 3:30, from what direction did

10   you come to go into Bolthouse Farms?

11       A.    From Highway 58.

12       Q.    Okay.

13       A.    Exiting at Fairfax Road.

14       Q.    Okay.

15       A.    On Fairfax Road making a left and driving over

16   the top of Highway 58, then making a right on

17   East Brundage Lane.

18       Q.    Okay.

19       A.    And then turning left into the Bolthouse Farms'

20   employee parking lot.

21       Q.    Would you mind with this blue pen drawing --

22   kind of tracing your route into Bolthouse Farms?

23       A.    Yes.  On my copy?

24       Q.    Yes, on your copy.

25       A.    Okay.

27

1      Q.    That will go with the court reporter.

2      A.    Okay.

3      Q.    Would you mind drawing some arrows just to show

4    the direction of your travel?

5      A.    Yeah.

6      Q.    Thank you.

7            So if you flip to the next page, Exhibit 2-2.

8      A.    Yes.

9      Q.    I've marked it down there.

10           This is a little closer image of

11   Bolthouse Farms.

12     A.    Yes.

13     Q.    Coming off 58, you were on -- which exit did

14   you take?  I'm sorry.

15     A.    Fairfax Road.

16     Q.    Is that the road just west of --

17     A.    Yes.

18     Q.    -- East Canal, East Side Canal?

19     A.    Yes.

20     Q.    So you would make a right onto Brundage Lane;

21   is that correct?

22     A.    Yes.

23     Q.    And then you drove towards Bolthouse, which is

24   to the east?

25     A.    Yes.

28

Atkinson-Baker Court Reporters
www.depo.com

18

```
 1        Q.    And then you went north.
 2              Do you know the name of that road that goes
 3   into Bolthouse Farms?
 4        A.    No.
 5        Q.    If it is a road.
 6        A.    No, I don't know the name.
 7        Q.    But that is the road that leads into the
 8   parking lot; is that right?
 9        A.    Yes.
10        Q.    Okay.  So if we can turn to the next one, 2-3,
11   Exhibit 2-3.
12              Do you see the red dot that is -- excuse me,
13   not red.
14              Do you see the bubble that says "7200 East
15   Brundage Lane"?
16        A.    Yes.
17        Q.    And so from Brundage Lane you went north onto
18   that pathway; is that correct?
19        A.    Yes.
20        Q.    Okay.  Did you park where -- on the west side
21   where I see lots of cars, or did you park on the east
22   side of that pathway where there are fewer cars?
23        A.    On the west side.
24        Q.    Okay.  So you pulled into Bolthouse Farms and
25   you went -- approximately how far is that entrance from
```

29

1    the turn of Brundage Lane to where you make that left

2    into the parking lot?

3        A.    Fifty yards.

4        Q.    Fifty yards?

5        A.    Yes.

6        Q.    Okay.  So you went from the road, Brundage

7    Lane, north and then you went left into the parking lot;

8    is that right??

9        A.    Yes.

10       Q.    If you could flip to Exhibit 2-4, please.

11             On this map it's a closer view of -- of

12   Bolthouse Farms; is that right?

13       A.    Yes.

14       Q.    Okay.  So from Brundage Lane going north into

15   the Bolthouse property, right where Brundage Lane turns

16   into it, is there anything stopping the pathway?

17             MR. TRUEBLOOD:  You mean impeding the car?

18             MR. TARNEJA:  Thank you.  Yes.

19   BY MR. TARNEJA:

20       Q.    Is there any impediment to the entryway into

21   Bolthouse Farms there?

22             MR. TRUEBLOOD:  Are you asking him if there's

23   a --

24   BY MR. TARNEJA:

25       Q.    Is there a gate?

30

```
 1      A.    Is there a gate?

 2      Q.    Right where the road from Bolthouse enters off

 3  Brundage Lane.

 4      A.    Yes.

 5      Q.    There is a gate?

 6      A.    Yes.

 7      Q.    Where is it?

 8      A.    Right here.

 9            Would you like me to indicate on this map?

10      Q.    Yeah.

11            What does that gate look like?

12      A.    Black iron.

13      Q.    And what -- when you -- on April 22nd you

14  turned into there, what was the position of that gate?

15      A.    The gate was open.

16      Q.    And is that gate depicted here in Exhibit 2-4

17  on the east side of the driveway going into

18  Bolthouse Farms?

19      A.    Yes.

20      Q.    Could you circle it for me.

21      A.    Yes.  Right here.

22      Q.    The part that you drew in would be in the

23  closed position; correct?

24      A.    Could you repeat that?

25      Q.    Yeah.
```

31

```
 1              The gate would be -- the part you drew in with
 2      the blue pen, that would be if their gate were closed?
 3          A.    Correct.
 4          Q.    As it's depicted in this image, when it's open
 5      it's basically double-lined on the east side of the
 6      driveway?
 7          A.    Yes.
 8          Q.    Okay.  So when you pulled in on April 22nd,
 9      that gate was open; is that right?
10          A.    Yes.
11          Q.    So you pulled in and you went north
12      approximately 50 yards?
13          A.    Yes.
14          Q.    From there you made a left-hand turn before --
15      was it before or after the security guard shack?
16          A.    Before.
17          Q.    So you made a left-hand turn before the
18      security guard shack; is that correct?
19          A.    Yes.
20          Q.    When you make that left-hand turn, is there
21      anything like a gate there at the entryway into that
22      parking lot?
23              MR. TRUEBLOOD:  Are you asking if there's a
24      gate?
25      ///
```

32

22

```
 1   BY MR. TARNEJA:
 2       Q.   Is there a gate?
 3            MR. TRUEBLOOD:   There are two entrances here.
 4            MR. TARNEJA:   I'm sorry.   I see two.   You're
 5   right.
 6   BY MR. TARNEJA:
 7       Q.   You drove -- which entrance did you go into --
 8       A.   When I pulled in --
 9       Q.   -- to start your shift?
10       A.   Off of Brundage?
11       Q.   Yes.
12       A.   I turned left through the first entryway.
13       Q.   So the further southern one?
14       A.   Yes.
15       Q.   Okay.   So you make a left there.
16            Is there anything in that first entryway, like
17   a gate?
18       A.   No.
19       Q.   So is there anything -- is there anyone manning
20   that area?
21       A.   Yes.
22       Q.   And where is that person standing -- sorry.
23   Let me go back.
24            Was there someone there on April 22nd at 3:30
25   when you went to work?
```

33

```
 1        Q.   When you -- you worked -- do you currently work

 2   at Bolthouse?

 3        A.   Yes.

 4        Q.   From the time you started to today, do they

 5   have someone manning that gate where you entered, the

 6   southern gate, on a daily basis?

 7             MR. TRUEBLOOD:  You mean the guard shack here

 8   at the entrance?

 9             MR. TARNEJA:  No.

10   BY MR. TARNEJA:

11        Q.   The entryway where Mr. Brooks entered on the

12   southern side, there are two -- two on the west side;

13   correct?

14             There's two entries on the west side of the

15   driveway going into Bolthouse?

16        A.   Yes.

17        Q.   Okay.  And you entered into the first or the

18   southern -- the most southern entryway into the employee

19   parking lot?

20        A.   Yes.

21        Q.   Is that where you typically entered?

22        A.   Yes.  Either that one or that one, depending on

23   parking spot availability.

24        Q.   Sorry.  That's not clear for the record, "that

25   one or that one."
```

                                                              35

1    entry?

2        A.   Yes.

3        Q.   Excuse me.  It's not gated.  Is that correct,

4    it's not gated?

5        A.   It's gated right here at the driveway off of

6    Brundage.

7        Q.   I just want to make this clear.

8             So you come off of Brundage.  There is a gate

9    on the driveway, but it was open when you came in on

10   April 22nd?

11       A.   Yes.

12       Q.   And then you made your first left --

13       A.   Yes.

14       Q.   -- into the parking lot?

15       A.   Yes.

16       Q.   Is there a gate at that first left?

17       A.   No.  There's an opening.

18       Q.   There's an opening.

19            Have you ever seen a gate there?

20       A.   No.

21       Q.   Have they ever put any type of barrier there?

22       A.   No barrier.

23       Q.   Okay.  So you -- on April 22nd you went in, you

24   made a left going north into Bolthouse's driveway, then

25   you made your first left going west into the employee

                                                            37

1      Q.    Is there ever an occasion where you have to

2   drive -- you had to drive your truck through the --

3   through the guard shack area?

4      A.    No.

5      Q.    So every day you worked at Bolthouse Farms you

6   would park in the employee parking lot to the west?

7      A.    Yes.

8      Q.    And the employee parking lot to the west does

9   not have any gates impeding entry into that area; is

10  that right?

11     A.    Into the lot right here?

12     Q.    The lot that you --

13     A.    The employee lot?

14     Q.    The lot where you parked your truck, correct.

15     A.    Not inside here.  Not inside -- once you pass

16  through the gate to enter the property, no.

17     Q.    Okay.  And the gate that you enter into the

18  property, on April 22nd it was open?

19     A.    Yes.

20     Q.    How about the month before?  If you remember,

21  is it always open?

22     A.    Yes.

23     Q.    Okay.  Has it ever been closed?

24     A.    I don't know.

25     Q.    So you wouldn't be able to recall them closed

45

```
 1   Could or prohibited or what?
 2   BY MR. TARNEJA:
 3      Q.   Today, right now, if I want to jump in my car
 4   and drive on Brundage Lane, go north on that driveway
 5   and turn left into the parking lot, could I do that?
 6           MR. TRUEBLOOD:  It's still vague.
 7           THE WITNESS:  Yeah.
 8   BY MR. TARNEJA:
 9      Q.   Yes, I could?
10      A.   It's -- like he said, it's vague.
11           Physically you could, but there's signage and
12   the guards would stop you.  There is roaming guards.
13   They check all visitors and people on the property.
14      Q.   How would they stop me?
15      A.   They would physically approach you in your
16   vehicle and they would ask if you were an employee or
17   what you were doing there.
18      Q.   So the guard knows every single employee who
19   works there?
20      A.   I don't know.
21      Q.   How would the guard identify who works at
22   Bolthouse and who doesn't work at Bolthouse?
23      A.   I don't know.
24      Q.   When you park your truck in the employee
25   parking lot, do you typically carry your keys with you?
```

49

```
 1        A.    Yes.

 2        Q.    You don't have to turn them in to anyone?

 3        A.    No.

 4        Q.    Okay.  Are you doing okay?  Do you want to take

 5   a break or anything?

 6              MR. TRUEBLOOD:  We're okay.

 7              THE WITNESS:  I'm good for a little bit.  When

 8   my coffee runs out I'll go refill that.

 9   BY MR. TARNEJA:

10        Q.    Let's just shift a little bit.

11              You started at 3:30; right?

12        A.    Yes.

13        Q.    You started your day on April 22nd at 3:30?

14        A.    Yes.

15        Q.    You parked in the first entryway off

16   Brundage Lane and neither of the entryways that you

17   drove through were closed?

18        A.    Yes.

19        Q.    They were both open?

20        A.    Yes.

21        Q.    And at eight o'clock you left to go eat lunch?

22        A.    Yes.

23        Q.    And when you left, both the gateways were open?

24        A.    I don't leave out those gateways.

25        Q.    Which way do you go out?
```

                                                              50

1      A.   Yes.

2      Q.   I'm sorry.  8:00 or 8:30?

3      A.   I left at 8:00 p.m. for my lunch.

4      Q.   Okay.  So the gate is closed at all times for

5  the exit of the parking lot?

6      A.   It is closed.  And as your vehicle approaches

7  it will open to let out one vehicle at a time.

8      Q.   So the gate has some type of sensor?

9      A.   Yes.

10     Q.   And you say it only allows one vehicle to leave

11 at a time?

12     A.   Yes.

13     Q.   Does it -- is it possible for two cars to go

14 out when it's open?

15     A.   I suppose it's possible.

16     Q.   The gate is --

17     A.   The gate is closed until a vehicle approaches

18 the sensor.

19          MR. TRUEBLOOD:  Let him ask his question.

20 BY MR. TARNEJA:

21     Q.   The gate isn't fast enough to open and close

22 between every single car unless -- unless the cars wait;

23 right?

24     A.   Yes.

25     Q.   So at eight o'clock you leave for lunch and you

52

1    go out this exit; correct?

2        A.    Correct.

3        Q.    You come back at 8:30 and you enter in the same

4    way you came in on -- for the start of your shift at

5    3:30?

6        A.    Yes.

7        Q.    And you park in the exact same spot?

8        A.    Yes.

9        Q.    You get out of your truck; right?

10       A.    Yes.

11       Q.    And then you walk north through the turnstile;

12   right?

13       A.    Yes.

14       Q.    And then you walk north again towards the back

15   of the property?

16       A.    Yes.

17       Q.    And then you go west into your warehouse?

18       A.    Yes.

19       Q.    From the warehouse you don't have any view of

20   the parking lot?

21       A.    Yes.

22       Q.    That's correct; right?

23       A.    Correct.

24       Q.    All right.  So let's shift a little bit towards

25   the time when you learned about your truck being towed

53

```
 1   away.  Okay?

 2        A.   Okay.

 3        Q.   So your -- you return from your shift.  You're

 4   at work at 8:30.  It was 8:30; right?

 5        A.   Yes.

 6        Q.   Then you're back in the warehouse; right?

 7        A.   Yes.

 8        Q.   Do you remember what time you learned that your

 9   truck had been towed?

10        A.   Around 9:30.

11        Q.   Okay.  Had you been -- you didn't actually see

12   your truck get towed away; correct?

13        A.   Correct.

14        Q.   Who notified you that your truck had been

15   towed?

16        A.   A warehouse employee that observed it in the

17   parking lot.

18        Q.   Do you remember that person's name?

19        A.   Yeah.  Jesus Lemus.

20        Q.   Spell that for us, please.

21        A.   J-e-s-u-s, L-e-m-u-s.

22        Q.   L-e-m-u-s?

23        A.   Correct.

24        Q.   Does Jesus still work at Bolthouse?

25        A.   No.
```

54

```
1        Q.    So Jesus came in at 9:00 -- sorry.  What time
2   did you say?
3        A.    9:30 p.m.
4        Q.    9:30 p.m. to tell you what?
5        A.    He said, "I saw somebody taking off with your
6   truck."
7        Q.    And do you know how much time went by from the
8   time he observed the truck being towed to the time he
9   told you that your truck had been towed?
10       A.    No.
11       Q.    Did -- how did you react?
12       A.    I got up from my seat immediately and followed
13  the same path that I followed coming to and from the
14  warehouse to run out to the parking lot to where I had
15  parked.
16       Q.    Okay.  So you -- you didn't walk, you ran from
17  the warehouse down the driveway --
18       A.    Correct.
19       Q.    -- through the turnstile to where your truck
20  was located?
21       A.    Correct.
22       Q.    At least where you had parked it?
23       A.    Yes.
24       Q.    And you realized that your truck was gone?
25       A.    Yes.
```

55

```
 1       Q.   Okay.  Do you know what time -- from any
 2   source, do you know what time your truck actually got
 3   towed away?
 4       A.   No.
 5       Q.   Do you know how the tow truck went into the
 6   employee parking lot?
 7            MR. TRUEBLOOD:  You mean did he personally
 8   observe it?
 9   BY MR. TARNEJA:
10       Q.   Or have you learned from any source how the tow
11   truck went in --
12            MR. TRUEBLOOD:  Other than from your attorney,
13   you can answer that.
14            THE WITNESS:  What's that?
15            MR. TRUEBLOOD:  Anything other than
16   communications from me, you can answer.  If someone else
17   told you.
18            THE WITNESS:  Okay.  Just from the security
19   guard's report and what they told me.
20            Because when I got out there and noticed that
21   my truck wasn't there, I immediately went to the guard
22   shack to tell them that I was the one whose truck had
23   been towed off.
24   BY MR. TARNEJA:
25       Q.   Okay.
```

56

```
1    to the guard shack and the two women patrol guards have
2    told you what they think has happened?
3        A.    Yes.
4        Q.    Okay.  And Ms. McEntire, she -- sorry.
5              Could you remind me what she said again?
6        A.    She said that a man hooked up to my truck,
7    drove out the wrong way, and he turned left out of the
8    driveway, heading east on Brundage Lane.
9        Q.    And so at that point did you -- did you think
10   about your -- the truck being repossessed?
11       A.    No.
12       Q.    What did you think -- why do you think this man
13   took your truck?
14       A.    I didn't know.
15       Q.    But leading up to this time, you had missed
16   four payments; correct?
17       A.    Yes.
18       Q.    And Gateway had noticed -- given you notice
19   that a possibility was that they would repossess your
20   truck?
21       A.    Yes.
22       Q.    So at this time, when your truck got towed, it
23   didn't cross your mind that your truck had possibly been
24   repossessed?
25       A.    Correct.
```

```
 1    thought he saw it pull off on the side street.  There's

 2    an industrial area.  He said he thought he saw it pull

 3    over there and that it might be back there.

 4        Q.    Okay.

 5        A.    But he did not locate the truck.

 6        Q.    So the roaming guard's efforts were that he

 7    went out the property and tried to find the truck --

 8        A.    Yes.

 9        Q.    -- and he thought he knew where it went; right?

10        A.    Yes.

11        Q.    But he didn't actually find it?

12        A.    Exactly.

13        Q.    So then you and -- you and the two security

14    guards at the guard shack, plus the roaming guard, are

15    now at the shack; right?

16        A.    Yes.

17        Q.    Okay.  When you guys are standing at the shack,

18    what happened next?

19        A.    Well, a coworker of mine, he's actually a

20    supervisor, Robert Gilstrap, he had driven up because he

21    had heard that I had ran out there.  He drove up on his

22    golf cart to see if I was okay and see what was going

23    on.  He observed just the guards telling me where they

24    had seen my truck go and that they saw the tow truck

25    driver drive off with it.
```

68

1       Q.   Did you call 911?

2       A.   I turned around and addressed the security

3   guards and said I was going to call 911.  Sabrina

4   McEntire asked that I did not.  She asked me not to call

5   911.

6       Q.   So you did not call 911?

7       A.   No.

8       Q.   So the sheriff or the police -- do you know who

9   would respond to this area?

10      A.   I don't.

11      Q.   Well, either way, the local authorities didn't

12  come to that guard shack?

13      A.   Correct.

14      Q.   So you told Mr. Gilstrap what happened?

15      A.   Uh-huh.

16      Q.   What happened next?

17      A.   From there we got in his vehicle, his car,

18  which was parked in the same parking lot.  We drove out

19  of the parking lot to go look for my truck.

20      Q.   Okay.  Did you and Mr. Gilstrap ever get in the

21  golf cart?

22      A.   Did we get in the golf cart?

23      Q.   Yeah, together.

24      A.   He parked the golf cart in the area, but we got

25  in his car and drove up the street to go look for the

70

1    vehicle.

2        Q.    Okay.  So is it correct, then, that you and

3    Mr. Gilstrap didn't leave Bolthouse's property in the

4    golf cart?

5        A.    Correct.  We didn't leave their property.

6    Bolthouse's property is also on the other side of

7    Brundage, as well.

8        Q.    Okay.

9        A.    The South Shop area.  He drove in the golf

10   cart.  We drove as far up, without leaving Bolthouse

11   property, to look and see if we can see it, and then

12   came back in the golf cart and got in his car and drove

13   further up the street.

14       Q.    So the golf cart, did you guys drive it on

15   East Brundage Lane?

16       A.    On Brundage Lane, yes, but on the side of the

17   road on Bolthouse property.

18       Q.    Okay.  I just want to figure out if you guys --

19   did you have to enter another gate or you were just

20   along the road?

21       A.    No.  On 2-5, right here by the guard shack, we

22   left.  We drove south on this road out of Bolthouse to

23   Brundage --

24       Q.    Okay.

25       A.    -- and drove left, but came over on this side

71

1    of the street because this is also Bolthouse property

2    over here.

3        Q.   Okay.

4        A.   We drove just about as far as right here.   We

5    couldn't see it looking down the road, so we turned

6    around and came back and parked the golf cart, got in

7    his car, and we drove and went to look for the vehicle.

8        Q.   How far did you guys go in the golf cart going

9    east?

10       A.   Not even a hundred yards.

11       Q.   And then you guys turned around in the golf

12   cart; right?

13       A.   Yes.

14       Q.   And drove back north towards the guard shack?

15       A.   Yes.

16       Q.   And where did you park the golf cart?

17       A.   We parked the golf cart -- you can see that

18   there is a parking space on 2-5.

19       Q.   Yeah.

20       A.   We parked the golf cart right there and walked

21   on foot over to his vehicle.  We drove out, came out the

22   electronic gate, and then drove left on Brundage,

23   heading eastbound on Brundage to go look in the area in

24   which the guard said they saw the truck go.

25       Q.   Do you remember about what time that was?

72

1       A.    Around 9:45.

2       Q.    Okay.  And just to reiterate.  You don't know

3   exactly when the truck -- the tow truck had towed your

4   truck?

5       A.    Exactly.

6       Q.    So around 9:45 you and Mr. Gilstrap drove east

7   on Brundage Lane looking for your truck?

8       A.    Yes.

9       Q.    Did you find it?

10      A.    Yes.

11      Q.    How long do you think that it took you guys to

12  find it?

13      A.    About five minutes.

14      Q.    Where did you find it?

15      A.    Let's see.

16      Q.    Maybe 2-1 would be the best.

17      A.    2-1 would probably be better, yes.

18      Q.    So we're looking at Exhibit 2-1.

19      A.    Exhibit 2-1.  We proceeded out of Bolthouse,

20  took a left on Brundage Lane, heading east on

21  Brundage Lane towards where you can see Highway 184.

22      Q.    Yes.

23      A.    We passed through that intersection.  We

24  crossed over Highway 184.  Where you can see on

25  Exhibit 2-1, right next to Highway 184, where it

73

```
 1      Q.   Did you meet or encounter the person driving
 2   the tow truck?
 3      A.   Yes.
 4      Q.   Do you remember his name?
 5      A.   Yes.
 6      Q.   What is it?
 7      A.   Tony Rodriguez.
 8      Q.   Did you or Mr. Gilstrap approach Mr. Rodriguez?
 9      A.   Yes.
10      Q.   Who approached Mr. Rodriguez?
11      A.   Well, initially we were in Robert Gilstrap's
12   car and we identified -- we could see my truck on the
13   back of the tow truck.  Robert pulled his car into the
14   cul-de-sac alongside his truck, and he rolled down his
15   window and motioned for the driver to stop.  I stepped
16   out on the passenger's side and stood up, threw my hands
17   up in the air and asked them to stop, not to drive off.
18   The driver asked who I was and why the driver of the car
19   was asking him to stop, if it was my vehicle.  He was
20   confused.  He didn't know who was who.
21      Q.   Was the tow truck moving or was it stopped in
22   the cul-de-sac when you found him?
23      A.   He was stopped when we saw him.  When we pulled
24   into the cul-de-sac and he saw us flag him down, he
25   attempted to drive off.
```

75

1    He said, "Sacramento."

2            I said, "You're taking the truck to

3    Sacramento?" And he said, "No, I'm just kidding. I'm

4    taking it here somewhere in town."

5        Q.    Okay. So Mr. Rodriguez said he had orders to

6    take the truck; right?

7        A.    Yes.

8        Q.    And then he said that he needed to take it

9    somewhere locally in Bakersfield?

10       A.    Yes.

11       Q.    And what -- how did you respond to him?

12       A.    I asked him where he was taking it in

13   Bakersfield. He said he couldn't tell me.

14       Q.    Okay. Did he give you any information?

15       A.    No.

16       Q.    Did he give you a business card?

17       A.    He gave me a business card and he said -- he

18   gave me his card and he said, "I'm taking it somewhere

19   locally. You will need to call your finance company to

20   find out where your truck will be."

21       Q.    Okay. So was Mr. Rodriguez friendly to you?

22       A.    Not at first. He didn't know who I was. He

23   thought --

24            MR. TRUEBLOOD: Let him ask his question.

25            THE WITNESS: Okay.

78

```
 1   BY MR. TARNEJA:
 2        Q.    Did he -- did Mr. Rodriguez -- was he just --
 3   was he acting cautiously?
 4        A.    Yes.
 5        Q.    After he realized that that was your truck, he
 6   gave you the information that you needed; right?
 7            MR. TRUEBLOOD:   Vague and ambiguous.
 8            THE WITNESS:   He told me that I would need to
 9   contact my finance company to find out where I could get
10   my truck.
11   BY MR. TARNEJA:
12        Q.    At that time he gave you a business card?
13        A.    Not at that time.
14        Q.    Okay.   When did he give you the business card?
15        A.    Not until later.
16        Q.    How long did you and Mr. Rodriguez have a
17   conversation?
18        A.    Well, I -- he told me he was going to be taking
19   the truck.   I told him I had some belongings inside that
20   I needed to get before he took it anywhere.   He told me
21   he would not give me the belongings unless I gave him
22   the keys to the truck.
23        Q.    I just want to get an answer to my question.
24            How long did you guys talk?
25        A.    Roughly ten minutes.
```

79

```
1        Q.    Does that look like the business card?

2        A.    Yes.

3        Q.    And does the information on the back look like

4   what Mr. Rodriguez wrote?

5        A.    Yes.

6        Q.    Now, you said you had some personal belongings

7   in the truck; right?

8        A.    Yes.

9        Q.    What did you have in the truck?

10       A.    My wallet.

11       Q.    Anything else?

12       A.    I had just some personal effects, personal

13   gifts.  I had some articles of clothing, some jackets

14   for work, gloves for work.  I had a pair of work boots

15   in there.  I had Tylenol and Imodium and just normal

16   stuff that I would carry for every day.

17       Q.    Okay.  Did you ask Mr. Rodriguez if you could

18   take out your personal stuff?

19       A.    Yes.  I told Mr. Rodriguez, "I have things I

20   need to get out of the truck."  He said that I can only

21   get them if I gave him the keys to the vehicle.

22       Q.    Did you give him the keys?

23       A.    I did.  Because at the time I didn't know if I

24   would be able to retrieve those belongings at a later

25   time, but I gave him the keys just for the sake of
```

1   hoping to get them.

2       Q.   Was it at that point -- actually, when was it

3   that you realized that this was -- they were

4   repossessing your truck?

5       A.   I still didn't know that that's what that truly

6   was.  I was just going off what he had told me.  I

7   hadn't talked to my finance company yet.

8       Q.   Through that point you didn't understand this

9   as being a repossession of your truck?

10      A.   I had never been through one before, so I

11  didn't know if that's what it truly was.

12      Q.   When did you realize your truck was actually

13  being repossessed?

14      A.   The following day when I contacted my finance

15  company

16      Q.   That was Gateway?

17      A.   Yes.

18      Q.   What did Gateway inform you?

19      A.   That it had been repossessed.

20      Q.   Okay.  Did you have a gun case in the truck?

21      A.   Yes, I did.  It was a gun safe.

22           I did not have --

23           MR. TRUEBLOOD:  Hold on.  Let him ask the

24  question.

25  ///

```
 1      A.    It's a half door that opens up the opposite

 2   way.

 3      Q.    Okay.  So the Gun Vault box was underneath

 4   the -- which side?

 5      A.    The rear seat on the passenger's side.

 6      Q.    Okay.  So if you're in the driver's seat, it

 7   was in the back right?

 8      A.    Correct.

 9      Q.    Okay.  Is that one of the items that you wanted

10   to get out?

11      A.    The wallet, yes.  I had my wallet in the gun

12   safe.

13      Q.    The wallet was in the gun safe?

14      A.    Yes.

15      Q.    But there was no gun in the gun safe?

16      A.    No.

17      Q.    When you gave Mr. Rodriguez the keys, did he

18   allow you to take your items out?

19      A.    Yes.

20      Q.    Did you take out your wallet?

21      A.    I took out my wallet.

22      Q.    Okay.  Did Mr. Rodriguez say anything else to

23   you when you guys spoke in those -- you said about ten

24   minutes; right?

25      A.    The whole encounter with him was ten minutes.
```

86

```
 1    his truck.
 2    BY MR. TARNEJA:
 3       Q.   It was after you learned that your truck was at
 4    an auction yard that you decided not to recover it;
 5    right?
 6       A.   No.   They said I would have to purchase it.   I
 7    could only purchase it at auction.
 8       Q.   Okay.   So the second day after it had been
 9    repossessed you no longer had the $2,600 buy-back
10    option?
11       A.   Correct.   They said that I had to purchase it
12    at auction.
13       Q.   Okay.   And is it at that time when you decided
14    that you couldn't go purchase the truck?
15       A.   I had to figure out how I would get there
16    because I didn't have a truck.   How I would get to the
17    auction and now it could be more than the $2,600.
18            MR. TARNEJA:   Do you mind if we take a break?
19            MR. TRUEBLOOD:   Sure.
20            (Recess taken.)
21            MR. TARNEJA:   Back on.
22    BY MR. TARNEJA:
23       Q.   I want to shift focus a little bit.
24            I want to shift to -- do you know of any
25    surveillance video depicting this incident?
```

99

1    A.    There are security cameras and surveillance
2    cameras around.  I'm sure it's on video.
3    Q.    Have you seen a video?
4    A.    I have not seen a video of the whole thing
5    happening.  I just saw a clip a couple of days after it
6    happened when I went to go ask if there was any camera
7    footage.  But I haven't seen the physical video of the
8    whole thing.
9    Q.    The clip that you saw, what did it show?
10   A.    It was just from a distance.  The gentleman who
11   was the head of security at that time, he had a file on
12   his computer.
13         He said -- he opened it up and said they had
14   watched the video.  I hadn't seen the video.  He said
15   that it showed the guy driving out the driveway and the
16   guards trying to stop him.
17         All I saw was he just opened it up on his
18   computer.  It was a still shot of -- I could see my
19   truck and a tow truck and people standing nearby.  I
20   couldn't tell who was in the footage.
21   Q.    Okay.  So it wasn't a video?  It was a still?
22   A.    It looked like it was a still shot of the
23   video.
24   Q.    Okay.  And you have not actually -- you haven't
25   actually seen a video?

100

```
 1        A.   I knew that there was a roving guard that went
 2   off the property to go look for it.   That's all I knew.
 3        Q.   Okay.
 4        A.   And I wasn't introduced to him, but the roving
 5   guard came back and pointed out the same thing that
 6   Sabrina did, where they saw the truck go.
 7        Q.   Have you had a chance to read this Incident
 8   Report line by line?
 9        A.   Yes, I just read through it.
10        Q.   Is there anything in here that you think is
11   inaccurate?
12             MR. TRUEBLOOD:   I'm going to object to that
13   question and instruct him not to answer.
14             This is a report that he's never seen before
15   written by somebody else.
16             If you want to be specific about specific
17   lines, that's fine, but he can't answer a question like
18   that.
19   BY MR. TARNEJA:
20        Q.   Okay.   So when -- at some point you told
21   Ms. McEntire that you were going to call 911; right?
22        A.   Yes.
23        Q.   And what did she say to you?
24        A.   She asked me not to call 911 because it would
25   involve Mr. Griffin, Silas Griffin, coming from his
```

```
 1    house out to the site.  She didn't want him to have to

 2    do that.

 3        Q.   And that convinced you not to call the police?

 4        A.   At that time, yes.

 5             Then she said -- she pointed out --

 6             MR. TRUEBLOOD:  Let him ask a question.

 7             THE WITNESS:  Okay.

 8    BY MR. TARNEJA:

 9        Q.   So Mr. -- she informed you that essentially it

10    would disturb Mr. Griffin?

11        A.   Yes.  She said that it would get ugly.

12        Q.   And you agreed with her that you didn't want to

13    bother Mr. Griffin?

14        A.   At that time, yes, and then -- yeah.

15        Q.   And this is -- this is at the time when your

16    truck had been towed away by an unknown person; right?

17        A.   Yes.

18        Q.   And so Mr. Griffin -- excuse me.

19             Ms. McEntire did not call Mr. Griffin; right?

20        A.   I don't know.

21        Q.   Mr. Griffin didn't come to the security guard

22    shack that night, did he?

23        A.   I don't know.

24        Q.   While you were at the security guard shack, did

25    he ever show up that night?
```

110

1     Q.    Earlier did you testify that you didn't call

2     911?

3     A.    When I was at the guard shack with the guards,

4     yes.

5     Q.    Okay.  So you went -- when did you call 911?

6     A.    After Robert and I left the guard shack and

7     were looking for the vehicle further down the street,

8     when we were in his car.

9     Q.    Okay.  And the -- what did the -- the Kern

10    County Sheriff's Department tell you?

11    A.    They asked for a description of the vehicle.

12    Q.    Okay.  Did they send a patrol officer to try to

13    find your truck?

14    A.    No.

15    Q.    Do you know why?

16    A.    At the time -- the time that they answered, we

17    made a visual contact with the vehicle.  I told them

18    that I found it and to disregard and I hung up the

19    phone.

20    Q.    How come -- up to that point you hadn't -- you

21    didn't know that your truck was being repossessed;

22    right?

23    A.    Yes.

24    Q.    How come you told the police to disregard?

25    A.    Because it was sitting there parked.

123

1     Q.   Attached to a tow truck; right?

2     A.   Yes.

3     Q.   And you didn't know why it was on a tow truck?

4     A.   Yes.

5     Q.   But you felt comfortable enough to tell the

6 police to disregard?

7     A.   Yes.

8     Q.   So you weren't -- you didn't see this as an

9 emergency that the police needed to come; right?

10    A.   Well, I was going to hang up so I could find

11 out what was going on rather than try to continue

12 talking to a dispatcher.

13    Q.   Okay.  So you never called the Kern

14 Sheriff's -- County Sheriff's Department again that

15 night, did you?

16    A.   Correct, I did not.

17    Q.   Did you call them any time after that night

18 about this incident?

19    A.   No.

20    Q.   On the last paragraph it says, "We clocked out

21 at 12" -- I believe it says 27 or 22 a.m.

22    A.   Yes.

23    Q.   "4:23, and left the turnstile gates into the

24 employee lot at roughly 12:35 a.m."  Is that right?

25    A.   Yes.

124

```
1       A.    Yes.

2       Q.    Is that your signature?

3       A.    Yes.

4       Q.    Your responses to those requests were to the

5    best of your knowledge?

6       A.    Yes.

7       Q.    Now, prior to -- between -- your first missed

8    payment was in January 2015; right?

9       A.    Yes.

10      Q.    And then until your truck was repossessed you

11   made no payments?

12      A.    Yes.

13      Q.    From that time, January 2015 through

14   April 22nd, that night, were -- did you change any of

15   your habits in terms of where you parked your truck?

16   Did you park it in a garage?  Did you try to hide your

17   truck?

18      A.    No.

19      Q.    Did you park -- when you parked at home, did

20   you park on a street or did you park in a driveway?

21      A.    Both.

22      Q.    Where would you normally -- more frequently

23   park?

24      A.    A driveway if it was available.

25      Q.    Is your home -- did you live in an apartment or
```

126

```
 1    a home?

 2         A.    A home.

 3         Q.    From January to April, until the time that your

 4    truck was repossessed, did you always park in front of

 5    your house?

 6         A.    Yes.

 7         Q.    Did you ever park it a block away?

 8         A.    No.

 9         Q.    Did you ever park it in someone's garage?

10         A.    No.

11         Q.    Did you ever park it out of plain sight?

12         A.    No.

13         Q.    Your truck would be pretty recognizable; right?

14         A.    Yes.

15         Q.    Red truck with oversized tires?

16         A.    Yes.

17         Q.    Do you know if anyone ever came to your house

18    about repossessing the truck?

19         A.    No.

20         Q.    You don't know if anyone came?

21         A.    I don't know.

22         Q.    Do you know if -- did your girlfriend ever ask

23    you if someone was trying to come get your truck?

24         A.    No.

25         Q.    Did she ever tell you that someone came to your
```

Atkinson-Baker Court Reporters
www.depo.com

1      Q.    One of the consequences of not repaying the

2   loan on your truck was the possibility that your truck

3   could be repossessed; right?

4           MR. TRUEBLOOD:  If you know.

5           THE WITNESS:  Yes.

6   BY MR. TARNEJA:

7      Q.    Did Mr. Rodriguez ever threaten you or give

8   you -- show any force or anything?

9           MR. TRUEBLOOD:  That is vague and ambiguous.

10  BY MR. TARNEJA:

11     Q.    Did Mr. Rodriguez ever use any force?

12     A.    No.

13     Q.    Did he --

14          MR. TRUEBLOOD:  On him personally?

15          MR. TARNEJA:  Yeah, on Mr. --

16          MR. TRUEBLOOD:  Or to remove the car from the

17  lot?

18          MR. TARNEJA:  No.

19  BY MR. TARNEJA:

20     Q.    I'm assuming you don't know what he did to

21  remove the truck since you didn't see it.

22     A.    I did not see it.

23     Q.    So you don't know how he loaded the truck onto

24  his tow truck; right?

25     A.    I don't know.

1    Q.   Mr. Rodriguez never used any force with you;
2    right?
3    A.   With me, no.
4    Q.   And he never threatened you, did he?
5    A.   He told me that I could only get my belongings
6    if I gave him the keys to the vehicle.
7    Q.   So in exchange for the keys, he was going to
8    allow you to access the inside of the truck?
9    A.   He was clear that I would not be able to get my
10   belongings unless I gave him my keys.
11   Q.   And the following day you went to the lot and
12   retrieved the items you couldn't retrieve that night;
13   right?
14   A.   Yes.
15   Q.   So it's possible that you could have retrieved
16   everything the next day, even if you couldn't have
17   retrieved it that night?
18        MR. TRUEBLOOD:  Calls for speculation; lacks
19   foundation.
20        THE WITNESS:  I didn't know.
21   BY MR. TARNEJA:
22   Q.   There was nothing -- when you went to the lot,
23   no one said you couldn't take certain items out of your
24   truck; right?
25   A.   Yes.

130

```
 1      Q.    That's right; right?

 2      A.    That is correct.

 3      Q.    So you and Mr. Rodriguez, you stated -- you

 4   testified that you never shook hands at the end of a

 5   conversation?

 6      A.    I don't recall.

 7      Q.    So it's possible that you did, you just don't

 8   remember?

 9      A.    It's possible.

10      Q.    And you don't remember telling Mr. Rodriguez

11   that he was just doing his job?

12      A.    No.

13      Q.    You don't remember that; right?

14      A.    I don't remember.

15      Q.    So it's possible that you did say to him --

16            MR. TRUEBLOOD:  Anything is possible, but did

17   you tell him that?

18            THE WITNESS:  I don't remember.

19   BY MR. TARNEJA:

20      Q.    Do you specifically remember not saying that to

21   him?

22      A.    I don't remember.

23      Q.    Okay.  I'm shifting gears a little bit.

24            So the auto insurance claim -- you became --

25   excuse me.
```

131

1    STATE OF CALIFORNIA   )
                           )   ss.
2    COUNTY OF KERN        )

3

4         I, the undersigned, declare under penalty of

5    perjury:

6         That I have read the foregoing transcript;

7         That I have made any corrections, additions, or

8    deletions that I was desirous of making;

9         That the foregoing is a true and correct

10   transcript of my testimony contained therein.

11        Executed this _____ day of _____, 2016,

12   at _____, California.

13

14

15                        _____

16                        JIMMIE RANDALL BROOKS

17

18

19

20

21

22

23

24

25

                                                        142

1   STATE OF CALIFORNIA        )
                              ) ss.
2   COUNTY OF KERN            )

3          I, Terri L. Haupt, CSR No. 6111, Certified

4   Shorthand Reporter, certify:

5          That the foregoing proceedings were taken

6   before me at the time and place therein set forth, at

7   which time the witness was put under oath by me;

8          That the testimony of the witness, the

9   questions propounded, and all objections and statements

10  made at the time of the examination were recorded

11  stenographically by me and were thereafter transcribed;

12         That the foregoing is a true and correct

13  transcript of my shorthand notes so taken.

14         I further certify that I am not a relative or

15  employee of any attorney of the parties, nor financially

16  interested in the action.

17         I declare under penalty of perjury under the

18  laws of California that the foregoing is true and

19  correct.

20         Dated this 27th day of January, 2016.

21

22

23

24         _____
                Terri L. Haupt, CSR No. 6111
25

143

Atkinson-Baker Court Reporters
www.depo.com

# EXHIBIT "B"

ALEXANDER B. TRUEBLOOD (Cal. Bar No. 150897)
TRUEBLOOD LAW FIRM
10940 Wilshire Boulevard, Suite 1600
Los Angeles, California 90024
Telephone: (310) 443-4139
Facsimile: (310) 943-2255

Attorneys for Plaintiff
JIMMIE BROOKS

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JIMMIE R. BROOKS,<br><br>      Plaintiff,<br><br>vs.<br><br>LEON'S QUALITY ADJUSTERS, INC., TONY RODRIGUEZ, and DOES 1 through 10, inclusive,<br><br>      Defendants. | Case No: 1:15−CV−00965−LJO−JLT<br><br>**FIRST AMENDED COMPLAINT FOR:**<br><br>**(1) VIOLATIONS OF THE FAIR DEBT COLLECTION PRACTICES ACT**<br><br>**(2) VIOLATIONS OF THE ROSENTHAL FAIR DEBT COLLECTION PRACTICES ACT**<br><br>**(3) CONVERSION** |

COMPLAINT

Plaintiff Jimmie Brooks hereby complains against defendants Leon's Quality Adjusters, Inc., Tony Rodriguez, and Does 1-10, and alleges on information and belief as follows:

**OPERATIVE FACTS**

1.     Plaintiff purchased an automobile on credit, which was financed by Gateway One Lending & Finance. Gateway took a security interest in the vehicle, which was collateral for the loan. Gateway alleged that plaintiff was in default on his agreement, and hired Leon's Quality Adjusters (or a repossession forwarder who hired Leon's Quality Adjusters) to repossess plaintiff's vehicle.

2.     Defendant Tony Rodriguez, an employee of Leon's Quality Adjusters, repossessed plaintiff's vehicle by entering the parking lot at plaintiff's workplace, which was secured and gated, without permission. Rodriguez breached the gate and drove into the lot, while being chased by security guards.  Before the security guards could reach him, he hooked up plaintiff's vehicle and fled the lot at high speed.  Accordingly, defendants breached the peace in the repossession of plaintiff's vehicle, in violation of Commercial Code § 9609 and the Collateral Recovery Act, Bus. & Prof. Code § 7508.2(d).

3.     Plaintiff followed Rodriguez out of the parking lot and caught up with him on the street.  Plaintiff had a right to collect his personal possessions in the vehicle, under the Collateral Recovery Act.  Rodriguez refused to permit plaintiff to remove his personal property and medication from the car, unless plaintiff handed over the keys to the vehicle. Needing his medication, plaintiff turned over the key. Defendants thereby committed the crime of extortion.

4.     Defendants damaged plaintiff's vehicle during or after the illegal repossession. Gateway One then submitted a claim on plaintiff's auto insurance policy, for the damage which defendants caused.

5.     As a result of defendants' illegal repossession in breach of the peace, plaintiff lost his vehicle permanently.

COMPLAINT

**JURISDICTION AND VENUE**

6.     The court has original jurisdiction over this matter pursuant to 15 U.S.C. § 1692k(d).  The court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

7.     Venue is proper in the Eastern District of California because a substantial part of the events or omissions giving rise to the claim occurred in this district, and defendants are subject to the court's personal jurisdiction in this district.

**PARTIES**

8.     Plaintiff is a natural person over the age of 18 years and is a resident of the state of California.

9.     Defendant Leon's Quality Adjusters, Inc. is a California corporation.

10.     Defendant Tony Rodriguez is an individual over the age of 18 years.

11.     Defendants Does 1 through 10 are persons or entities whose true names and capacities are presently unknown to plaintiff, and who therefore are sued by such fictitious names.   Plaintiff is informed and believes and thereon alleges that each of the fictitiously named defendants perpetrated some or all of the wrongful acts alleged herein, is responsible in some manner for the matters alleged herein, and is jointly and severally liable to plaintiff.  Plaintiff will seek leave of court to amend this complaint to state the true names and capacities of such fictitiously named defendants when ascertained.

12.     At all times mentioned herein, each defendant was the agent or employee of each of the other defendants and was acting within the course and scope of such agency or employment.  The defendants are jointly and severally liable to plaintiff.

COMPLAINT

62

1

2

**FIRST CAUSE OF ACTION**
**(Against All Defendants for Violations of the Fair Debt Collection Practices**
**Act, 15 U.S.C. § 1692 et seq.).**

3

4

13.     Plaintiff realleges and incorporates herein by reference the allegations of all paragraphs above.

5

6

7

8

14.     Plaintiff is a "consumer" who allegedly owed a "debt", and defendants are "debt collectors", as those terms are defined at 15 U.S.C. § 1692a.  Defendants use instrumentalities of interstate commerce or the mails in a business the principal purpose of which is the enforcement of security interests.

9

10

11

12

13

15.     Defendants violated 15 U.S.C. § 1692f(6) by taking nonjudicial action to effect dispossession or disablement of property when (1) there was no present right to possession of the property claimed as collateral through an enforceable security interest; and/or (2) the property was exempt by law from such dispossession or disablement.

14

15

16

16.     Defendants had no present right to repossess plaintiff's vehicle from a secured area without permission, but did so in violation of Commercial Code § 9609 and the Collateral Recovery Act, Bus. & Prof. Code § 7508.2(d).

17

18

19

17.     Plaintiff is entitled to any actual damages sustained by him as a result of defendants' conduct, in an amount according to proof, pursuant to 15 U.S.C. § 1692k.

20

21

22

23

24

18.     Plaintiff is entitled to statutory damages of $1,000 against each defendant, pursuant to 15 U.S.C. § 1692k.  Defendants have frequently and persistently failed to comply with the FDCPA, and have violated the FDCPA intentionally.  The nature of defendants' violations justifies the maximum statutory damages award available.

25

26

19.     Plaintiff is entitled to the costs of the action, together with a reasonable attorneys fee, pursuant to 15 U.S.C. § 1692k.

27

WHEREFORE, plaintiff prays for relief as set forth below.

28

COMPLAINT

### SECOND CAUSE OF ACTION
**(Against all Defendants for Violations of the Rosenthal Fair Debt Collection Practices Act, Cal. Civil Code § 1788 et seq.)**

20.     Plaintiff realleges and incorporates herein by reference the allegations of all paragraphs above.

21.     The California Legislature has found that "unfair or deceptive debt collection practices undermine the public confidence which is essential to the continued functioning of the banking and credit system and sound extensions of credit to consumers." Cal. Civ. Code § 1788.1(a)(2). It thus enacted the Rosenthal Fair Debt Collection Practices Act, Cal. Civ. Code §§ 1788, et seq. (the "Rosenthal Act"), to ensure the integrity of our banking and credit industry. Id. § 1788.1(b).

22.     Plaintiff is a "debtor" within the meaning of Civil Code § 1788.2(h) in that he is a natural person from whom defendants sought to collect a "consumer debt" alleged to be due and owing by reason of a consumer credit transaction. "Debt" is defined under the Rosenthal Act to mean "money, property or their equivalent which is due or owing or alleged to be due or owing from a natural person to another person." Civil Code § 1788.2(d).

23.     The defendants at all times relevant herein were "debt collectors" within the meaning of Civil Code § 1788.2(c), in that they regularly and in the ordinary course of business, on behalf of themselves or others, engage in acts and practices in connection with the collection of money or property which is due or alleged be due or owing by reason of a consumer credit transaction.

24.     Defendants violated Civil Code § 1788.10(a) by using criminal means to cause harm to the property of plaintiff. Defendants committed misdemeanors by violating Bus. & Prof. Code §§ 7502.1(a), and 7508.2(d). Defendants also committed extortion in violation of Penal Code §§ 518-520. As a result, plaintiff suffered damage, including losing his vehicle permanently.

25.     Defendants violated Civil Code § 1788.10(a) by using physical force to cause damage to plaintiff's vehicle.

COMPLAINT

26.     Defendants violated Civil Code § 1788.17, incorporating by reference 15 U.S.C. § 1692d, by engaging in conduct the natural consequence of which was to harass, oppress, or abuse plaintiff in connection with the collection of an alleged debt.

27.     Defendants violated Civil Code § 1788.17, incorporating by reference 15 U.S.C. § 1692e, by making false or misleading misrepresentations.

28.     Defendants violated Civil Code § 1788.17, incorporating by reference 15 U.S.C. § 1692f, by using unfair or unconscionable means to collect or attempt to collect an alleged debt.

29.     As a proximate result of defendants' violations of the Rosenthal Act, plaintiff has been damaged in amounts which are subject to proof. Plaintiff is entitled to recover actual damages pursuant to Civil Code § 1788.17, incorporating by reference 15 U.S.C. § 1692k(a)(1), or in the alternative, Civil Code § 1788.30(a).

30.     Defendants' violations of the Rosenthal Act were willful and knowing. Plaintiff is entitled to recover statutory damages of $1,000 per defendant pursuant to Civil Code § 1788.17, incorporating by reference 15 U.S.C. § 1692k(a)(2)(A), and Civil Code § 1788.30(b).

31.     Plaintiff is entitled to recover attorneys fees and costs pursuant to Civil Code § 1788.17, incorporating by reference 15 U.S.C. § 1692k(a)(3), or in the alternative, Civil Code § 1788.30(c).

WHEREFORE, plaintiff prays for relief as set forth below

### THIRD CAUSE OF ACTION
### (Against All Defendants For Conversion)

32.    Plaintiff realleges and incorporates herein by reference the allegations of all paragraphs above.

33.    Plaintiff was entitled to immediate possession of his vehicle when it was repossessed by defendants. Defendants were not entitled to breach of the peace in order to repossess the vehicle.

34.    Defendants wrongfully deprived plaintiff of possession of his vehicle by repossessing it without any present right to do so, in breach of the peace.

35.    Plaintiff has suffered and is entitled to recover damages for defendants' conversion.

36.    Defendants acted with malice, oppression, and/or fraud towards plaintiff within the meaning of Civil Code § 3294, thereby entitling him to an award of punitive damages. Defendants' corporate officers, directors, or managing agents are personally guilty of oppression, fraud or malice, had advance knowledge of the unfitness of the employees who acted towards plaintiff with malice, oppression, or fraud, employed such employees with conscious disregard for the rights or safety of others, and/or themselves authorized or ratified the wrongful conduct or knowingly accepted and retained the benefits of the wrongdoing.

WHEREFORE, plaintiff prays for relief as set forth below.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for the following relief:

1. For actual damages;

2. For statutory damages;

3. For punitive damages;

4. For pre-judgment interest to the extent permitted by law;

5. For an award of attorneys' fees, costs and expenses incurred in the investigation, filing and prosecution of this action; and

6. For such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury under the United States and California constitutions.


Dated:  December 21, 2015          Respectfully Submitted,
                                   TRUEBLOOD LAW FIRM



                                   By:  _____/s/_____
                                        Alexander B. Trueblood

                                   Attorneys for Plaintiff
                                   JIMMIE BROOKS

---

7                                          COMPLAINT

# EXHIBIT "C"

ORIGINAL

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA, BAKERSFIELD DIVISION

JIMMIE R. BROOKS,                    )
                                     )
            Plaintiff,               )
                                     )
     vs.                             )   Case No. 1:15-CV-00965-JLT
                                     )
LEON'S QUALITY ADJUSTERS,            )
INC., TONY RODRIGUEZ, and DOES )
through 10, inclusive,               )
                                     )
            Defendants.              )
_____)

VIDEOTAPED DEPOSITION OF LUIS ANTHONY RODRIGUEZ

Thursday, March 31, 2016

Bakersfield, California

1:05 p.m. - 3:36 p.m.

Reported by:  Patricia Kerchner, CSR No. 12017



**MAXENE WEINBERG AGENCY, INC.**

Litigation Support From Opening to Verdict

800-640-1949 | www.mwadepos.net

LUIS ANTHONY RODRIGUEZ - 3/31/2016

```
 1                        APPEARANCES
 2
 3
 4    For Plaintiff:      Trueblood Law Firm
                          By MR. ALEC TRUEBLOOD
 5                        Attorney at Law
                          10940 Wilshire Boulevard
 6                        Suite 1600
                          Los Angeles, California  90024
 7                        (310) 443-4139
                          alec@hush.com
 8
 9
10
11
      For Defendants:    Lewis Brisbois
12                       Bisgaard & Smith LLP
                         By MR. ANKUR TARNEJA
13                       Attorney at Law
                         633 West Fifth Street
14                       Suite 4000
                         Los Angeles, California  90071
15                       (213) 250-1800
                         Ankur.Tarneja@lewisbrisbois.com
16
17
18
19
      Also Present:      Leon Scroggins
20
21
22
23
      The Video          David Beniashvili
24    Technician:
25
```

Page 2

Maxene Weinberg Agency
(800) 640-1949

LUIS ANTHONY RODRIGUEZ - 3/31/2016

| | | |
|---|---|---|
| 1 | point, Leon's had accepted the case. | 14:22:42 |
| 2 | MR. TARNEJA:  Objection.  He's testified | 14:22:44 |
| 3 | he's never seen this before. | 14:22:46 |
| 4 | BY MR. TRUEBLOOD: | 14:22:46 |
| 5 | Q.  Did Leon's accept the assignment to | 14:22:47 |
| 6 | repossess my client's vehicle on April 16th, 2015? | 14:22:50 |
| 7 | A.  Yes. | 14:22:54 |
| 8 | Q.  Okay.  And then did you -- how did you learn | 14:22:55 |
| 9 | that you -- you had been -- you had been tasked to -- | 14:22:58 |
| 10 | to do this repossession? | 14:23:02 |
| 11 | A.  We have -- we ran our own areas here in | 14:23:06 |
| 12 | Bakersfield.  And Mr. Brooks, his area was -- well, | 14:23:13 |
| 13 | his address was in my area. | 14:23:21 |
| 14 | Q.  And -- and how did you get notified that you | 14:23:22 |
| 15 | had been given the -- this task? | 14:23:26 |
| 16 | A.  They -- the girls in the office -- Nicole, | 14:23:28 |
| 17 | she will print it out and put it in -- in my box. | 14:23:33 |
| 18 | Q.  Okay.  So what date did you get it in your | 14:23:37 |
| 19 | box? | 14:23:41 |
| 20 | A.  I can't recall.  I don't remember. | 14:23:41 |
| 21 | Q.  Is it normally the same day that -- that an | 14:23:43 |
| 22 | order comes in? | 14:23:47 |
| 23 | A.  Yes. | 14:23:47 |
| 24 | Q.  Okay. | 14:23:48 |
| 25 | MR. TARNEJA:  Counsel, could you clarify | 14:23:51 |

Page 65

LUIS ANTHONY RODRIGUEZ - 3/31/2016

| 1 | THE WITNESS:  This one.  It says:  Two-story | 14:26:25 |
| 2 | brick house with two car garage with windows. | 14:26:32 |
| 3 | BY MR. TRUEBLOOD: | 14:26:32 |
| 4 | Q.  Right. | 14:26:32 |
| 5 | A.  Unit was not located.  Our adjuster did not | 14:26:35 |
| 6 | attempt contact with the customer during the visit | 14:26:40 |
| 7 | because it is a -- the first field visit on this -- | 14:26:45 |
| 8 | on this account. | 14:26:49 |
| 9 | Our adjuster did not attempt contact with | 14:26:51 |
| 10 | the neighbors during the trip because it was the | 14:26:53 |
| 11 | first field run made on this account.  Our adjusters | 14:26:56 |
| 12 | had the following -- oh, man -- request on this one. | 14:27:02 |
| 13 | Q.  And it continues on the next page. | 14:27:06 |
| 14 | A.  Where is it at? | 14:27:07 |
| 15 | Q.  Page 8. | 14:27:09 |
| 16 | A.  Oh, this. | 14:27:10 |
| 17 | Q.  At the top. | 14:27:12 |
| 18 | A.  "Other Comments:  I run --" | 14:27:12 |
| 19 | Q.  Right. | 14:27:14 |
| 20 | A.  "-- the POE." | 14:27:16 |
| 21 | Q.  Right. | 14:27:16 |
| 22 | A.  Right. | 14:27:16 |
| 23 | Q.  So you wrote, "I run --" "I run POE today, | 14:27:16 |
| 24 | 4/17/15"? | 14:27:19 |
| 25 | A.  Right. | 14:27:20 |

Page 69

LUIS ANTHONY RODRIGUEZ - 3/31/2016

| | | |
|---|---|---|
| 1 | Q. And so you -- on -- on -- does this indicate | 14:27:20 |
| 2 | to you that on April 17th, you went to Silver Moon | 14:27:23 |
| 3 | Drive. You didn't see the unit. | 14:27:26 |
| 4 | A. Right. | 14:27:27 |
| 5 | Q. And you didn't make any attempt to contact | 14:27:28 |
| 6 | anyone -- | 14:27:32 |
| 7 | A. Contact -- | 14:27:32 |
| 8 | Q. -- is that right? | 14:27:33 |
| 9 | A. Right. | 14:27:34 |
| 10 | Q. Okay. And then the next action you took on | 14:27:35 |
| 11 | the account was the following day; right? | 14:27:39 |
| 12 | A. Correct. | 14:27:42 |
| 13 | Q. And what did you do on that day, April 18th? | 14:27:42 |
| 14 | A. That's this one right here (indicating)? | 14:27:49 |
| 15 | MR. TARNEJA: Yeah. Do you recall what -- | 14:27:51 |
| 16 | what you did, without reading this document? | 14:27:52 |
| 17 | THE WITNESS: Let's see. The next day, I | 14:27:55 |
| 18 | ran the account. I ran the home address. The unit | 14:27:57 |
| 19 | was not showing. There was tire marks indicating a | 14:28:03 |
| 20 | truck or some kind of vehicle was parking there. I | 14:28:09 |
| 21 | did make contact with a neighbor, and he did confirm | 14:28:17 |
| 22 | that there was a red, older Ford model parked at that | 14:28:20 |
| 23 | vehicle -- at that driveway. | 14:28:25 |
| 24 | BY MR. TRUEBLOOD: | 14:28:25 |
| 25 | Q. Okay. So you recall contacting the neighbor | 14:28:27 |

Page 70

LUIS ANTHONY RODRIGUEZ - 3/31/2016

| | | |
|---|---|---|
| 1 | but it's not in this entry -- right? -- or is that | 14:28:31 |
| 2 | later? | 14:28:35 |
| 3 | A.   That was the very next day. | 14:28:40 |
| 4 | Q.   Okay.  So let's just stick with this day, | 14:28:41 |
| 5 | which is April 18th.  You go by the home address and | 14:28:44 |
| 6 | then it says, "Run POE." | 14:28:50 |
| 7 | Does that mean you went by the place of | 14:28:52 |
| 8 | employment at Bolthouse Farms? | 14:28:54 |
| 9 | A.   Yes. | 14:28:55 |
| 10 | Q.   Okay.  So can you -- you -- did you write | 14:28:55 |
| 11 | these words, "Run POE, POE parking," et cetera, | 14:29:01 |
| 12 | et cetera? | 14:29:05 |
| 13 | A.   I did. | 14:29:05 |
| 14 | Q.   Okay.  Can you read that for us. | 14:29:05 |
| 15 | A.   On the 18th -- | 14:29:07 |
| 16 | Q.   On the -- | 14:29:07 |
| 17 | A.   -- or on the 17th.  I'm sorry. | 14:29:08 |
| 18 | Q.   On the 18th. | 14:29:09 |
| 19 | A.   On the 18th:  Ran account during the day and | 14:29:10 |
| 20 | night.  No unit showing.  No cars parked in the | 14:29:13 |
| 21 | driveway.  Tire marks do not go into the garage.  POE | 14:29:16 |
| 22 | parking -- | 14:29:22 |
| 23 | Q.   Run POE. | 14:29:22 |
| 24 | A.   Right, run POE. | 14:29:23 |
| 25 | -- is gated with security.  Cannot get in | 14:29:25 |

Page 71

LUIS ANTHONY RODRIGUEZ - 3/31/2016

| | | |
|---|---|---|
| 1 | the parking lot.  Big oleander trees in the way from | 14:29:28 |
| 2 | the street. | 14:29:31 |
| 3 | Q.  Okay.  So you physically drove by the place | 14:29:32 |
| 4 | of employment -- | 14:29:39 |
| 5 | A.  Right. | 14:29:39 |
| 6 | Q.  -- on that day; right? | 14:29:41 |
| 7 | A.  Right. | 14:29:42 |
| 8 | Q.  And where did you go as you drove by?  Did | 14:29:43 |
| 9 | you drive -- just drive by on Brundage? | 14:29:45 |
| 10 | A.  I was actually going home to eat dinner. | 14:29:47 |
| 11 | That's where I was going -- | 14:29:51 |
| 12 | Q.  Okay. | 14:29:51 |
| 13 | A.  -- when I went through the POE. | 14:29:52 |
| 14 | Q.  So tell me where did you go and what did you | 14:29:54 |
| 15 | see. | 14:29:57 |
| 16 | A.  Oleander trees, I know that, and then I seen | 14:30:00 |
| 17 | a security guard in -- with the golf cart.  That's | 14:30:05 |
| 18 | the only thing I seen.  I didn't go in or anything. | 14:30:08 |
| 19 | MR. TRUEBLOOD:  Okay.  Let me -- let me mark | 14:30:11 |
| 20 | as the next exhibit, Exhibit 3, a drawing of the -- | 14:30:16 |
| 21 | the Bolthouse Farms area. | 14:30:32 |
| 22 | (Plaintiff's Exhibit Number 3 | 14:30:32 |
| 23 | marked for identification.) | 14:30:32 |
| 24 | BY MR. TRUEBLOOD: | 14:30:32 |
| 25 | Q.  If you -- if you -- if you turn it so that | 14:30:39 |

Page 72

LUIS ANTHONY RODRIGUEZ - 3/31/2016

| 1 | "Brundage" can be read at the bottom, that's the | 14:30:41 |
| 2 | right -- the right aspect. | 14:30:44 |
| 3 | So did you drive along here on -- on | 14:30:45 |
| 4 | Brundage and see -- and -- and see the oleanders | 14:30:48 |
| 5 | there that were -- and the fencing along Brundage? | 14:30:52 |
| 6 | A. Right. | 14:30:56 |
| 7 | Q. Okay. And did you see this gate at the | 14:30:56 |
| 8 | lower left as well that first time you ran through? | 14:31:02 |
| 9 | A. This gate (indicating)? | 14:31:07 |
| 10 | Q. No. This gate here at the lower left where | 14:31:08 |
| 11 | it has an arrow pointing to it (indicating). | 14:31:11 |
| 12 | A. Oh, yes. Yes. | 14:31:13 |
| 13 | Q. You saw that? | 14:31:13 |
| 14 | A. Uh-huh. | 14:31:14 |
| 15 | Q. That's an exit gate; right? | 14:31:15 |
| 16 | A. Right. | 14:31:16 |
| 17 | Q. And it's a -- so it's a one-way exit gate; | 14:31:17 |
| 18 | right? | 14:31:20 |
| 19 | A. Right. | 14:31:20 |
| 20 | Q. And was the gate closed at that time? | 14:31:20 |
| 21 | A. Yes. | 14:31:22 |
| 22 | Q. As -- as you drove along Brundage, did you | 14:31:22 |
| 23 | notice any signage on the -- on the gate that has all | 14:31:24 |
| 24 | the oleander trees? | 14:31:29 |
| 25 | A. No. | 14:31:30 |

Page 73

Maxene Weinberg Agency
(800) 640-1949

LUIS ANTHONY RODRIGUEZ - 3/31/2016

```
 1        Q.   And then you drove by the entrance here on     14:31:31
 2   the right (indicating) to the Bolthouse Farms            14:31:35
 3   premises; right?                                         14:31:41
 4        A.   Right.                                         14:31:43
 5        Q.   Did you drive in here onto the premises        14:31:43
 6   (indicating)?                                            14:31:46
 7        A.   I did not.                                      14:31:47
 8        Q.   Okay.  Did you look -- did you look through    14:31:48
 9   the -- it's -- it's -- was it gated or was it open?      14:31:50
10        A.   It was open.                                   14:31:53
11        Q.   Okay.  Did you look in and see what was        14:31:53
12   there?                                                    14:31:57
13        A.   I did.                                          14:31:57
14        Q.   And you -- that's when you saw the security    14:31:58
15   guards and the golf cart?                                14:32:00
16        A.   Right.                                          14:32:02
17        Q.   And did you notice the security shacks?        14:32:02
18        A.   I did.                                          14:32:05
19        Q.   Did you notice any signage when you looked     14:32:05
20   inside the driveway?                                      14:32:11
21        A.   No, I did not.                                 14:32:12
22        Q.   And why did you drive by that night?          14:32:13
23        A.   I -- just to see if I spotted the vehicle     14:32:23
24   parked out on the street.                                14:32:27
25        Q.   And also to assess where you might repossess  14:32:28
```

Page 74

LUIS ANTHONY RODRIGUEZ - 3/31/2016

| | | |
|---|---|---|
| 1 | THE REPORTER:  One at a time, please. | 14:34:14 |
| 2 | THE WITNESS:  Excuse me?  Oh, one at a time. | 14:34:19 |
| 3 | THE REPORTER:  Wait for him. | 14:34:20 |
| 4 | THE WITNESS:  Okay. | 14:34:20 |
| 5 | BY MR. TRUEBLOOD: | 14:34:21 |
| 6 | Q.  And did you see the two gates by the | 14:34:21 |
| 7 | security shacks? | 14:34:23 |
| 8 | A.  Yes. | 14:34:24 |
| 9 | Q.  Can you mark where the security shacks are, | 14:34:24 |
| 10 | just in front of them, with a "D." | 14:34:27 |
| 11 | A.  (Witness complies.) | 14:34:34 |
| 12 | Q.  Then if you go left of your "D," you'll see | 14:34:34 |
| 13 | there's two arrows for the entrances into the | 14:34:37 |
| 14 | employee parking lot.  Do you see those? | 14:34:40 |
| 15 | A.  I do. | 14:34:41 |
| 16 | Q.  Did you notice that this was an employee | 14:34:41 |
| 17 | parking lot the first time you went by? | 14:34:44 |
| 18 | A.  I did. | 14:34:45 |
| 19 | Q.  Did you -- were you able to see the | 14:34:46 |
| 20 | direction of traffic for those two entrances? | 14:34:51 |
| 21 | A.  I did. | 14:34:54 |
| 22 | Q.  Did you notice that it was -- they were both | 14:34:55 |
| 23 | one-way entrances? | 14:34:57 |
| 24 | A.  Yes. | 14:34:58 |
| 25 | Q.  But you didn't -- did you see any signs -- | 14:34:59 |

Page 77

LUIS ANTHONY RODRIGUEZ - 3/31/2016

| | | |
|---|---|---|
| 1 | Q.  But you were able to see in when you looked | 14:36:52 |
| 2 | in the driveway? | 14:36:55 |
| 3 | A.  Yes. | 14:36:55 |
| 4 | Q.  Okay.  And you saw that that was an employee | 14:36:56 |
| 5 | parking lot? | 14:36:58 |
| 6 | A.  Yes. | 14:36:58 |
| 7 | Q.  And you saw that there was a two -- it was | 14:36:59 |
| 8 | two one-way entrances? | 14:37:02 |
| 9 | A.  Correct. | 14:37:03 |
| 10 | Q.  All right.  Did you talk to anybody that | 14:37:04 |
| 11 | first time you went by? | 14:37:10 |
| 12 | A.  I did not. | 14:37:11 |
| 13 | Q.  And you didn't drive into the driveway? | 14:37:12 |
| 14 | A.  No. | 14:37:15 |
| 15 | Q.  Okay.  So let's go to your next entry, | 14:37:15 |
| 16 | which -- which is on April 20th, 2015.  Tell me what | 14:37:41 |
| 17 | you did on that day. | 14:37:44 |
| 18 | A.  On the notes? | 14:37:47 |
| 19 | Q.  Well, you can use the notes to refresh your | 14:37:49 |
| 20 | recollection, but tell me what you -- you recollect. | 14:37:51 |
| 21 | A.  On Ap- -- April 20th, I did make contact at | 14:37:53 |
| 22 | the given address, and I did speak with a female.  I | 14:37:57 |
| 23 | asked for R.O., and she responded that nobody lives | 14:38:04 |
| 24 | here under that name. | 14:38:09 |
| 25 | Q.  So this was at Mr. Brooks' home? | 14:38:10 |

Page 80

LUIS ANTHONY RODRIGUEZ - 3/31/2016

| | | |
|---|---|---|
| 1 | A.   Right, correct. | 14:38:13 |
| 2 | Q.   And you had -- you did this -- you did that | 14:38:14 |
| 3 | run on -- actually, on April 19th -- right? -- but | 14:38:16 |
| 4 | you -- the entry is April 20th; is that correct? | 14:38:19 |
| 5 | A.   Correct, I believe. | 14:38:22 |
| 6 | Q.   Okay.  So April 19th about 8:15, you show up | 14:38:24 |
| 7 | at -- near my client's home.  You talk to a neighbor. | 14:38:28 |
| 8 | And what happens? | 14:38:35 |
| 9 | A.   That -- April 19th? | 14:38:37 |
| 10 | Q.   April 19th, yeah. | 14:38:38 |
| 11 | A.   Yes.  I did talk to the neighbor and, yes, | 14:38:40 |
| 12 | he said that there was an older model Ford truck, red | 14:38:42 |
| 13 | in color, parked at that address. | 14:38:46 |
| 14 | Q.   Okay.  And what else? | 14:38:48 |
| 15 | A.   That's pretty much -- I said, "Okay.  Thank | 14:38:53 |
| 16 | you." | 14:38:55 |
| 17 | Q.   Okay.  But this neighbor says they hadn't | 14:38:56 |
| 18 | seen it for like three weeks now; right? | 14:38:58 |
| 19 | A.   Correct. | 14:39:00 |
| 20 | Q.   So that's on April 19th.  And, then, correct | 14:39:01 |
| 21 | me if I'm wrong, but it's -- you have another entry | 14:39:06 |
| 22 | on April 20th.  You made another contact; right? | 14:39:10 |
| 23 | A.   Correct, at the given address. | 14:39:12 |
| 24 | Q.   Did you -- on April 19th, did you run the | 14:39:15 |
| 25 | place of employment again? | 14:39:18 |

Page 81

LUIS ANTHONY RODRIGUEZ - 3/31/2016

| | | |
|---|---|---|
| 1 | A.   On the 20th? | 14:39:19 |
| 2 | Q.   On the 19th. | 14:39:20 |
| 3 | A.   The 19th.  I don't believe so or I would | 14:39:21 |
| 4 | have wrote it in the notes. | 14:39:23 |
| 5 | Q.   So the next -- the next action you took on | 14:39:23 |
| 6 | this account was on April 20th; right? | 14:39:25 |
| 7 | A.   Correct. | 14:39:28 |
| 8 | Q.   And what did you do on April 20th? | 14:39:29 |
| 9 | A.   Made contact. | 14:39:29 |
| 10 | Q.   With who? | 14:39:30 |
| 11 | A.   With -- with a -- a female at the given | 14:39:31 |
| 12 | address and she said that nobody lives there under | 14:39:34 |
| 13 | that name. | 14:39:37 |
| 14 | Q.   Okay.  And when you went up and -- and made | 14:39:38 |
| 15 | the contact, what -- what was your intention? | 14:39:44 |
| 16 | A.   To talk to Mr. Brooks. | 14:39:47 |
| 17 | Q.   And what were you going to say to him? | 14:39:48 |
| 18 | A.   "I'm here for the vehicle." | 14:39:51 |
| 19 | Q.   And were you going to do what you testified | 14:39:52 |
| 20 | previously, that you would say, "I'm either going to | 14:39:57 |
| 21 | take your vehicle or you should contact your lender | 14:40:01 |
| 22 | to make a payment"? | 14:40:03 |
| 23 | A.   Correct. | 14:40:04 |
| 24 | Q.   But -- but the woman answers and she says | 14:40:05 |
| 25 | there's no one with that name living there. | 14:40:10 |

Page 82

Maxene Weinberg Agency
(800) 640-1949

LUIS ANTHONY RODRIGUEZ - 3/31/2016

| 1 | A.  Exactly. | 14:40:12 |
|---|---|---|
| 2 | Q.  Did you -- did you run the place of | 14:40:13 |
| 3 | employment on April 20th? | 14:40:16 |
| 4 | A.  I -- I didn't run it because I would have | 14:40:19 |
| 5 | done the notes. | 14:40:21 |
| 6 | Q.  Okay.  So what did you do next on the | 14:40:22 |
| 7 | account? | 14:40:26 |
| 8 | A.  I ran the POE. | 14:40:26 |
| 9 | Q.  And what day was that? | 14:40:28 |
| 10 | A.  The day of the repossession. | 14:40:32 |
| 11 | Q.  Okay.  Well, let's -- let's go back to the | 14:40:34 |
| 12 | next entry, April 22nd about 4:04 p.m.  Do you see | 14:40:36 |
| 13 | that one?  It says, "Please call debtor at | 14:40:42 |
| 14 | (661) 900-0537 to demand unit." | 14:40:44 |
| 15 | A.  Uh-huh. | 14:40:48 |
| 16 | Q.  Did you write that? | 14:40:49 |
| 17 | A.  No. | 14:40:50 |
| 18 | Q.  Who wrote that? | 14:40:50 |
| 19 | MR. TARNEJA:  If you know.  Do you know who | 14:40:51 |
| 20 | wrote it? | 14:40:54 |
| 21 | THE WITNESS:  I do not know who wrote it. | 14:40:55 |
| 22 | BY MR. TRUEBLOOD: | 14:40:56 |
| 23 | Q.  Did you see that note on that day? | 14:40:56 |
| 24 | A.  I did. | 14:40:59 |
| 25 | Q.  Okay.  And what -- what did you take that to | 14:40:59 |

Page 83

LUIS ANTHONY RODRIGUEZ - 3/31/2016

| | | |
|---|---|---|
| 1 | mean? | 14:41:02 |
| 2 | A. To call him. | 14:41:04 |
| 3 | Q. That you should call him? | 14:41:05 |
| 4 | A. Right, that I should call him. | 14:41:06 |
| 5 | Q. And did you call? | 14:41:07 |
| 6 | A. No, I did not. | 14:41:09 |
| 7 | Q. Why didn't you call? | 14:41:10 |
| 8 | A. Either I was too busy or I just didn't have | 14:41:11 |
| 9 | time to call him. | 14:41:14 |
| 10 | Q. Well, under the normal work environment, | 14:41:15 |
| 11 | who -- who puts in a note like this, to please call | 14:41:23 |
| 12 | the debtor? | 14:41:25 |
| 13 | A. I have no idea who puts that note. | 14:41:26 |
| 14 | Q. But it's something you get from your office? | 14:41:28 |
| 15 | A. Exactly. | 14:41:30 |
| 16 | Q. And it comes through on the RDN system? | 14:41:31 |
| 17 | A. (Witness nods head.) | 14:41:33 |
| 18 | Q. Is that right? | 14:41:34 |
| 19 | A. Yes. | 14:41:35 |
| 20 | Q. And it also says something here about a DRN | 14:41:35 |
| 21 | (sic) hit; right? | 14:41:39 |
| 22 | A. Correctly. | 14:41:39 |
| 23 | Q. What does it say about that? | 14:41:41 |
| 24 | A. On April 22nd? | 14:41:42 |
| 25 | Q. Yes. | 14:41:43 |

Page 84

LUIS ANTHONY RODRIGUEZ - 3/31/2016

| | | |
|---|---|---|
| 1 | A.   RDN hit. | 14:41:43 |
| 2 | Q.   Right. | 14:41:46 |
| 3 | MR. TARNEJA:  Do you want him to read -- | 14:41:46 |
| 4 | read the entry? | 14:41:47 |
| 5 | MR. TRUEBLOOD:  He can summarize it. | 14:41:47 |
| 6 | THE WITNESS:  The DRN (sic) hit vehicle, I | 14:41:50 |
| 7 | guess the time, the date, where it was hit -- | 14:41:51 |
| 8 | somebody -- somebody scanned it. | 14:41:57 |
| 9 | BY MR. TRUEBLOOD: | 14:41:58 |
| 10 | Q.   Okay.  So there -- there is a -- a location | 14:41:58 |
| 11 | hit for my client's vehicle; right? | 14:42:02 |
| 12 | A.   Not at this -- yes, there is.  There's the | 14:42:05 |
| 13 | GPS coordinates right here. | 14:42:08 |
| 14 | Q.   Okay.  So there's a location hit and then | 14:42:10 |
| 15 | you're seeing this on the system on -- on that day; | 14:42:11 |
| 16 | right? | 14:42:13 |
| 17 | A.   Correct. | 14:42:14 |
| 18 | Q.   And that's the home address that -- that | 14:42:14 |
| 19 | it -- | 14:42:14 |
| 20 | A.   Correct. | 14:42:14 |
| 21 | Q.   -- that it came back as the location; right? | 14:42:18 |
| 22 | A.   Correct. | 14:42:19 |
| 23 | Q.   And you -- you write that the coordinates | 14:42:21 |
| 24 | are the home address; right? | 14:42:26 |
| 25 | A.   Correct. | 14:42:27 |

Page 85

Maxene Weinberg Agency
(800) 640-1949

LUIS ANTHONY RODRIGUEZ - 3/31/2016

| | | |
|---|---|---|
| 1 | MR. TARNEJA:  Sorry.  Sorry.  Who wrote this | 14:42:28 |
| 2 | entry? | 14:42:29 |
| 3 | MR. TRUEBLOOD:  That's what I'm getting at. | 14:42:30 |
| 4 | MR. TARNEJA:  Oh, sorry.  Okay. | 14:42:31 |
| 5 | MR. TRUEBLOOD:  Yeah. | 14:42:31 |
| 6 | BY MR. TRUEBLOOD: | 14:42:31 |
| 7 | Q.  Did you write these words, "which is the | 14:42:32 |
| 8 | home address.  So they were covering for him"? | 14:42:35 |
| 9 | A.  No, I didn't write that. | 14:42:37 |
| 10 | Q.  Who -- who wrote that? | 14:42:38 |
| 11 | A.  I have no idea who wrote those. | 14:42:39 |
| 12 | Q.  Did you see those notes on April 22nd about | 14:42:41 |
| 13 | 4- -- 4:04 p.m.? | 14:42:44 |
| 14 | A.  I did not. | 14:42:45 |
| 15 | Q.  Well, this is a message to you, isn't it? | 14:42:46 |
| 16 | A.  Yes, it is. | 14:42:50 |
| 17 | Q.  So didn't you see the message? | 14:42:50 |
| 18 | A.  I -- I would have to log into his account | 14:42:53 |
| 19 | in order for me to see these -- these -- these -- you | 14:42:57 |
| 20 | know, the comments. | 14:43:00 |
| 21 | Q.  Uh-huh.  But did you get notified that -- | 14:43:01 |
| 22 | A.  I got notified, but I didn't read the -- the | 14:43:05 |
| 23 | notes. | 14:43:07 |
| 24 | Q.  All right.  So you got notified that there | 14:43:07 |
| 25 | was a hit; right? | 14:43:09 |

Page 86

LUIS ANTHONY RODRIGUEZ - 3/31/2016

| | | |
|---|---|---|
| 1 | A. Right. | 14:43:10 |
| 2 | Q. And you got notified where the hit was? | 14:43:10 |
| 3 | A. I got notified, but I did not read the -- | 14:43:13 |
| 4 | the notes. | 14:43:16 |
| 5 | Q. All right. So you didn't see these words -- | 14:43:16 |
| 6 | A. No. | 14:43:19 |
| 7 | Q. -- "which is the home address. So they were | 14:43:26 |
| 8 | covering for him"? | 14:43:29 |
| 9 | A. Right, I did not see it. | 14:43:29 |
| 10 | Q. Okay. When you got the hit, did you go to | 14:43:30 |
| 11 | the home address? | 14:43:30 |
| 12 | A. I did not. | 14:43:30 |
| 13 | Q. Why not? | 14:43:30 |
| 14 | A. I was probably tired that day. I didn't | 14:43:36 |
| 15 | want to do it. | 14:43:39 |
| 16 | Q. Okay. So this is about 4:00 in the | 14:43:39 |
| 17 | afternoon. | 14:43:44 |
| 18 | A. Right. | 14:43:44 |
| 19 | Q. It's the same day as the repossession; | 14:43:45 |
| 20 | right? | 14:43:45 |
| 21 | A. Right. | 14:43:48 |
| 22 | Q. And you repossessed my car around -- you | 14:43:48 |
| 23 | repossessed my client's car around 9:30 p.m. -- | 14:43:51 |
| 24 | right? -- | 14:43:51 |
| 25 | A. Right. | 14:43:56 |

Page 87

LUIS ANTHONY RODRIGUEZ - 3/31/2016

| | | |
|---|---|---|
| 1 | Q.  -- that day?  So that's about five hours or | 14:43:56 |
| 2 | so.  What -- what were you doing in that five hours? | 14:43:58 |
| 3 | A.  Running my other accounts.  That's what I | 14:44:00 |
| 4 | was doing. | 14:44:04 |
| 5 | Q.  Okay.  At the time you got this hit about | 14:44:05 |
| 6 | 4 -- 4 o'clock that day, had you decided that you | 14:44:12 |
| 7 | were going to try the place of employment that night | 14:44:15 |
| 8 | for my client? | 14:44:18 |
| 9 | A.  I thought about hitting the POE on my way | 14:44:21 |
| 10 | home. | 14:44:24 |
| 11 | Q.  At night? | 14:44:25 |
| 12 | A.  At night. | 14:44:26 |
| 13 | Q.  But you -- you decided that you needed to | 14:44:27 |
| 14 | call Mr. Leon before you made that decision; right? | 14:44:32 |
| 15 | A.  To make the repossession? | 14:44:37 |
| 16 | Q.  Right. | 14:44:38 |
| 17 | A.  Yes. | 14:44:39 |
| 18 | Q.  Okay.  And -- and the reason you -- you | 14:44:39 |
| 19 | wanted to call him was to get his authority to -- to | 14:44:43 |
| 20 | go into the -- the area that was guarded but not | 14:44:47 |
| 21 | gated; right? | 14:44:52 |
| 22 | A.  I wanted to make sure it was okay; that I | 14:44:54 |
| 23 | wasn't breaking any laws. | 14:44:57 |
| 24 | Q.  All right.  So what -- I take it, you had | 14:44:58 |
| 25 | some doubts whether -- whether or not you would be | 14:45:03 |

Page 88

LUIS ANTHONY RODRIGUEZ - 3/31/2016

| | | |
|---|---|---|
| 1 | repossession, how I planned it out or -- | 14:47:23 |
| 2 | Q.  No.  I'm thinking -- yeah, how you planned | 14:47:26 |
| 3 | it out before you did it. | 14:47:28 |
| 4 | A.  I parked my truck on Brundage Lane facing | 14:47:31 |
| 5 | west next to the oleander trees.  I got off my truck, | 14:47:37 |
| 6 | walked into the parking lot, and the first thing I | 14:47:47 |
| 7 | seen was a red lifted Ford (indicating). | 14:47:54 |
| 8 | MR. TARNEJA:  He's pointing at -- for the | 14:47:57 |
| 9 | record, he's pointing at the second entry to the | 14:47:58 |
| 10 | employee parking lot. | 14:48:00 |
| 11 | MR. TRUEBLOOD:  Okay. | 14:48:01 |
| 12 | THE WITNESS:  As I was walking to -- just | 14:48:02 |
| 13 | passing the first entrance, I was already looking for | 14:48:05 |
| 14 | a red vehicle. | 14:48:10 |
| 15 | BY MR. TRUEBLOOD: | 14:48:10 |
| 16 | Q.  Why don't you mark where you -- where you | 14:48:10 |
| 17 | saw the red vehicle.  This is moments before you | 14:48:13 |
| 18 | repossess it; right? | 14:48:18 |
| 19 | A.  Right. | 14:48:19 |
| 20 | Q.  Okay.  So why don't you mark with an "H" | 14:48:19 |
| 21 | where you -- where you saw the red vehicle. | 14:48:22 |
| 22 | A.  (Witness complies.) | 14:48:25 |
| 23 | Q.  Can I see?  Okay.  That's right in -- that's | 14:48:27 |
| 24 | right in the middle.  That's not in the parking. | 14:48:33 |
| 25 | That's right in the middle. | 14:48:35 |

Page 91

LUIS ANTHONY RODRIGUEZ - 3/31/2016

| | | |
|---|---|---|
| 1 | A.   I was walking. | 14:48:36 |
| 2 | Q.   That's where you were? | 14:48:37 |
| 3 | A.   (Witness nods.) | 14:48:38 |
| 4 | Q.   Okay.  But I want you to mark -- we're going | 14:48:39 |
| 5 | to say that the "H" is where you were; right? | 14:48:41 |
| 6 | A.   (Witness nods.) | 14:48:45 |
| 7 | Q.   You were physically standing without your | 14:48:45 |
| 8 | vehicle.  Let's -- let's mark with an "I" where you | 14:48:47 |
| 9 | saw the red car. | 14:48:51 |
| 10 | A.   (Witness complies.) | 14:48:53 |
| 11 | Q.   Okay.  Did you -- did you plan to enter | 14:48:56 |
| 12 | one -- one -- either the driveway where you were | 14:49:06 |
| 13 | standing or the other driveway where it was parked? | 14:49:08 |
| 14 | Which one were you planning to use? | 14:49:10 |
| 15 | A.   I was -- this -- the second one | 14:49:12 |
| 16 | (indicating). | 14:49:19 |
| 17 | Q.   The second one. | 14:49:19 |
| 18 | Now, the -- the -- the written statements by | 14:49:21 |
| 19 | the guards state that you didn't use the second one. | 14:49:27 |
| 20 | You used the first one; is that correct? | 14:49:30 |
| 21 | A.   Incorrect. | 14:49:33 |
| 22 | Q.   You entered the second driveway? | 14:49:33 |
| 23 | A.   Second driveway. | 14:49:35 |
| 24 | Q.   Okay.  And you -- you -- you entered, and | 14:49:36 |
| 25 | then did you leave through that same driveway? | 14:49:44 |

Page 92

LUIS ANTHONY RODRIGUEZ - 3/31/2016

| | | | |
|---|---|---|---|
| 1 | A. | I did. | 14:49:46 |
| 2 | Q. | So you came out again, passed the guard | 14:49:46 |
| 3 | shack, and made a right and -- and exited Bolthouse | | 14:49:51 |
| 4 | Farms? | | 14:49:54 |
| 5 | A. | Yes. | 14:49:54 |
| 6 | Q. | Okay.  And that was the wrong way on the -- | 14:49:54 |
| 7 | it was against traffic; right? | | 14:49:59 |
| 8 | A. | Correct. | 14:50:00 |
| 9 | Q. | Why did you leave against traffic? | 14:50:00 |
| 10 | A. | Easier access, faster. | 14:50:03 |
| 11 | Q. | Why did you want to be faster? | 14:50:05 |
| 12 | A. | I didn't want to breach the peace. | 14:50:09 |
| 13 | Q. | You didn't want the security guards catching | 14:50:11 |
| 14 | up to you? | | 14:50:13 |
| 15 | A. | (Witness nods.) | 14:50:15 |
| 16 | Q. | Is that right? | 14:50:15 |
| 17 | A. | Correct. | 14:50:16 |
| 18 | Q. | Did you see any security guards on the way | 14:50:16 |
| 19 | in? | | 14:50:19 |
| 20 | A. | I did not. | 14:50:19 |
| 21 | Q. | Did you see any security guards on the way | 14:50:20 |
| 22 | out? | | 14:50:22 |
| 23 | A. | I did not. | 14:50:22 |
| 24 | Q. | Did you make eye contact with anyone? | 14:50:23 |
| 25 | A. | Nobody. | 14:50:26 |

Page 93

LUIS ANTHONY RODRIGUEZ - 3/31/2016

| | | |
|---|---|---|
| 1 | A.  Correct. | 14:51:25 |
| 2 | Q.  You didn't have permission from anyone at | 14:51:26 |
| 3 | Bolthouse Farms to enter, did you? | 14:51:28 |
| 4 | A.  Correct. | 14:51:29 |
| 5 | Q.  Now, on this day of the repossession, did | 14:51:30 |
| 6 | you notice any signs? | 14:51:38 |
| 7 | A.  I did not. | 14:51:39 |
| 8 | Q.  Did you see anyone in the guard shack? | 14:51:40 |
| 9 | A.  I did not. | 14:51:46 |
| 10 | Q.  How long did it take you to -- to hook up | 14:51:47 |
| 11 | the vehicle? | 14:51:54 |
| 12 | A.  Less than a minute. | 14:51:55 |
| 13 | Q.  So for -- and then how long did it take you | 14:51:56 |
| 14 | to leave, seconds? | 14:51:59 |
| 15 | A.  Seconds. | 14:52:01 |
| 16 | Q.  So after you -- after you walked in and | 14:52:02 |
| 17 | scouted on foot, then you went back to your tow truck | 14:52:06 |
| 18 | that was parked out on Brundage; right? | 14:52:11 |
| 19 | A.  Correct. | 14:52:11 |
| 20 | Q.  And you started up the engine and drove in; | 14:52:14 |
| 21 | right? | 14:52:14 |
| 22 | A.  At that point, when I went back to my truck, | 14:52:19 |
| 23 | that's when I called Mr. Leon. | 14:52:22 |
| 24 | Q.  All right.  Then how long was your | 14:52:24 |
| 25 | conversation with Mr. Leon? | 14:52:25 |

Page 95

Maxene Weinberg Agency
(800) 640-1949

LUIS ANTHONY RODRIGUEZ - 3/31/2016

| | | |
|---|---|---|
| 1 | A.   Less than five minutes. | 14:52:27 |
| 2 | Q.   Okay.  And tell me again -- I mean, that | 14:52:28 |
| 3 | five minutes is a fairly long conversation.  What -- | 14:52:33 |
| 4 | what do you recollect about that conversation that | 14:52:37 |
| 5 | you haven't told me. | 14:52:38 |
| 6 | A.   That's why I said less than five minutes | 14:52:40 |
| 7 | because I just told him, "This is the way it is. | 14:52:42 |
| 8 | This is what I'm seeing.  What should I do?" | 14:52:45 |
| 9 | Q.   Okay.  So you told him you -- you told him | 14:52:48 |
| 10 | you had seen security shacks and security guards; | 14:52:50 |
| 11 | right? | 14:52:54 |
| 12 | MR. TARNEJA:  Objection.  He didn't state | 14:52:54 |
| 13 | that he saw a security shack -- security guards. | 14:52:56 |
| 14 | BY MR. TRUEBLOOD: | 14:52:56 |
| 15 | Q.   Did you -- did you tell him that there were | 14:52:59 |
| 16 | security guards there? | 14:53:00 |
| 17 | A.   Did I tell him? | 14:53:01 |
| 18 | Q.   Yes. | 14:53:02 |
| 19 | A.   I didn't tell him there was security guards. | 14:53:02 |
| 20 | I told him there's a security shack. | 14:53:05 |
| 21 | Q.   Okay.  Up until this time when you're having | 14:53:07 |
| 22 | the conversation, had you seen any security guards | 14:53:11 |
| 23 | other than the one in the cart? | 14:53:13 |
| 24 | A.   No, I did not. | 14:53:14 |
| 25 | Q.   You had -- you had seen the one in the cart | 14:53:15 |

Page 96

LUIS ANTHONY RODRIGUEZ - 3/31/2016

| | | |
|---|---|---|
| 1 | before; right? | 14:53:17 |
| 2 | A.   The first time I ran the POE. | 14:53:17 |
| 3 | Q.   Right. | 14:53:19 |
| 4 | A.   Yeah. | 14:53:20 |
| 5 | Q.   Did you tell Mr. Leon that you had seen a | 14:53:20 |
| 6 | security guard that time? | 14:53:22 |
| 7 | A.   I did not. | 14:53:23 |
| 8 | Q.   You told him you had seen the security | 14:53:24 |
| 9 | shack, though? | 14:53:27 |
| 10 | A.   Correct. | 14:53:27 |
| 11 | Q.   You didn't discuss any signage? | 14:53:28 |
| 12 | A.   Correct. | 14:53:31 |
| 13 | Q.   So what did you ask him, actually? | 14:53:31 |
| 14 | A.   I asked him, "This is what I'm seeing," and | 14:53:35 |
| 15 | he asked me, "Have you VIN'ed the vehicle?  Are you | 14:53:40 |
| 16 | sure that's the vehicle?"  And I told him "Yes." | 14:53:46 |
| 17 | "Are the gates open?"  "Yes."  "If you could hook | 14:53:50 |
| 18 | it --" "If you can get that unit before they stop | 14:53:52 |
| 19 | you, go ahead and take it." | 14:53:55 |
| 20 | Q.   Okay.  Did you tell him that in order to -- | 14:54:00 |
| 21 | well, you knew that the -- the correct exit, | 14:54:05 |
| 22 | actually, the one where -- if you were following | 14:54:08 |
| 23 | traffic, was down here on Brundage (indicating); | 14:54:10 |
| 24 | right? | 14:54:11 |
| 25 | A.   Correct. | 14:54:12 |

Page 97

Maxene Weinberg Agency
(800) 640-1949

LUIS ANTHONY RODRIGUEZ - 3/31/2016

| | | |
|---|---|---|
| 1 | A.  Right here, "J" (indicating). | 14:57:39 |
| 2 | Q.  Okay.  So -- and then mark with a "J1" the | 14:57:45 |
| 3 | other places where you saw people -- "J1," "J2." | 14:57:48 |
| 4 | A.  Okay.  Right here, 1, 2 (indicating). | 14:57:54 |
| 5 | Q.  And did you see people going in -- in and | 14:57:59 |
| 6 | out of these gates near the guard -- guard shacks? | 14:58:01 |
| 7 | A.  Yes. | 14:58:04 |
| 8 | Q.  Okay.  So mark that with a "J3." | 14:58:04 |
| 9 | A.  (Witness complies.) | 14:58:04 |
| 10 | Q.  There were other people there too; right? | 14:58:10 |
| 11 | A.  Correct. | 14:58:12 |
| 12 | Q.  And were they -- were they passing along in | 14:58:12 |
| 13 | front of these two entrances and to the parking lot? | 14:58:14 |
| 14 | A.  They were going this way (indicating). | 14:58:17 |
| 15 | Q.  Okay.  Mark that with a "J4." | 14:58:20 |
| 16 | A.  (Witness complies.) | 14:58:20 |
| 17 | MR. TRUEBLOOD:  For the record, he's -- he's | 14:58:22 |
| 18 | drawn a line between "J3" and "J4" to show where the | 14:58:24 |
| 19 | people were walking. | 14:58:27 |
| 20 | BY MR. TRUEBLOOD: | 14:58:27 |
| 21 | Q.  Okay.  And that's right where you | 14:58:28 |
| 22 | repossessed the truck, isn't it? | 14:58:30 |
| 23 | A.  Correct. | 14:58:31 |
| 24 | Q.  And you're sure you -- you saw nobody trying | 14:58:32 |
| 25 | to stop you? | 14:58:42 |

Page 101

Maxene Weinberg Agency
(800) 640-1949

| | | | |
|---|---|---|---|
| 1 | A. | A hundred percent. | 14:58:42 |
| 2 | Q. | You saw nobody running behind you? | 14:58:44 |
| 3 | A. | A hundred percent. | 14:58:48 |
| 4 | Q. | Did anybody call out to you? | 14:58:49 |
| 5 | A. | I didn't hear nothing. | 14:58:51 |
| 6 | Q. | Did anybody point at you? | 14:58:53 |
| 7 | A. | No. | 14:58:56 |
| 8 | Q. | Did you think you were being followed by | 14:58:57 |
| 9 | security guards? | | 14:59:03 |
| 10 | A. | No. | 14:59:04 |
| 11 | Q. | And how much time from the time you drove | 14:59:04 |
| 12 | into Bolthouse Farms until the time you left at Point | | 14:59:19 |
| 13 | C did -- was it?  How much time elapsed? | | 14:59:24 |
| 14 | A. | Less than a minute. | 14:59:27 |
| 15 | Q. | So -- so where did you go with the truck, my | 14:59:28 |
| 16 | client's truck, after the repossession? | | 14:59:44 |
| 17 | A. | I went east on Brundage. | 14:59:48 |
| 18 | Q. | And where specifically? | 14:59:50 |
| 19 | A. | East passing the railroad tracks to your | 14:59:53 |
| 20 | first right, which a building right there was under | | 14:59:58 |
| 21 | construction, and I parked right next to that | | 15:00:02 |
| 22 | building on -- just south of Brundage. | | 15:00:09 |
| 23 | Q. | Why didn't you go to the tow yard? | 15:00:12 |
| 24 | A. | Because I haven't put -- I didn't put my | 15:00:21 |
| 25 | chains or my straps on or my lights, my running | | 15:00:24 |

Page 102

LUIS ANTHONY RODRIGUEZ - 3/31/2016

| | | |
|---|---|---|
| 1 | lights. | 15:00:28 |
| 2 | Q.   Okay.   And why hadn't you done that? | 15:00:28 |
| 3 | A.   Because I just hooked and booked. | 15:00:30 |
| 4 | Q.   You needed to make it as quick as possible | 15:00:32 |
| 5 | so that you wouldn't be confronted by security | 15:00:35 |
| 6 | guards? | 15:00:37 |
| 7 | A.   Exactly. | 15:00:37 |
| 8 | Q.   Was there a particular establishment where | 15:00:38 |
| 9 | you stopped? | 15:00:46 |
| 10 | A.   "Establishment," meaning what? | 15:00:50 |
| 11 | Q.   A business. | 15:00:52 |
| 12 | A.   There was a business.   The business is -- | 15:00:54 |
| 13 | it's up and running now. | 15:00:57 |
| 14 | Q.   Do you recall what it's called? | 15:00:58 |
| 15 | A.   I think it's called Cox Petroleum. | 15:00:59 |
| 16 | Q.   Okay.   So you're -- you're putting on the | 15:01:03 |
| 17 | chains and the other gear; right?   And is that when | 15:01:06 |
| 18 | my client appears? | 15:01:09 |
| 19 | A.   No. | 15:01:10 |
| 20 | Q.   Okay.   So you're at that location.   Did you | 15:01:10 |
| 21 | stay there or did you go to another location? | 15:01:13 |
| 22 | A.   I went to another location. | 15:01:15 |
| 23 | Q.   Where did you go? | 15:01:16 |
| 24 | A.   I went -- kept going east on Brundage, just | 15:01:17 |
| 25 | passing the 184 next to a Subway, inside a | 15:01:20 |

Page 103

Maxene Weinberg Agency
(800) 640-1949

LUIS ANTHONY RODRIGUEZ - 3/31/2016

| | | |
|---|---|---|
| 1 | steering wheel still locks automatically, but I still | 15:02:35 |
| 2 | like to secure the vehicle.  And that's when I put my | 15:02:38 |
| 3 | running lights and my chains.  I had put my straps | 15:02:42 |
| 4 | already. | 15:02:46 |
| 5 | Q.  So you put the running lights and the chains | 15:02:46 |
| 6 | at the second location? | 15:02:51 |
| 7 | A.  Correctly. | 15:02:52 |
| 8 | Q.  And you unlocked the steering wheel, made | 15:02:53 |
| 9 | sure it was unlocked? | 15:02:56 |
| 10 | A.  The steering wheel was already locked.  I | 15:02:57 |
| 11 | just double secured it with the seat belt. | 15:02:59 |
| 12 | Q.  Okay.  And is it at that location, at the | 15:03:01 |
| 13 | Subway, where my client appeared? | 15:03:05 |
| 14 | A.  As I was leaving. | 15:03:06 |
| 15 | Q.  When did you make the report of repossession | 15:03:07 |
| 16 | to the police? | 15:03:11 |
| 17 | A.  As soon as -- no -- no more than 15 minutes. | 15:03:11 |
| 18 | Q.  After the repossession? | 15:03:18 |
| 19 | A.  Correct. | 15:03:19 |
| 20 | Q.  Was it while you were at the Subway? | 15:03:20 |
| 21 | A.  Yes. | 15:03:23 |
| 22 | Q.  Well, when you -- when you went in and got | 15:03:23 |
| 23 | the car, some people must have seen you; right? | 15:03:46 |
| 24 | A.  Correct. | 15:03:46 |
| 25 | Q.  A lot of people saw you because it was a | 15:03:49 |

Page 105

LUIS ANTHONY RODRIGUEZ - 3/31/2016

| | | |
|---|---|---|
| 1 | shift change; right? | 15:03:52 |
| 2 | A.  Correct. | 15:03:52 |
| 3 | Q.  Did any of those people that you saw make | 15:03:53 |
| 4 | any gestures to you or speak to you? | 15:04:07 |
| 5 | A.  No. | 15:04:10 |
| 6 | Q.  Nobody said, "Hey, what are you doing?" | 15:04:10 |
| 7 | A.  No. | 15:04:15 |
| 8 | Q.  So what happened when Mr. Brooks arrived at | 15:04:16 |
| 9 | the Subway location? | 15:04:22 |
| 10 | A.  He actually arrived with his colleague.  I | 15:04:25 |
| 11 | don't remember this guy's name.  But as I was leaving | 15:04:29 |
| 12 | the cul-de-sac, he -- his car went in front of my | 15:04:35 |
| 13 | truck, which made me slam my brakes. | 15:04:39 |
| 14 | And his colleague said, "Hey, that's my | 15:04:43 |
| 15 | truck."  And I asked him, "Who are you?"  And he | 15:04:48 |
| 16 | says, "Jimmie Brooks."  And I said, "Who?" | 15:04:53 |
| 17 | At that time, I noticed the gentleman | 15:04:57 |
| 18 | getting out of the passenger's side with his | 15:05:00 |
| 19 | cell phone on -- on -- talking on some -- you know, | 15:05:02 |
| 20 | talking.  He came to my window and he said, "I'm | 15:05:04 |
| 21 | Jimmie Brooks."  And I said, "Well, he just said that | 15:05:09 |
| 22 | he was Jimmie Brooks."  And he's all like, "No.  No. | 15:05:11 |
| 23 | No.  I am." | 15:05:13 |
| 24 | At that time that he was talking, he was | 15:05:16 |
| 25 | talking to the sheriff's stating, "Oh, it's in back | 15:05:17 |

Page 106

LUIS ANTHONY RODRIGUEZ - 3/31/2016

| | | |
|---|---|---|
| 1 | of the --" "It's --" "It's being repossessed. It's | 15:05:23 |
| 2 | in back of a tow truck. It's not stolen." That's -- | 15:05:24 |
| 3 | that's what Jimmie said. | 15:05:29 |
| 4 | And he asked me, "Can I get my property?" | 15:05:30 |
| 5 | And I said, "Yes. Let me just pull off to the side, | 15:05:33 |
| 6 | that way you could get your property." | 15:05:36 |
| 7 | Q. Did you tell Mr. Brooks, "You can have your | 15:05:38 |
| 8 | property if you give me the key to your car?" | 15:05:42 |
| 9 | A. I did not. | 15:05:44 |
| 10 | Q. Did you talk about the key with Mr. Brooks? | 15:05:44 |
| 11 | A. After he got his property. | 15:05:47 |
| 12 | Q. What was said about the key at that point? | 15:05:49 |
| 13 | A. I just asked him, "Can I have the key. It's | 15:05:51 |
| 14 | a lot easier for me to move your car around --" | 15:05:54 |
| 15 | "-- your truck around." | 15:05:56 |
| 16 | Q. And it's your testimony that that occurred | 15:05:57 |
| 17 | after he got his personal possessions? | 15:05:59 |
| 18 | A. Yes. | 15:06:02 |
| 19 | Q. Did the other person, who was with | 15:06:02 |
| 20 | Mr. Brooks, witness that conversation about the key? | 15:06:05 |
| 21 | A. I don't know if he was there. I know he was | 15:06:11 |
| 22 | taking stuff out of the truck to put in the car. | 15:06:13 |
| 23 | Q. He was assisting Mr. Brooks? | 15:06:16 |
| 24 | A. Yes. | 15:06:17 |
| 25 | Q. But you don't know one way or another | 15:06:17 |

Page 107

LUIS ANTHONY RODRIGUEZ - 3/31/2016

| | | |
|---|---|---|
| 1 | Q.   And you wanted to be there when the police, | 15:07:21 |
| 2 | if they were called, came; right? | 15:07:26 |
| 3 | A.   Well, yes.   I mean.... | 15:07:29 |
| 4 | Q.   Okay.   So you stopped near the location of | 15:07:32 |
| 5 | the repossession? | 15:07:34 |
| 6 | A.   Right. | 15:07:35 |
| 7 | Q.   Was there anything else said between you and | 15:07:36 |
| 8 | Mr. Brooks at that spot by the Subway that you | 15:07:43 |
| 9 | haven't told me? | 15:07:46 |
| 10 | A.   Yes. | 15:07:46 |
| 11 | Q.   What? | 15:07:47 |
| 12 | A.   I asked Mr. Brooks -- I noticed that there | 15:07:47 |
| 13 | was a tan box, metal box, underneath the backseat.   I | 15:07:51 |
| 14 | kind of figured it was a gun, and I told Mr. Brooks, | 15:07:58 |
| 15 | "Is that a gun?"   And he said, "Yes."   And I told | 15:08:01 |
| 16 | him, "You're not going to use it on me?"   And he | 15:08:04 |
| 17 | said, "No.   You're cool." | 15:08:06 |
| 18 | Q.   How could he use it if it was in a box? | 15:08:07 |
| 19 | A.   He has a key. | 15:08:10 |
| 20 | Q.   Well, you didn't feel threatened by | 15:08:11 |
| 21 | Mr. Brooks, did you? | 15:08:15 |
| 22 | A.   I didn't but once I seen that he was | 15:08:15 |
| 23 | reaching for that box, that's when I told him. | 15:08:17 |
| 24 | Q.   Did he reach -- reach for the box before you | 15:08:20 |
| 25 | discussed the box or af- -- or was that after? | 15:08:23 |

Page 109

LUIS ANTHONY RODRIGUEZ - 3/31/2016

| | | |
|---|---|---|
| 1 | they'll find you right away instead of going through | 15:09:16 |
| 2 | your name.  And, besides, you have tools in the back | 15:09:19 |
| 3 | of your tool truck --" "-- in" "-- in" "-- in your | 15:09:22 |
| 4 | truck.  You want to get those out?"  He stated, "No. | 15:09:24 |
| 5 | I'm getting my vehicle out anyways." | 15:09:27 |
| 6 | Q.  He stated -- he stated that -- | 15:09:29 |
| 7 | A.  He's going to -- he's going to get his | 15:09:34 |
| 8 | vehicle -- he's going to get his vehicle out anyways | 15:09:37 |
| 9 | so he didn't have the need to take those tools out of | 15:09:38 |
| 10 | that toolbox. | 15:09:41 |
| 11 | Q.  I see.  So the tools were left in the car? | 15:09:42 |
| 12 | A.  Exactly. | 15:09:44 |
| 13 | Q.  Okay.  Anything else that was said that | 15:09:44 |
| 14 | night between you and Mr. Brooks? | 15:09:47 |
| 15 | A.  No, sir. | 15:09:48 |
| 16 | Q.  How about between you and the other man? | 15:09:48 |
| 17 | A.  No, just a handshake. | 15:09:53 |
| 18 | Q.  And did you hear -- overhear anything -- you | 15:09:54 |
| 19 | shook hands with him? | 15:09:58 |
| 20 | A.  Yes. | 15:09:59 |
| 21 | Q.  Why? | 15:09:59 |
| 22 | A.  Shook hands with Mr. Brooks and the other | 15:10:00 |
| 23 | guy. | 15:10:02 |
| 24 | Q.  Okay.  After everything was concluded? | 15:10:02 |
| 25 | A.  Yes. | 15:10:05 |

Page 111

LUIS ANTHONY RODRIGUEZ - 3/31/2016

| | | |
|---|---|---|
| 1 | Q.  Did -- did you overhear any conversations | 15:10:06 |
| 2 | between Mr. Brooks and the other man? | 15:10:11 |
| 3 | A.  I did not. | 15:10:13 |
| 4 | Q.  What did you overhear Mr. Brooks saying on | 15:10:13 |
| 5 | the phone to the sheriff? | 15:10:20 |
| 6 | A.  Stating, "It's not stolen.  It's behind a | 15:10:23 |
| 7 | tow truck.  It's being repossessed." | 15:10:27 |
| 8 | Q.  Did you think the police were coming at that | 15:10:29 |
| 9 | point? | 15:10:31 |
| 10 | A.  Once they say, "It's repossessed," no. | 15:10:32 |
| 11 | MR. TRUEBLOOD:  All right.  Let's take a | 15:10:40 |
| 12 | little break there. | 15:10:41 |
| 13 | MR. TARNEJA:  Off the record. | 15:10:43 |
| 14 | THE VIDEOGRAPHER:  Going off the record at | 15:10:45 |
| 15 | 3:10 p.m. | 15:10:47 |
| 16 | (Recess taken.) | 15:20:20 |
| 17 | THE VIDEOGRAPHER:  Back on the record at | 15:20:20 |
| 18 | 3:21 p.m. | 15:21:04 |
| 19 | BY MR. TRUEBLOOD: | 15:21:06 |
| 20 | Q.  Did you call Mr. Leon after the repossession | 15:21:08 |
| 21 | of Mr. Brooks' vehicle? | 15:21:10 |
| 22 | A.  I did. | 15:21:11 |
| 23 | Q.  And tell me what happened in that | 15:21:12 |
| 24 | conversation. | 15:21:14 |
| 25 | A.  I just called him to tell him that I got the | 15:21:15 |

Page 112

LUIS ANTHONY RODRIGUEZ - 3/31/2016

| | | |
|---|---|---|
| 1 | vehicle -- | 15:21:19 |
| 2 | Q.   How long -- | 15:21:19 |
| 3 | A.   -- without any breach of the peace. | 15:21:21 |
| 4 | Q.   How long did the conversation go on? | 15:21:22 |
| 5 | A.   Less than a minute. | 15:21:24 |
| 6 | Q.   You wanted to reassure him that there had | 15:21:25 |
| 7 | been no breach of the peace? | 15:21:29 |
| 8 | A.   Correct. | 15:21:30 |
| 9 | Q.   What did he say to you? | 15:21:30 |
| 10 | A.   "Good job." | 15:21:33 |
| 11 | Q.   That was it? | 15:21:33 |
| 12 | A.   That was it. | 15:21:35 |
| 13 | Q.   Did he ask you any details about the | 15:21:36 |
| 14 | repossession? | 15:21:38 |
| 15 | A.   No. | 15:21:39 |
| 16 | Q.   When you said that there had not been a | 15:21:39 |
| 17 | breach of the peace to Mr. Leon, what -- what did you | 15:21:45 |
| 18 | mean? | 15:21:47 |
| 19 | A.   Cops -- police being called out or any kind | 15:21:53 |
| 20 | of confrontations or -- or -- or fights with the | 15:21:58 |
| 21 | R.O., which is the registered owner. | 15:22:03 |
| 22 | Q.   Is that basically what you were trained | 15:22:08 |
| 23 | regarding what a breach of the peace is? | 15:22:14 |
| 24 | A.   Yes. | 15:22:16 |
| 25 | Q.   Not other things but those things? | 15:22:16 |

Page 113

LUIS ANTHONY RODRIGUEZ - 3/31/2016

```
 1    STATE OF CALIFORNIA  )
                           )  ss.
 2    COUNTY OF KERN       )

 3

 4          I, LUIS ANTHONY RODRIGUEZ, do hereby
 5    certify:
 6          That I have read the foregoing deposition;
 7          That I have made such changes in form and/or
 8    substance to the within deposition as might be
 9    necessary to render the same true and correct;
10          That having made such changes thereon, I
11    hereby subscribe my name to the deposition.
12          I declare, under penalty of perjury, that
13    the foregoing is true and correct.
14          Executed this _____ day of _____,
15    2016, at _____, California.
16

17

18                  _____
19                      LUIS ANTHONY RODRIGUEZ
20

21

22

23

24

25
```

Page 127

128

1  STATE OF CALIFORNIA )
                       )  ss.
2  COUNTY OF KERN      )

3

4        I, Patricia Kerchner, a Certified Shorthand

5  Reporter in the State of California, holding

6  Certificate No. 12017, do hereby certify that

7  LUIS ANTHONY RODRIGUEZ, the witness named in the

8  foregoing deposition, was by me duly sworn; that said

9  deposition was taken Thursday, March, 31, 2016, at the

10 time and place set forth on the first page hereof.

11       That upon the taking of the deposition, the

12 words of the witness were written down by me in

13 stenotypy and thereafter transcribed by computer under

14 my supervision; that the foregoing is a true and correct

15 transcript of the testimony given by the witness.

16       Pursuant to Federal Rule 30(e), transcript

17 review was requested.

18       I further certify that I am neither counsel for

19 nor in any way related to any party to said action, nor

20 in any way interested in the result or outcome thereof.

21       Dated this 8th day of April, 2016, at

22 Bakersfield, California.

23

24                     Patricia Kerchner, CSR No. 12017

25

# EXHIBIT "D"

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

JIMMIE R. BROOKS,                )

                                 )

          Plaintiff,             )

                                 )

     vs.                         )   NO.

                                 )   1:15-CV-00965-LJO-JLT

LEON'S QUALITY ADJUSTERS,        )

INC., TONY RODRIGUEZ, and        )

DOES 1 through 10,               )

inclusive,                       )

                                 )

          Defendants.            )

_____ )


VIDEOTAPED DEPOSITION OF AMANJOT BAJWA

Valencia, California

Wednesday, April 13, 2016

2:18 P.M. - 3:36 P.M.


REPORTED BY:

HEIDI VAN ELGORT

CSR NO. 12466

AMANJOT BAJWA - 4/13/2016

```
 1                    UNITED STATES DISTRICT COURT
 2                  EASTERN DISTRICT OF CALIFORNIA
 3
 4    JIMMIE R. BROOKS,             )
                                    )
 5             Plaintiff,           )
                                    )
 6         vs.                      )   NO.
                                    )   1:15-CV-00965-LJO-JLT
 7    LEON'S QUALITY ADJUSTERS,     )
      INC., TONY RODRIGUEZ, and     )
 8    DOES 1 through 10,            )
      inclusive,                    )
 9                                  )
               Defendants.          )
10    _____  )
11
12
13
14
15
16            Videotaped deposition of AMANJOT BAJWA, a
17    witness, taken on behalf of the Plaintiff, at 27959
18    Smyth Drive, Valencia, California, commencing at
19    2:18 P.M. and ending at 3:36 P.M. on Wednesday,
20    April 13, 2016, before Heidi Van Elgort, Certified
21    Shorthand Reporter No. 12466.
22
23
24
25
```

Page 2

AMANJOT BAJWA - 4/13/2016

```
 1    Bolthouse, irrespective of what business they have,     14:2
 2    they have to check in with security first.              14:2
 3        Q    And so the policy was to prohibit any entry    14:2
 4    into the employee parking lot, for example, by          14:2
 5    anyone unless they had checked in and been              14:2
 6    authorized; right?                                      14:2
 7        A    Well, if you see the main parking lot,         14:2
 8    it's -- there is no way to stop cars.  It's not an      14:2
 9    arm access to the main parking lot.  So if you come     14:2
10    in your vehicle and you just drive down to the main     14:2
11    parking lot, there is no way we would know that         14:2
12    whether you work at Bolthouse or not because you        14:2
13    just took your car and you went in.                     14:2
14        Q    Right.                                         14:2
15        A    Tow trucks are a red flag because it's a       14:2
16    tow truck.  You can see it's a tow truck.  The          14:2
17    moment you see a tow truck, it's a red flag.  It        14:2
18    doesn't matter where it is on the perimeter of the      14:2
19    property.  And immediately the rover or whoever sees    14:2
20    it first, whether surveillance or somebody reports      14:2
21    it or another officer sees it or the rover sees it      14:2
22    himself or herself, you go in, make contact.            14:2
23        Q    So those tow trucks -- so any kind of tow      14:2
24    truck was absolutely prohibited from entering into      14:2
25    the employee parking lot even though those two          14:3
```

Page 15

AMANJOT BAJWA - 4/13/2016

```
 1   entrances.                                          14:3

 2        Q    Okay.                                     14:3

 3        A    The main entrances.                       14:3

 4        Q    Got you.  Okay.  There was apparently video   14:3

 5   taken of the repossession incident; right?         14:3

 6        A    Yes.                                      14:3

 7        Q    Did you ever see it?                      14:3

 8        A    Yes.                                      14:3

 9        Q    Tell me about that.  When and where did you   14:3

10   see it?                                             14:3

11        A    In Silas Griffin's office.               14:3

12        Q    Uh-huh, was it right after the incident? 14:3

13        A    The next morning.                         14:3

14        Q    So did Silas call you in?                14:3

15        A    Yes.                                      14:3

16        Q    And you watched the video together?      14:3

17        A    Yes.                                      14:3

18        Q    Had it already been pulled up?           14:3

19        A    Yes.                                      14:3

20        Q    And tell me in as much detail as you can 14:3

21   what you saw in the video.                          14:3

22        A    So what we saw was this -- do you happen to   14:3

23   have a map of that because that could just --       14:3

24        Q    I'll give --                              14:3

25        A    That will just tell how it happened.      14:3
```

Page 20

AMANJOT BAJWA - 4/13/2016

| | | |
|---|---|---|
| 1 | manager, he can reach out to Jimmie's supervisor | 14:4 |
| 2 | and, you know, get them into their protocol. That | 14:4 |
| 3 | is on their end what they do or they did at that | 14:4 |
| 4 | time. | 14:4 |
| 5 | Q    Silas' end? | 14:4 |
| 6 | A    Silas' end. | 14:4 |
| 7 | Q    Okay.  So what did you do the next day to | 14:4 |
| 8 | investigate the incident, if anything? | 14:4 |
| 9 | A    Well, I was called in to review the footage | 14:4 |
| 10 | to see how this happened because the -- I guess the | 14:4 |
| 11 | biggest question which was on the question of | 14:4 |
| 12 | client's mind was how did this happen so fast, and | 14:4 |
| 13 | nobody could really give an answer to the how did | 14:4 |
| 14 | this happen so fast until we saw it on the video. | 14:4 |
| 15 | This guy, the tow truck driver, did an amazing job I | 14:4 |
| 16 | guess. He was -- you could tell that by the way he | 14:4 |
| 17 | did the repo -- and this is my opinion, my | 14:4 |
| 18 | professional opinion because of the investigations | 14:4 |
| 19 | I've done in my past.  You could tell he vetted the | 14:4 |
| 20 | place very well.  He knew exactly where Jimmie | 14:4 |
| 21 | Brooks' truck was, and he chose deliberately the | 14:4 |
| 22 | time for shift change because there's a lot of | 14:4 |
| 23 | traffic.  Cars are coming in and out.  Yes. | 14:4 |
| 24 | Q    Okay. | 14:4 |
| 25 | A    Very well timed, well done.  Less than 40 | 14:4 |

Page 34

AMANJOT BAJWA - 4/13/2016

```
 1     A    Okay.                                      15:0
 2     Q    And you testified that in your experience  15:0
 3  this was a very professional repossession; is that 15:0
 4  right?                                             15:0
 5     A    Absolutely.                                15:0
 6     Q    How many repossessions have you witnessed  15:0
 7  or seen videos of in the past?                     15:0
 8     A    Almost six.                                15:0
 9     Q    Six?                                       15:0
10     A    Yes.                                       15:0
11     Q    And how would you rate this --             15:0
12     A    Not videos.  I'm sorry.  Let me correct    15:0
13  that.  Reported repossessions in which we actually 15:0
14  went to talk to the repossessing driver that you   15:0
15  cannot do that.                                    15:0
16         MR. TRUEBLOOD:  I have to make a belated    15:0
17  objection.  That question calls for an opinion and 15:0
18  lacks foundation.                                  15:0
19  BY MR. TARNEJA:                                    15:0
20     Q    And in this case did you ever speak to the 15:0
21  driver and or the company?                         15:0
22     A    Negative.                                  15:0
23     Q    In the six repossessions that you've been a 15:0
24  part of, how would you rank this repossession in   15:0
25  terms of the speed that it occurred?               15:0
```

Page 43

AMANJOT BAJWA - 4/13/2016

```
 1      A    Just with Silas on one or two occasions,    15:2.
 2   yes.                                                 15:2.
 3      Q    What do you mean just with Silas?  Did       15:2.
 4   you --                                               15:2.
 5      A    Because we are not authorized to do it.      15:2.
 6      Q    Did you actually use -- type into the        15:2.
 7   keyboard and use the mouse, or were you observing    15:2.
 8   Silas do what he did?                                15:2.
 9      A    No.  On the computer to put the date and     15:2.
10   the time to review the footage for a set day and     15:2.
11   time.                                                15:2.
12      Q    And do you have any -- do you have any       15:2.
13   knowledge as to how far back the system can retrieve 15:2.
14   video?                                               15:2.
15      A    From what I'm told by the client, 11 days.   15:2.
16      Q    So every 11 days the system rewrites over    15:2.
17   whatever it's recorded?                              15:2.
18      A    I guess they can -- their data doesn't hold  15:2.
19   more than that.  I guess the data.                   15:2.
20      Q    I understand.  The guard shack on the south  15:2.
21   side where Ms. Jimenez was located or posted that    15:2.
22   night, tell us where the windows are on that shack.  15:2.
23   Which sides?                                         15:2.
24      A    South, east, and west.                       15:2.
25      Q    Which ones open and close?                   15:2.
```

Page 62

AMANJOT BAJWA - 4/13/2016

```
 1    were in the shift change, did anyone from                15:2

 2    AlliedBarton speak to any of those employees that        15:2

 3    evening about the events that occurred that evening?     15:2

 4         A    Did any of the -- like the guards, they        15:2

 5    talked to an employee?                                   15:2

 6         Q    Who were going either in or out because of     15:2

 7    the what you described as shift change?                  15:2

 8         A    I would not know that.  I mean it's a shift    15:2

 9    change.  People go in and out.                           15:2

10         Q    Do you know if any employee complained         15:2

11    about a tow truck almost hitting them?                   15:2

12         A    Not to my knowledge, no.                       15:2

13         Q    Do you know if any employee complained of a    15:2

14    tow truck blocking their entry or exit into the --       15:2

15         A    Negative.  Not to my knowledge.  Could it      15:2

16    have been brought up to Bolthouse safety department?     15:2

17    I would not be aware of that.                            15:2

18         Q    Who would be aware of that?                    15:2

19         A    The Bolthouse safety department.               15:2

20         Q    Is there a person in particular who would      15:2

21    know that information?                                   15:2

22         A    The director, Mr. Charles --                   15:2

23         Q    Mr. Daniels?                                   15:2

24         A    -- Daniels.                                    15:2

25         Q    Okay.  How many video surveillance cameras     15:2
```

Page 68

```
 1
 2
 3
 4              DECLARATION UNDER PENALTY OF PERJURY
 5                            * * *
 6
 7          I, AMANJOT BAJWA, the witness herein,
 8   declare under penalty of perjury that I have read
 9   the foregoing deposition in its entirety and that
10   the testimony contained therein, as corrected by me,
11   is a true and accurate transcription of my testimony
12   elicited at said time and place.
13
14          Dated this _____ day of
15   _____, 20____, at
16   _____, California.
17
18                        _____
19                             AMANJOT BAJWA
20
21
22
23
24
25
```

Page 76

```
 1                  REPORTER'S CERTIFICATE

 2

 3          I, HEIDI VAN ELGORT, CSR NO. 12466, A

 4    CERTIFIED SHORTHAND REPORTER IN AND FOR THE STATE OF

 5    CALIFORNIA, DO HEREBY CERTIFY:

 6          THAT PRIOR TO BEING EXAMINED, THE WITNESS

 7    NAMED IN THE FOREGOING PROCEEDINGS WAS BY ME DULY

 8    SWORN TO TESTIFY TO THE TRUTH, THE WHOLE TRUTH, AND

 9    NOTHING BUT THE TRUTH;

10          THAT SAID PROCEEDINGS WERE TAKEN BY ME IN

11    SHORTHAND AT THE TIME AND PLACE HEREIN NAMED AND WAS

12    THEREAFTER TRANSCRIBED INTO TYPEWRITING UNDER MY

13    DIRECTION, SAID TRANSCRIPT BEING A TRUE AND CORRECT

14    TRANSCRIPTION OF MY SHORTHAND NOTES.

15          I FURTHER CERTIFY THAT I HAVE NO INTEREST

16    IN THE OUTCOME OF THIS ACTION.

17          PURSUANT TO FEDERAL RULE 30(E), TRANSCRIPT

18    REVIEW WAS REQUESTED.

19

20                  DATED THIS 26TH DAY OF APRIL 2016,

                    AT VALENCIA, CALIFORNIA

21

22          _____

                    HEIDI VAN ELGORT, CSR NO. 12466

23

24

25

                                                      Page 77
```

# EXHIBIT "E"

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

JIMMIE R. BROOKS,                    )
                                     )
        Plaintiff,                   )
                                     )
    vs.                              )   NO.
                                     )   1:15-CV-00965-LJO-JLT
LEON'S QUALITY ADJUSTERS,            )
INC., TONY RODRIGUEZ, and            )
DOES 1 through 10,                   )
inclusive,                           )
                                     )
        Defendants.                  )
_____    )


VIDEOTAPED DEPOSITION OF LUCIA JIMENEZ
Valencia, California
Wednesday, April 13, 2016
10:01 A.M. - 11:33 A.M.




REPORTED BY:
HEIDI VAN ELGORT
CSR NO. 12466

LUCIA JIMENEZ - 4/13/2016

```
 1                UNITED STATES DISTRICT COURT
 2                EASTERN DISTRICT OF CALIFORNIA
 3
 4   JIMMIE R. BROOKS,              )
                                    )
 5           Plaintiff,             )
                                    )
 6        vs.                       )   NO.
                                    )   1:15-CV-00965-LJO-JLT
 7   LEON'S QUALITY ADJUSTERS,      )
     INC., TONY RODRIGUEZ, and      )
 8   DOES 1 through 10,             )
     inclusive,                     )
 9                                  )
             Defendants.            )
10   _____)
11
12
13
14
15
16           Videotaped deposition of LUCIA JIMENEZ, a
17   witness, taken on behalf of the Plaintiff, at 27959
18   Smyth Drive, Valencia, California, commencing at
19   10:01 A.M. and ending at 11:33 A.M. on Wednesday,
20   April 13, 2016, before Heidi Van Elgort, Certified
21   Shorthand Reporter No. 12466.
22
23
24
25
```

Page 2

LUCIA JIMENEZ - 4/13/2016

| | | | |
|---|---|---|---|
| 1 | A | Yes, sir. | 10:06:56 |
| 2 | Q | There's two guard shacks there; right? | 10:06:57 |
| 3 | A | Yes. | 10:07:00 |
| 4 | Q | Were you in the one that was closer to the | 10:07:00 |
| 5 | | street or the one that was further back in the | 10:07:02 |
| 6 | | property? | 10:07:04 |
| 7 | A | The one closer to the street up in the | 10:07:04 |
| 8 | | front. | 10:07:06 |
| 9 | Q | And at that time who would normally be in | 10:07:08 |
| 10 | | the shack that was behind you? | 10:07:11 |
| 11 | A | Who was in the -- the wood shack behind me? | 10:07:13 |
| 12 | Q | Yeah. | 10:07:17 |
| 13 | A | That was Sabrina. | 10:07:17 |
| 14 | Q | McEntire? | 10:07:19 |
| 15 | A | Yes. | 10:07:20 |
| 16 | Q | And was she your supervisor? | 10:07:20 |
| 17 | A | At the time, yes. | 10:07:22 |
| 18 | Q | So you were reporting to Sabrina, and | 10:07:23 |
| 19 | | Sabrina was reporting to AJ? | 10:07:26 |
| 20 | A | Yes. | 10:07:27 |
| 21 | Q | So back in April 2015, what were your job | 10:07:28 |
| 22 | | responsibilities as you were in that shack and being | 10:07:37 |
| 23 | | a security guard? | 10:07:39 |
| 24 | A | Inside, since I was in the guard shack in | 10:07:40 |
| 25 | | the front, my duties were access control in the -- | 10:07:43 |

Page 12

LUCIA JIMENEZ - 4/13/2016

| | | |
|---|---|---|
| 1 | MR. TRUEBLOOD: I'm going to mark as | 10:41:33 |
| 2 | Exhibit 19 the left side of the exit gate. | 10:41:34 |
| 3 | (Exhibit 19 marked) | 10:41:37 |
| 4 | BY MR. TRUEBLOOD: | 10:41:43 |
| 5 | Q Does that appear to be an accurate | 10:41:43 |
| 6 | representation of the left side of the exit gate as | 10:41:46 |
| 7 | you look at it from Brundage Lane on April 22, 2015? | 10:41:48 |
| 8 | A Yes. | 10:41:51 |
| 9 | Q So you had that "Do Not Enter, Exit Only" | 10:41:51 |
| 10 | sign; right? | 10:41:54 |
| 11 | A Yes. | 10:41:55 |
| 12 | Q So you were on station in the front guard | 10:42:03 |
| 13 | shack on April 22, 2015, about 9:30 P.M.; right? | 10:42:08 |
| 14 | A Yes. | 10:42:12 |
| 15 | Q And around that time did you see a | 10:42:12 |
| 16 | repossession vehicle going into one of the two | 10:42:16 |
| 17 | driveways that were to your right here? | 10:42:20 |
| 18 | MR. LEE: I'm going to object to the term | 10:42:22 |
| 19 | "repossession vehicle," but you can go ahead and | 10:42:24 |
| 20 | answer. | 10:42:27 |
| 21 | THE WITNESS: I seen a tow truck vehicle | 10:42:27 |
| 22 | come in. | 10:42:30 |
| 23 | BY MR. TRUEBLOOD: | 10:42:31 |
| 24 | Q Tell me how you first saw the tow truck, | 10:42:31 |
| 25 | and what did you see? | 10:42:33 |

Page 37

LUCIA JIMENEZ - 4/13/2016

| | | |
|---|---|---|
| 1 | A    I just seen the unmarked tow truck come | 10:42:34 |
| 2 | into the parking lot. | 10:42:38 |
| 3 | Q    Did you -- | 10:42:40 |
| 4 | A    To the driveway. | 10:42:41 |
| 5 | Q    Did you see him entering from Brundage Lane | 10:42:41 |
| 6 | into the main driveway? | 10:42:44 |
| 7 | A    No.  I just seen him when he was on the | 10:42:45 |
| 8 | driveway already. | 10:42:47 |
| 9 | Q    And did he go into the driveway that -- | 10:42:48 |
| 10 | strike that. | 10:42:54 |
| 11 | He had entered from Brundage Lane into the | 10:42:54 |
| 12 | Bolthouse Farms main driveway; right? | 10:43:00 |
| 13 | A    Yes, to the main driveway. | 10:43:01 |
| 14 | Q    And then did he enter into the first | 10:43:03 |
| 15 | driveway that's closest to Brundage Lane, or did he | 10:43:07 |
| 16 | enter into the second driveway that's farther away | 10:43:09 |
| 17 | from Brundage Lane? | 10:43:12 |
| 18 | A    The first that's closer to Brundage between | 10:43:14 |
| 19 | J and K. | 10:43:17 |
| 20 | Q    Did you see him going into that driveway? | 10:43:18 |
| 21 | A    Yes. | 10:43:21 |
| 22 | Q    And what were you supposed to do if a | 10:43:21 |
| 23 | vehicle like that didn't -- strike that. | 10:43:26 |
| 24 | Did he stop to get permission to get into | 10:43:28 |
| 25 | that driveway or not? | 10:43:31 |

Page 38

LUCIA JIMENEZ - 4/13/2016

```
 1      A    No.                                          10:43:32

 2      Q    How fast was he going when you first saw     10:43:32

 3   him?                                                 10:43:37

 4           MR. TARNEJA:  If you know.                   10:43:37

 5           THE WITNESS:  I wouldn't happen to know how  10:43:38

 6   fast he was driving.  I just seen him come in.       10:43:41

 7   BY MR. TRUEBLOOD:                                    10:43:43

 8      Q    Can you give me an estimate?                 10:43:44

 9      A    About seven miles, ten miles.                10:43:47

10      Q    Seven to ten miles per hour?                 10:43:51

11      A    Uh-huh.                                      10:43:54

12      Q    And did you see him turn into that first     10:43:55

13   driveway?                                            10:43:57

14      A    No.  What I seen is him coming in the        10:43:57

15   driveway and then just backing up to the parking     10:44:02

16   lot.                                                 10:44:06

17      Q    So when you first saw him, he was -- was he  10:44:06

18   already in this first -- this first entrance to the  10:44:12

19   parking?                                             10:44:16

20      A    Yes.                                         10:44:17

21      Q    And then he stopped and backed up?           10:44:17

22      A    Yes.  At the moment I didn't see when he     10:44:19

23   stopped because I was calling my guard, letting him  10:44:23

24   know there's a tow truck that came onto the          10:44:27

25   driveway.  Next time I know, I lost site of the tow  10:44:29
```

Page 39

LUCIA JIMENEZ - 4/13/2016

| | | |
|---|---|---|
| 1 | truck. | 10:44:32 |
| 2 | Q    Uh-huh, but did you see him backing up? | 10:44:32 |
| 3 | A    I seen him when he went in, yes. | 10:44:35 |
| 4 | Q    But did you see him backing up? | 10:44:37 |
| 5 | A    Yes.  When he was backing up into the | 10:44:39 |
| 6 | driveway.  I mean to the parking lot. | 10:44:40 |
| 7 | Q    Where was he backing up from? | 10:44:42 |
| 8 | A    He came in into the driveway and backed in | 10:44:44 |
| 9 | backwards. | 10:44:48 |
| 10 | Q    Oh, okay.  So let's clarify that.  He drove | 10:44:48 |
| 11 | in front ways from Brundage? | 10:44:52 |
| 12 | A    Uh-huh. | 10:44:54 |
| 13 | Q    And then where did he stop? | 10:44:55 |
| 14 | A    He like -- he really didn't stop.  He just | 10:44:57 |
| 15 | kind of went -- like slowed down the speed and just | 10:45:00 |
| 16 | went backed in. | 10:45:04 |
| 17 | Q    Okay.  So he kind of turned in the main | 10:45:05 |
| 18 | driveway and then backed into this first entrance | 10:45:08 |
| 19 | into the parking? | 10:45:10 |
| 20 | A    Yes. | 10:45:11 |
| 21 | Q    And did you see him backing all the way | 10:45:14 |
| 22 | down the parking? | 10:45:16 |
| 23 | A    As soon as he went into the parking lot, I | 10:45:18 |
| 24 | lost sight of the -- of the tow truck. | 10:45:21 |
| 25 | Q    So what were your thoughts when you first | 10:45:24 |

Page 40

| | | |
|---|---|---|
| 1 | saw him going into the driveway? | 10:45:27 |
| 2 | A    It was -- I just seen it was a tow truck | 10:45:29 |
| 3 | maybe to pick up a vehicle that's been broken down | 10:45:33 |
| 4 | in the parking lot, and that's when I called my | 10:45:36 |
| 5 | other guard to let her know to go check what's going | 10:45:39 |
| 6 | on. | 10:45:42 |
| 7 | Q    And what did you say? | 10:45:42 |
| 8 | A    There was a tow truck that just came into | 10:45:44 |
| 9 | the parking lot. | 10:45:46 |
| 10 | Q    Why did you advise -- who did you advise? | 10:45:46 |
| 11 | A    Who did I -- | 10:45:49 |
| 12 | Q    Who did you tell that to? | 10:45:51 |
| 13 | A    Sabrina. | 10:45:52 |
| 14 | Q    McEntire? | 10:45:53 |
| 15 | A    McEntire. | 10:45:54 |
| 16 | Q    Why did you call Sabrina and let her know | 10:45:55 |
| 17 | that a truck was entering into the driveway? | 10:45:57 |
| 18 | MR. TARNEJA:  Objection.  She didn't say | 10:45:59 |
| 19 | how she communicated with Sabrina. | 10:46:02 |
| 20 | BY MR. TRUEBLOOD: | 10:46:04 |
| 21 | Q    Did you telephone Sabrina? | 10:46:04 |
| 22 | A    Yes. | 10:46:06 |
| 23 | Q    And you picked up the phone in your guard | 10:46:06 |
| 24 | shack and called her guard shack behind you? | 10:46:08 |
| 25 | A    Yes. | 10:46:11 |

Page 41

LUCIA JIMENEZ - 4/13/2016

| | | |
|---|---|---|
| 1 | Q    And why did you call her when you saw the | 10:46:11 |
| 2 | tow truck? | 10:46:14 |
| 3 | A    I called Sabrina McEntire over the phone to | 10:46:15 |
| 4 | let her know the tow truck was on property because I | 10:46:19 |
| 5 | figured she was going to be closer to get to the tow | 10:46:22 |
| 6 | truck than our roving guard. | 10:46:25 |
| 7 | Q    And you called her because the tow truck | 10:46:27 |
| 8 | wasn't permitted into go into that driveway; isn't | 10:46:30 |
| 9 | that correct? | 10:46:33 |
| 10 | A    Yes. | 10:46:34 |
| 11 | Q    And because the tow truck had not obtained | 10:46:34 |
| 12 | permission to go there? | 10:46:37 |
| 13 | A    Yes. | 10:46:38 |
| 14 | Q    And what did Sabrina say, if anything? | 10:46:39 |
| 15 | A    She just -- she said where did the tow | 10:46:41 |
| 16 | truck went.  I told her into the parking lot, and | 10:46:46 |
| 17 | that's the only thing I told her.  We hang up the | 10:46:48 |
| 18 | phone. | 10:46:52 |
| 19 | Q    Did you then -- did you leave the guard | 10:46:52 |
| 20 | shack at any time? | 10:46:54 |
| 21 | A    No, I didn't.  She did. | 10:46:55 |
| 22 | Q    Okay.  Did you -- so you stayed in the | 10:46:56 |
| 23 | guard shack, and were you watching the tow truck | 10:47:01 |
| 24 | doing whatever it was doing? | 10:47:04 |
| 25 | A    I tried to keep an eye on the tow truck, | 10:47:05 |

Page 42

Maxene Weinberg Agency
(800) 640-1949

LUCIA JIMENEZ - 4/13/2016

| 1 | but since I had to also do my post, I had to check | 10:47:09 |
| 2 | in the people that were coming in. | 10:47:12 |
| 3 | Q    And was this a time where there was a | 10:47:15 |
| 4 | change in shifts?  Is that correct? | 10:47:19 |
| 5 | A    Yes.  It was during shift change for | 10:47:20 |
| 6 | Bolthouse employees. | 10:47:24 |
| 7 | Q    And were there quite a few people going in | 10:47:25 |
| 8 | and out of the gates and walking around the parking | 10:47:28 |
| 9 | lot at that time? | 10:47:30 |
| 10 | A    Yes. | 10:47:30 |
| 11 | Q    And those were Bolthouse employees? | 10:47:31 |
| 12 | A    Yes. | 10:47:33 |
| 13 | Q    So you first saw the tow truck -- when you | 10:47:34 |
| 14 | first caught a glimpse of it, it was still in the | 10:47:46 |
| 15 | main driveway and had not yet turned into the | 10:47:49 |
| 16 | parking area; is that correct? | 10:47:52 |
| 17 | A    Yes. | 10:47:54 |
| 18 | Q    And then you saw it go into the parking -- | 10:47:54 |
| 19 | you saw it back into the parking area; right? | 10:47:57 |
| 20 | A    Yes. | 10:48:00 |
| 21 | Q    And at what point did you lose site of it | 10:48:01 |
| 22 | or did you turn your head and look at something | 10:48:04 |
| 23 | else? | 10:48:06 |
| 24 | A    At the moment the tow truck came into the | 10:48:06 |
| 25 | parking lot because the vehicles will block it, | 10:48:09 |

Page 43

Maxene Weinberg Agency
(800) 640-1949

LUCIA JIMENEZ - 4/13/2016

| | | |
|---|---|---|
| 1 | that's the moment I lost site of the tow truck. | 10:48:11 |
| 2 | Q    And what you do mean the vehicles blocked | 10:48:13 |
| 3 | it? | 10:48:14 |
| 4 | A    Well, because you have employees' vehicles | 10:48:14 |
| 5 | parked in the main parking lot.  So it's kind of | 10:48:17 |
| 6 | hard for you to see where is it going once they turn | 10:48:20 |
| 7 | into the parking lot. | 10:48:23 |
| 8 | Q    So you're saying that the employees' | 10:48:24 |
| 9 | vehicles blocked your view? | 10:48:26 |
| 10 | A    Yes. | 10:48:27 |
| 11 | Q    All right.  And where approximately on | 10:48:28 |
| 12 | Exhibit 1 was that?  Can you point that out to us? | 10:48:31 |
| 13 | A    Where I lost the view? | 10:48:34 |
| 14 | Q    Where you lost view of the tow truck. | 10:48:35 |
| 15 | A    Right here. | 10:48:37 |
| 16 | Q    So why don't you point that -- hold that up | 10:48:38 |
| 17 | to the camera and show where you lost -- | 10:48:42 |
| 18 | A    Right here. | 10:48:45 |
| 19 | Q    Okay.  Thank you.  And then did you -- | 10:48:46 |
| 20 | A    (Indicating.) | 10:48:56 |
| 21 | Q    And what happened next? | 10:48:58 |
| 22 | A    I -- well, as soon as I seen the tow truck | 10:49:01 |
| 23 | come in, I contacted Sabrina McEntire.  She was in | 10:49:05 |
| 24 | the guard shack in the back, and then she came out | 10:49:07 |
| 25 | and tried to stop the tow truck, but it was too | 10:49:10 |

Page 44

Maxene Weinberg Agency
(800) 640-1949

LUCIA JIMENEZ - 4/13/2016

| | | |
|---|---|---|
| 1 | late.  By the time she came out, he was gone. | 10:49:12 |
| 2 | Q    What did you see as far as her trying to | 10:49:15 |
| 3 | stop the tow truck? | 10:49:17 |
| 4 | A    As soon as she seen him coming out of the | 10:49:18 |
| 5 | parking lot, she tried to run to stop him, and she | 10:49:22 |
| 6 | was screaming at the tow truck, but he didn't stop. | 10:49:25 |
| 7 | Q    Okay.  So where did you see -- where did | 10:49:28 |
| 8 | you see the tow truck leaving the parking area? | 10:49:34 |
| 9 | A    The same way he entered. | 10:49:39 |
| 10 | Q    Are you sure it was that same driveway, or | 10:49:41 |
| 11 | was it the first driveway that was closer to you? | 10:49:44 |
| 12 | A    The same driveway he entered. | 10:49:46 |
| 13 | Q    Okay.  And he entered out -- he exited that | 10:49:48 |
| 14 | driveway with a vehicle hooked up to the back of his | 10:49:52 |
| 15 | tow truck; right? | 10:49:55 |
| 16 | A    Yes. | 10:49:56 |
| 17 | Q    And that was a red truck; right? | 10:49:57 |
| 18 | A    Yes. | 10:49:59 |
| 19 | Q    And he exited that same driveway that you | 10:49:59 |
| 20 | say he went into essentially going out the wrong | 10:50:03 |
| 21 | way; right? | 10:50:08 |
| 22 | A    Yes. | 10:50:09 |
| 23 | Q    And was he -- what speed was he going out? | 10:50:09 |
| 24 | MR. TARNEJA:  If you know. | 10:50:13 |
| 25 | BY MR. TRUEBLOOD: | 10:50:15 |

Page 45

LUCIA JIMENEZ - 4/13/2016

| | | | |
|---|---|---|---|
| 1 | Q | Approximately? | 10:50:15 |
| 2 | A | Probably about ten miles, eight miles.  I | 10:50:17 |
| 3 | don't know because he was out -- as soon as he came | | 10:50:22 |
| 4 | out, he left. | | 10:50:25 |
| 5 | Q | Was there any screeching of tires? | 10:50:25 |
| 6 | A | Not that I heard, no. | 10:50:28 |
| 7 | Q | When the tow truck driver came in -- before | 10:50:30 |
| 8 | he went out, when he came in -- | | 10:50:38 |
| 9 | A | Okay. | 10:50:40 |
| 10 | Q | -- when you first saw him, did you make any | 10:50:41 |
| 11 | eye contact with him? | | 10:50:43 |
| 12 | A | No. | 10:50:44 |
| 13 | Q | Okay.  Did you shout or say anything? | 10:50:45 |
| 14 | A | No. | 10:50:47 |
| 15 | Q | And that's because you were in the guard | 10:50:48 |
| 16 | shack; right? | | 10:50:50 |
| 17 | A | Yes. | 10:50:51 |
| 18 | Q | All right.  When he came out -- why don't | 10:50:51 |
| 19 | you mark where Sabrina was when the tow truck came | | 10:50:59 |
| 20 | out of the driveway on Exhibit 1. | | 10:51:02 |
| 21 | A | When the tow truck was coming out of the | 10:51:05 |
| 22 | driveway? | | 10:51:09 |
| 23 | Q | Yeah, why don't you mark with an R, an R | 10:51:10 |
| 24 | and a circle, where Sabrina was when you saw her | | 10:51:13 |
| 25 | shouting and trying to stop the tow truck. | | 10:51:16 |

Page 46

LUCIA JIMENEZ - 4/13/2016

| | | |
|---|---|---|
| 1 | A    She came out of -- yes. | 10:53:09 |
| 2 | Q    She came through that gate at a high speed | 10:53:11 |
| 3 | of running; right? | 10:53:15 |
| 4 | A    Yes. | 10:53:16 |
| 5 | Q    And then when he was approximately at | 10:53:16 |
| 6 | position R on Exhibit 1, that's when you saw her | 10:53:20 |
| 7 | shouting to the tow truck to stop? | 10:53:24 |
| 8 | A    Yes.  As soon as she noticed a tow truck | 10:53:27 |
| 9 | coming out, she started yelling at the tow truck | 10:53:29 |
| 10 | to -- | 10:53:33 |
| 11 | Q    What was she yelling? | 10:53:33 |
| 12 | A    Don't recall.  I don't -- I didn't hear her | 10:53:34 |
| 13 | because I was inside the guard shack, what she was | 10:53:38 |
| 14 | yelling. | 10:53:40 |
| 15 | Q    But it was -- you know she had a high -- | 10:53:40 |
| 16 | she was yelling.  Did you see her raising her hands | 10:53:43 |
| 17 | in a gesture to stop? | 10:53:48 |
| 18 | A    Yes. | 10:53:50 |
| 19 | Q    But the tow truck did not stop; is that | 10:53:50 |
| 20 | correct? | 10:53:57 |
| 21 | A    No, he didn't. | 10:53:57 |
| 22 | Q    The tow truck turned and went through the | 10:53:59 |
| 23 | main driveway and exited on Brundage; right? | 10:54:01 |
| 24 | A    Yes. | 10:54:04 |
| 25 | Q    And did the tow truck pick up speed as it | 10:54:05 |

Page 49

LUCIA JIMENEZ - 4/13/2016

| | | |
|---|---|---|
| 1 | locations that you know where there were people. | 10:55:07 |
| 2 | A    Well, they had -- there was people all over | 10:55:10 |
| 3 | because, like I said, it was during shift -- | 10:55:12 |
| 4 | Bolthouse shift change.  So I had people near the | 10:55:16 |
| 5 | guard shack checking in with me, and people were | 10:55:19 |
| 6 | coming in going to park. | 10:55:24 |
| 7 | Q    Were there people directly in front of the | 10:55:26 |
| 8 | parking driveway where he was exiting? | 10:55:29 |
| 9 | A    At the moment he was exiting, I didn't see | 10:55:31 |
| 10 | no -- | 10:55:33 |
| 11 | Q    Uh-huh. | 10:55:33 |
| 12 | A    -- no people right there. | 10:55:34 |
| 13 | Q    But were there people along this -- near | 10:55:36 |
| 14 | this fence where there's K, L, M, and N on | 10:55:37 |
| 15 | Exhibit 1? | 10:55:40 |
| 16 | A    Don't remember. | 10:55:40 |
| 17 | Q    Where do you remember seeing people out in | 10:55:41 |
| 18 | this main driveway? | 10:55:43 |
| 19 | A    At the main driveway I don't remember | 10:55:45 |
| 20 | people.  The only people I remember, it was the | 10:55:47 |
| 21 | people I had at my window checking in. | 10:55:49 |
| 22 | Q    Okay.  Did you see people in the parking | 10:55:51 |
| 23 | areas? | 10:55:55 |
| 24 | A    The people that were just coming to check | 10:55:55 |
| 25 | in with me, they came from the parking area. | 10:55:57 |

Page 51

LUCIA JIMENEZ - 4/13/2016

| | | |
|---|---|---|
| 1 | since the only thing I saw was just the tow truck | 10:58:25 |
| 2 | coming in and out.  That's it because I stayed in my | 10:58:27 |
| 3 | post because I can't leave my post.  I stayed at my | 10:58:31 |
| 4 | post working for the rest of the shift. | 10:58:33 |
| 5 | MR. TRUEBLOOD:  All right.  So let's take a | 10:58:35 |
| 6 | break there. | 10:58:36 |
| 7 | THE VIDEOGRAPHER:  Good, Counsel? | 10:58:37 |
| 8 | MR. LEE:  Yes. | 10:58:40 |
| 9 | MR. TARNEJA:  Yes, that's good. | 10:58:41 |
| 10 | THE VIDEOGRAPHER:  Going off the record at | 10:58:44 |
| 11 | 10:58 A.M. | 10:58:46 |
| 12 | (Recess) | 11:05:02 |
| 13 | THE VIDEOGRAPHER:  Back on the record at | 11:05:02 |
| 14 | 11:05 A.M. | 11:05:04 |
| 15 | BY MR. TRUEBLOOD: | 11:05:08 |
| 16 | Q   As the tow truck was leaving the main | 11:05:09 |
| 17 | driveway for Bolthouse and going out onto Brundage, | 11:05:16 |
| 18 | did you see Ms. McEntire move from position R on | 11:05:21 |
| 19 | Exhibit 1? | 11:05:24 |
| 20 | A   I don't remember. | 11:05:27 |
| 21 | Q   Did you see her chase after the tow truck | 11:05:28 |
| 22 | as it left the driveway? | 11:05:32 |
| 23 | A   Yes. | 11:05:34 |
| 24 | Q   As it -- I mean where did you see her chase | 11:05:35 |
| 25 | the truck on Exhibit 1? | 11:05:40 |

Page 54

LUCIA JIMENEZ - 4/13/2016

| | | | |
|---|---|---|---|
| 1 | A | She was coming down the driveway. | 11:05:41 |
| 2 | Q | She was coming down from position R towards | 11:05:43 |
| 3 | the Brundage Lane entrance? | | 11:05:47 |
| 4 | A | Yes. | 11:05:49 |
| 5 | Q | And the tow truck was in front of her? | 11:05:50 |
| 6 | A | Yes. | 11:05:53 |
| 7 | Q | And she was chasing after it; right? | 11:05:54 |
| 8 | A | Yes.  She was waving them down so he could | 11:05:57 |
| 9 | stop. | | 11:06:00 |
| 10 | Q | Right.  But she would have been behind the | 11:06:00 |
| 11 | truck at this point? | | 11:06:04 |
| 12 | A | Not right behind the truck, no.  But she | 11:06:04 |
| 13 | was -- she seen the truck leaving, and that's when | | 11:06:07 |
| 14 | she started walking, trying to run after him trying | | 11:06:10 |
| 15 | to stop. | | 11:06:13 |
| 16 | Q | And was he -- was the truck -- so it wasn't | 11:06:14 |
| 17 | the back of the truck that she was chasing after. | | 11:06:18 |
| 18 | It was the truck was at an angle to her; is that | | 11:06:21 |
| 19 | right? | | 11:06:23 |
| 20 | A | No.  He was almost out of the parking lot | 11:06:24 |
| 21 | as soon as she even got to get close enough.  She | | 11:06:26 |
| 22 | never got to get close enough to the tow truck or | | 11:06:30 |
| 23 | anything. | | 11:06:33 |
| 24 | Q | How -- approximately how close to the truck | 11:06:33 |
| 25 | did she get? | | 11:06:36 |

Page 55

Maxene Weinberg Agency
(800) 640-1949

LUCIA JIMENEZ - 4/13/2016

| | | |
|---|---|---|
| 1 | closest. | 11:09:33 |
| 2 | BY MR. TRUEBLOOD: | 11:09:34 |
| 3 | Q     All right.  And then she moved up to | 11:09:34 |
| 4 | position T, and the truck moved out to position S; | 11:09:36 |
| 5 | right? | 11:09:40 |
| 6 | A     Yes. | 11:09:40 |
| 7 | Q     And from -- as she was moving from position | 11:09:40 |
| 8 | R to position T, she was yelling and waving her | 11:09:44 |
| 9 | hands the whole time? | 11:09:48 |
| 10 | A     Don't remember. | 11:09:51 |
| 11 | Q     What did you observe? | 11:09:52 |
| 12 | A     The only thing I could remember is, when | 11:09:53 |
| 13 | she was coming out, that's when she -- she was | 11:09:56 |
| 14 | yelling and doing hand gestures to try to stop the | 11:10:01 |
| 15 | tow truck when he was coming out of the parking lot | 11:10:04 |
| 16 | already. | 11:10:08 |
| 17 | Q     And she was yelling and making those hand | 11:10:08 |
| 18 | gestures while she was at position R? | 11:10:10 |
| 19 | A     Yes. | 11:10:13 |
| 20 | Q     And he was at position T -- or position U; | 11:10:13 |
| 21 | right? | 11:10:18 |
| 22 | A     U, yes. | 11:10:18 |
| 23 | Q     Did you see the driver of the tow truck? | 11:10:22 |
| 24 | A     No. | 11:10:24 |
| 25 | Q     You didn't get any glimpse of him at all? | 11:10:25 |

Page 59

LUCIA JIMENEZ - 4/13/2016

| | | |
|---|---|---|
| 1 | A    No. | 11:10:29 |
| 2 | Q    I take it that neither you nor Ms. McEntire | 11:10:39 |
| 3 | had a weapon on at that time? | 11:10:43 |
| 4 | A    No. | 11:10:43 |
| 5 | Q    You're unarmed as part of your work? | 11:10:44 |
| 6 | A    Yes. | 11:10:46 |
| 7 | Q    Did you have uniforms and badges on? | 11:10:47 |
| 8 | A    Yes. | 11:10:50 |
| 9 | Q    And what color are your uniforms and | 11:10:51 |
| 10 | badges? | 11:10:55 |
| 11 | A    Our uniforms are light blue, and our -- we | 11:10:55 |
| 12 | have our Bolthouse badge. | 11:11:02 |
| 13 | Q    All right.  And is the -- what does the | 11:11:05 |
| 14 | badge look like? | 11:11:08 |
| 15 | A    Well, we have certain badges.  We have the | 11:11:09 |
| 16 | Bolthouse badge.  It has our picture on it.  It's | 11:11:12 |
| 17 | our name with security underneath, and then we have | 11:11:15 |
| 18 | the -- our AlliedBarton badge. | 11:11:18 |
| 19 | Q    And is the AlliedBarton badge like a little | 11:11:21 |
| 20 | silver badge? | 11:11:24 |
| 21 | A    It's a -- I don't know what it's called. | 11:11:25 |
| 22 | It's like a little security badge they gave us that | 11:11:30 |
| 23 | we put on our uniforms. | 11:11:32 |
| 24 | Q    Does it sort of look like a little | 11:11:34 |
| 25 | sheriff's badge, or is it like more of an identity | 11:11:36 |

Page 60

LUCIA JIMENEZ - 4/13/2016

| | | |
|---|---|---|
| 1 | Okay.  Mr. Trueblood asked you a lot of | 11:13:57 |
| 2 | questions about signage.  Do you recall those | 11:13:59 |
| 3 | questions? | 11:14:01 |
| 4 | A    Yes. | 11:14:01 |
| 5 | Q    In Exhibit 1 the signs that he referred to | 11:14:02 |
| 6 | on the street side on Brundage, are those | 11:14:07 |
| 7 | illuminated by anything? | 11:14:11 |
| 8 | MR. TRUEBLOOD:  Are they -- | 11:14:13 |
| 9 | MR. TARNEJA:  -- illuminated by anything? | 11:14:14 |
| 10 | MR. TRUEBLOOD:  Now? | 11:14:16 |
| 11 | THE WITNESS:  I'm not sure. | 11:14:17 |
| 12 | MR. TARNEJA:  And good point. | 11:14:18 |
| 13 | Q    Were they illuminated in April of 2015? | 11:14:19 |
| 14 | A    Illuminated? | 11:14:23 |
| 15 | Q    Yeah, were there lights? | 11:14:24 |
| 16 | MR. LEE:  Lit up.  If you know. | 11:14:24 |
| 17 | THE WITNESS:  In the night, no. | 11:14:28 |
| 18 | BY MR. TRUEBLOOD: | 11:14:29 |
| 19 | Q    Would they be visible at nighttime? | 11:14:29 |
| 20 | MR. TRUEBLOOD:  Lacks foundation. | 11:14:32 |
| 21 | MR. LEE:  If you know. | 11:14:34 |
| 22 | BY MR. TARNEJA: | 11:14:34 |
| 23 | Q    If you know? | 11:14:35 |
| 24 | A    Not -- no. | 11:14:36 |
| 25 | Q    They would not be visible; is that correct? | 11:14:37 |

Page 63

LUCIA JIMENEZ - 4/13/2016

| | | |
|---|---|---|
| 1 | yelling? | 11:18:30 |
| 2 | A    Yes. | 11:18:30 |
| 3 | Q    And then you also saw her waving her hands? | 11:18:30 |
| 4 | A    Yes. | 11:18:33 |
| 5 | Q    When she was coming from that shack to | 11:18:34 |
| 6 | position R, did you see what the tow truck driver | 11:18:38 |
| 7 | was doing at that point? | 11:18:43 |
| 8 | A    No. | 11:18:44 |
| 9 | Q    Do you know if he was looking to the north? | 11:18:44 |
| 10 | To the left? | 11:18:52 |
| 11 | MR. TRUEBLOOD:  Lacks foundation. | 11:18:53 |
| 12 | THE WITNESS:  North -- | 11:18:55 |
| 13 | BY MR. TARNEJA: | 11:18:55 |
| 14 | Q    If you know? | 11:18:58 |
| 15 | MR. TRUEBLOOD:  Only if you know. | 11:18:58 |
| 16 | THE WITNESS:  What do you mean north of -- | 11:19:00 |
| 17 | BY MR. TARNEJA: | 11:19:00 |
| 18 | Q    Was he looking to the left as he was | 11:19:02 |
| 19 | driving out of the driveway, if you know? | 11:19:04 |
| 20 | A    No, I don't know. | 11:19:05 |
| 21 | Q    Okay.  Now, the guard shack that you manned | 11:19:10 |
| 22 | in exhibit -- if you look at Exhibit 6, please. | 11:19:13 |
| 23 | Is that glass -- is that glass that we see | 11:19:34 |
| 24 | in the guard shack? | 11:19:38 |
| 25 | A    The window? | 11:19:41 |

Page 68

LUCIA JIMENEZ - 4/13/2016

```
 1
 2
 3
 4              DECLARATION UNDER PENALTY OF PERJURY
 5                            * * *
 6
 7           I, LUCIA JIMENEZ, the witness herein,
 8   declare under penalty of perjury that I have read
 9   the foregoing deposition in its entirety and that
10   the testimony contained therein, as corrected by me,
11   is a true and accurate transcription of my testimony
12   elicited at said time and place.
13
14           Dated this _____ day of
15   _____, 20____, at
16   _____, California.
17
18                          _____
19                               LUCIA JIMENEZ
20
21
22
23
24
25
```

Page 81

LUCIA JIMENEZ - 4/13/2016

```
 1
 2                    REPORTER'S CERTIFICATE
 3
 4           I, HEIDI VAN ELGORT, CSR NO. 12466, A
 5   CERTIFIED SHORTHAND REPORTER IN AND FOR THE STATE OF
 6   CALIFORNIA, DO HEREBY CERTIFY:
 7           THAT PRIOR TO BEING EXAMINED, THE WITNESS
 8   NAMED IN THE FOREGOING PROCEEDINGS WAS BY ME DULY
 9   SWORN TO TESTIFY TO THE TRUTH, THE WHOLE TRUTH, AND
10   NOTHING BUT THE TRUTH;
11           THAT SAID PROCEEDINGS WERE TAKEN BY ME IN
12   SHORTHAND AT THE TIME AND PLACE HEREIN NAMED AND WAS
13   THEREAFTER TRANSCRIBED INTO TYPEWRITING UNDER MY
14   DIRECTION, SAID TRANSCRIPT BEING A TRUE AND CORRECT
15   TRANSCRIPTION OF MY SHORTHAND NOTES.
16           I FURTHER CERTIFY THAT I HAVE NO INTEREST
17   IN THE OUTCOME OF THIS ACTION.
18           PURSUANT TO FEDERAL RULE 30(E), TRANSCRIPT
19   REVIEW WAS REQUESTED.
20
21                    DATED THIS 26TH DAY OF APRIL, 2016,
                      AT VALENCIA, CALIFORNIA
22
23           _____
                 HEIDI VAN ELGORT, CSR NO. 12466
24
25
```

Page 82

# EXHIBIT "F"





Exhibit 2
Witness: Jimmie Randall Brooks
Date: 1/12/16
Reporter: Terri L Haupt, CSR6111

Google Maps 7200 E Brundage Ln

2-1

Google Maps   7200 E Brundage Ln



2-3

144

Google Maps   7200 E Brundage Ln



2-4/

145

Google Maps    7200 E Brundage Ln



2-5

146

Incident Report Continued:

102-2015

LEON'S QUALITY ADJUSTERS, INC. -
BAKERSFIELD

STATE LICENSE # RA1231

TONY RODRIGUEZ
FIELD ADJUSTER

PO BOX 347
BAKERSFIELD, CA 93302

·661·328·6300

JIMMIE BROOKS

SORRY I MISSED YOU, PLEASE CALL ME BACK AT

520-1044

REF # 497-0

Tow Truck Company Business Card Front Side

Tow Truck Company Business Card Back Side

**Page 4 of 4**

Exhibit  3
Witness: Jimmie Randall Brooks
Date:  1/26/16
Reporter: Terri L Haupt, CSR6111

147

Wm. Bolthouse Farms, Inc.
Security Department
<u>Incident Report</u>

**Type of Incident:** Vehicle Repossession                    **Report Number: 102-2015**

| Location: Main Employee Parking Lot | | | | |
|---|---|---|---|---|
| From:<br>04-22-2015<br>2128 hours | To:<br>04-22-2015<br>2220 hours | Date<br>Reported:<br>04-22-2015 | Time:<br>2128 hours | Reporting Officer:<br>Sabrina McEntire |

| Code:   RP=Reporting Person | SU=Subject | W=Witness | I=Involved |
|---|---|---|---|

| R<br>P | Name:<br>Lucia Jimenez | Company/Department:<br>Allied Barton/Security Officer |
|---|---|---|
| | Employee Number:<br>27 | Contact Phone/Ext.<br>661-366-7209/6827 |
| I | Name:<br>Tony Rodriguez | Company/Department:<br>Leon's Quality Adjusters, INC. |
| | Employee Number:<br>P.O.Box 347 Bakersfield, CA. 93302 | Contact Phone/Ext.<br>661-520-1046/ Ref # 40779 |
| I | Name:<br>Jimmie Brooks | Company/Department:<br>Bolthouse Farms/Warehouse Shipping 2nd Shift |
| | Employee Number:<br>45658 | Contact Phone/Ext.<br>661-366-7209/5667 |
| I | Name:<br>Robert Gilstrap | Company/Department:<br>Bolthouse Farms/ Warehouse Shipping Supervisor 2nd Shift |
| | Employee Number:<br>45588 | Contact Phone/Ext.<br>661-366-7209/5667 |
| I | Name:<br>Lewis Richardson | Company/Department:<br>Allied Barton/Security Officer |
| | Employee Number:<br>6 | Contact Phone/Ext.<br>661-366-7209/6827 |

**Narrative:**

On 04-22-2015 at approximately 2128 hours, while performing my duties in the Central Monitoring Station (C.M.S.), I was contacted by Officer L. Jimenez who stated she observed an unmarked tow truck enter the Main Employee Parking lot. I notified the roving guard, Officer L. Richardson, who responded from the east trailers (#9-15); and simultaneously viewed the security cameras. I observed the unmarked tow truck in the south lane of the Main Employee Parking lot. I observed that the tow truck had attached an unknown, pick-up truck that was red in color and was proceeding out of the main employee parking lot driving against traffic. I left the C.M.S.

Page 1 of 4

Exhibit 4
Witness: Jimmie Randall Brooks
Date: 1/26/16
Reporter: Terri L Haupt, CSR6111

148

Incident Report Continued:                                                           102-2015

building and attempted to stop the tow truck, but was unsuccessful. The tow truck made an east bound turn onto
E. Brundage Lane and proceeded driving. I was standing at the edge of the Main Employee Parking lot entrance
and observed the tow truck turn into the first driveway on the south side of E. Brundage lane, east of the railroad
tracks.

At approximately 2131 hours, I contacted the Allied Barton account manager, AJ Bajwa, and informed him of the
details of the situation.

At approximately 2133 hours, Officer L. Richardson arrived at South Guard and I informed him of the details of
the situation. Officer Richardson stated while he was enroute to South Guard, he observed an unmarked tow
truck, towing a red pick-up truck, turn into the first driveway on the south side of E. Brundage lane, east of the
railroad tracks. Officer Richardson stated he was going to drive to the East Brundage Gate to see if he could
locate the tow truck from there. I asked him to obtain the towing company's name if possible.

At approximately 2137 hours, I overheard a Bolthouse Farms employee, Jimmie Brooks, stating to Officer L.
Jimenez that someone informed him that a tow truck came and took his truck. I contacted Mr. Brooks and asked
if he was the registered owner of the vehicle that was towed. Mr. Brooks stated he was. Mr. Brooks stated he
wanted to call the police and report it missing. I stated to Mr. Brooks, "before you call the police I can take you
and show you where the truck went, and maybe you can find it". I escorted Mr. Brooks to the edge of the Main
Employee Parking lot entrance, to show him where the tow truck was last seen. On our way to the edge of the
drive way, I advised Mr. Brooks that if he called Law Enforcement the Bolthouse Farms Security Manager, Silas
Griffin, would have to get involved. I informed Mr. Brooks that Silas was at home and would have to come out to
Bolthouse; I also advised him that it would be a long reporting process and it could get ugly (referring to the
reporting procedures for Law Enforcement arriving on Bolthouse property). Mr. Brooks and I arrived at the edge
of the Main Employee Parking lot entrance and I showed him where the tow truck was last seen. Mr. Brooks

Incident Report Continued:                                                                          102-2015

confirmed that he understood the location I was referring to by repeating the directions back to me. I informed

Mr. Brooks that Officer Richardson was attempting to locate the tow truck. Mr. Brooks asked If Officer

Richardson would be able to take him to the location the tow truck was last seen when he (Officer Richardson)

returned. I informed Mr. Brooks that Officer Richardson could not take him to the location where the tow truck

was last seen, because it was not Bolthouse Farms Property. I stated to Mr. Brooks that If he did notify Law

Enforcement, to please Inform me so I could begin making the proper notifications. Mr. Brooks and I returned to

South Guard where the Apex Shipping Supervisor, Robert Gilstrap, was exiting on a golf cart. Mr. Gilstrap asked

Mr. Brooks if everything was ok. Mr. Brooks informed Mr. Gilstrap of the details of the situation. Mr. Gilstrap told

Mr. Brooks to "Jump in" and he would take him (Mr. Brooks) to go find the tow truck. Mr. Brooks and Mr. Gilstrap

exited Bolthouse Property and proceeded eastbound on E. Brundage lane. Shortly after leaving Mr. Gilstrap and

Mr. Brooks returned and parked the golf cart in the visitor parking area. Mr. Brooks and Mr. Gilstrap got into Mr.

Gilstrap's personal vehicle and proceeded eastbound on E. Brundage lane In order to locate the tow truck.


At approximately 2150 hours, Officer L. Richardson returned to South Guard and informed me he was unable to

locate the tow truck.


At approximately 2215 hours, Mr. Brooks and Mr. Gilstrap returned to South Guard and informed me they had

located Mr. Brooks' truck. Mr. Brooks stated he contacted the tow truck driver who provided him with a business

card. I obtained a photocopy of the business card for the tow truck driver, Tony Rodrigues (See attached).


All parties cleared the scene at approximately 2220 hours.


Pending further investigation.


Page 3 of 4

# EXHIBIT "G"

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

JIMMIE R. BROOKS,                  )
                                   )
          Plaintiff,               )
                                   )
     vs.                           )   NO.
                                   )   1:15-CV-00965-LJO-JLT
LEON'S QUALITY ADJUSTERS,          )
INC., TONY RODRIGUEZ, and          )
DOES 1 through 10,                 )
inclusive,                         )
                                   )
          Defendants.              )
_____)

VIDEOTAPED DEPOSITION OF SABRINA McENTIRE

Valencia, California

Wednesday, April 13, 2016

11:51 A.M. - 1:40 P.M.

REPORTED BY:

HEIDI VAN ELGORT

CSR NO. 12466

SABRINA McENTIRE - 4/13/2016

```
 1                    UNITED STATES DISTRICT COURT
 2                   EASTERN DISTRICT OF CALIFORNIA
 3
 4    JIMMIE R. BROOKS,            )
                                   )
 5              Plaintiff,         )
                                   )
 6         vs.                     )    NO.
                                   )    1:15-CV-00965-LJO-JLT
 7    LEON'S QUALITY ADJUSTERS,    )
      INC., TONY RODRIGUEZ, and    )
 8    DOES 1 through 10,           )
      inclusive,                   )
 9                                 )
                Defendants.        )
10    _____ )
11
12
13
14
15            Videotaped deposition of SABRINA McENTIRE,
16    a witness, taken on behalf of the Plaintiff, at
17    27959 Smyth Drive, Valencia, California, commencing
18    at 11:51 A.M. and ending at 1:40 P.M. on Wednesday,
19    April 13, 2016, before Heidi Van Elgort, Certified
20    Shorthand Reporter No. 12466.
21
22
23
24
25
```

Page 2

SABRINA McENTIRE - 4/13/2016

| | | | |
|---|---|---|---|
| 1 | Q | About what year was that? | 11:57:25 |
| 2 | A | 1999. | 11:57:26 |
| 3 | Q | All right.  So this repossession incident | 11:57:27 |
| 4 | | was in April of 2015.  At that time were you still a | 11:57:40 |
| 5 | | security officer at AlliedBarton? | 11:57:44 |
| 6 | A | Yes. | 11:57:46 |
| 7 | Q | And what were your shifts that you were | 11:57:47 |
| 8 | | working at Bolthouse at that time? | 11:57:49 |
| 9 | A | I varied through every shift.  I -- I was | 11:57:53 |
| 10 | | in a position of every shift at that time. | 11:57:56 |
| 11 | Q | Were you supervising people? | 11:57:58 |
| 12 | A | At that time, yes. | 11:58:00 |
| 13 | Q | Who were you supervising? | 11:58:01 |
| 14 | A | At the time it was Lucia Jimenez and Lewis | 11:58:03 |
| 15 | | Richardson. | 11:58:07 |
| 16 | Q | And who were you reporting to? | 11:58:09 |
| 17 | A | AJ Bajwa. | 11:58:11 |
| 18 | Q | And AJ is AlliedBarton as well; right? | 11:58:15 |
| 19 | A | Yes. | 11:58:18 |
| 20 | Q | So it would vary.  You would just -- you | 11:58:20 |
| 21 | | would be assigned different shifts on different | 11:58:26 |
| 22 | | days? | 11:58:28 |
| 23 | A | Whatever shift he felt I was needed in, | 11:58:29 |
| 24 | | yes. | 11:58:32 |
| 25 | Q | Okay.  But on April 22, 2015, the date of | 11:58:32 |

Page 12

SABRINA McENTIRE - 4/13/2016

| | | |
|---|---|---|
| 1 | the repossession, you were working what shift? | 11:58:38 |
| 2 | A    Second shift. | 11:58:39 |
| 3 | Q    And what shift is that? | 11:58:40 |
| 4 | A    From 2:00 o'clock in the afternoon until | 11:58:41 |
| 5 | 10:30 P.M. | 11:58:44 |
| 6 | Q    And describe your duties on that day as far | 11:58:52 |
| 7 | as, you know, maintaining security. | 11:58:57 |
| 8 | A    I was in the central monitoring station | 11:59:00 |
| 9 | watching the cameras, making sure that no one was | 11:59:04 |
| 10 | going to come into the fence or any areas that they | 11:59:07 |
| 11 | weren't supposed to.  Anybody that I didn't | 11:59:11 |
| 12 | recognize that wasn't supposed to be on property. | 11:59:12 |
| 13 | Q    And was that your normal work? | 11:59:15 |
| 14 | A    One of the positions, yes. | 11:59:18 |
| 15 | Q    Yeah, and when you say the central | 11:59:20 |
| 16 | monitoring shack, that's the second one that's | 11:59:23 |
| 17 | located at the Bolthouse Farms entrance that's | 11:59:30 |
| 18 | behind the first one where people are checked in; is | 11:59:34 |
| 19 | that right? | 11:59:36 |
| 20 | A    Yes. | 11:59:37 |
| 21 | Q    So how many security cameras have you got | 11:59:37 |
| 22 | in -- how many security screens can you see as part | 11:59:41 |
| 23 | of your job?  Is it rotating from one to another, or | 11:59:44 |
| 24 | how does that work? | 11:59:47 |
| 25 | A    It stays positioned on certain screens.  We | 11:59:48 |

Page 13

SABRINA McENTIRE - 4/13/2016

| | | |
|---|---|---|
| 1 | MR. TARNEJA:   Join. | 12:10:05 |
| 2 | BY MR. TRUEBLOOD: | 12:10:07 |
| 3 | Q    Was this sign there on April 22nd? | 12:10:07 |
| 4 | A    Yes. | 12:10:09 |
| 5 | Q    Okay.   And what is that sign intended to -- | 12:10:10 |
| 6 | A    It -- | 12:10:15 |
| 7 | Q    -- to say to visitors to the plant? | 12:10:16 |
| 8 | A    Pretty much anybody that comes into the | 12:10:18 |
| 9 | plant needs to check with security before they | 12:10:21 |
| 10 | enter. | 12:10:23 |
| 11 | Q    And does the plant include the south and | 12:10:23 |
| 12 | north entrance to the employee parking?   In other | 12:10:25 |
| 13 | words, does people going into the employee parking, | 12:10:28 |
| 14 | wherever they are, do they also need to check with | 12:10:31 |
| 15 | the guard? | 12:10:33 |
| 16 | A    No.   It's open. | 12:10:33 |
| 17 | Q    That's open? | 12:10:35 |
| 18 | A    Yes. | 12:10:35 |
| 19 | Q    But was it the company policy to permit | 12:10:36 |
| 20 | unauthorized vehicles at that time into that -- into | 12:10:41 |
| 21 | the employee parking? | 12:10:44 |
| 22 | A    I don't understand. | 12:10:46 |
| 23 | Q    In other words, was it permitted under | 12:10:47 |
| 24 | policies that you were operating under for | 12:10:50 |
| 25 | unauthorized vehicles, that is, not employees, to go | 12:10:54 |

Page 22

Maxene Weinberg Agency
(800) 640-1949

SABRINA McENTIRE - 4/13/2016

| | | |
|---|---|---|
| 1 | into the north or south employee parking lot? | 12:10:58 |
| 2 | A    We don't know exactly what are employee -- | 12:11:01 |
| 3 | what are employee vehicles or not.  It's an open | 12:11:05 |
| 4 | parking lot.  Any car can come in that needs to, but | 12:11:09 |
| 5 | we do patrol the parking lot to make sure that | 12:11:13 |
| 6 | people are not parked incorrectly and keep them from | 12:11:16 |
| 7 | doing things they're not supposed to in the parking | 12:11:22 |
| 8 | lot. | 12:11:25 |
| 9 | Q    But I mean the sign here on Exhibit 7 right | 12:11:25 |
| 10 | at the entrance says, "Authorized Vehicles Only," | 12:11:28 |
| 11 | doesn't it? | 12:11:31 |
| 12 | A    Yes. | 12:11:32 |
| 13 | Q    I mean doesn't that mean that any -- | 12:11:32 |
| 14 | MR. LEE:  Counsel, if I might just to help. | 12:11:36 |
| 15 | Maybe if you were to ask about tow trucks I wouldn't | 12:11:39 |
| 16 | have a problem. | 12:11:42 |
| 17 | MR. TRUEBLOOD:  All right.  I'll do that. | 12:11:43 |
| 18 | Q    Were tow truck's permitted to enter into | 12:11:44 |
| 19 | the north or south parking lot without checking with | 12:11:47 |
| 20 | the guard first -- | 12:11:50 |
| 21 | A    No. | 12:11:51 |
| 22 | Q    -- on April 22, 2015? | 12:11:52 |
| 23 | A    No.  They always have to check with us | 12:11:52 |
| 24 | first. | 12:11:55 |
| 25 | Q    And so a tow truck such as the one that | 12:11:55 |

Page 23

1

2

3

4                  DECLARATION UNDER PENALTY OF PERJURY

5                                ***

6

7            I, SABRINA McENTIRE, the witness herein,

8    declare under penalty of perjury that I have read

9    the foregoing deposition in its entirety and that

10   the testimony contained therein, as corrected by me,

11   is a true and accurate transcription of my testimony

12   elicited at said time and place.

13

14            Dated this _____ day of

15   _____, 20____, at

16   _____, California.

17

18                              _____

19                                   SABRINA McENTIRE

20

21

22

23

24

25

Page 92

Maxene Weinberg Agency
(800) 640-1949

SABRINA McENTIRE - 4/13/2016

```
1
2                    REPORTER'S CERTIFICATE
3
4             I, HEIDI VAN ELGORT, CSR NO. 12466, A
5    CERTIFIED SHORTHAND REPORTER IN AND FOR THE STATE OF
6    CALIFORNIA, DO HEREBY CERTIFY:
7             THAT PRIOR TO BEING EXAMINED, THE WITNESS
8    NAMED IN THE FOREGOING PROCEEDINGS WAS BY ME DULY
9    SWORN TO TESTIFY TO THE TRUTH, THE WHOLE TRUTH, AND
10   NOTHING BUT THE TRUTH;
11            THAT SAID PROCEEDINGS WERE TAKEN BY ME IN
12   SHORTHAND AT THE TIME AND PLACE HEREIN NAMED AND WAS
13   THEREAFTER TRANSCRIBED INTO TYPEWRITING UNDER MY
14   DIRECTION, SAID TRANSCRIPT BEING A TRUE AND CORRECT
15   TRANSCRIPTION OF MY SHORTHAND NOTES.
16            I FURTHER CERTIFY THAT I HAVE NO INTEREST
17   IN THE OUTCOME OF THIS ACTION.
18            PURSUANT TO FEDERAL RULE 30(E), TRANSCRIPT
19   REVIEW WAS REQUESTED.
20
21                  DATED THIS 26TH DAY OF APRIL, 2016,
                    AT VALENCIA, CALIFORNIA
22
23
                    _____
24                  HEIDI VAN ELGORT, CSR NO. 12466
25
```

Maxene Weinberg Agency
(800) 640-1949

## DEPONENT'S CHANGES OR CORRECTIONS

**NOTE:** If you are adding to your testimony, print the exact words you want to add. If you are deleting from your testimony, print the exact words you want to delete.

I, Sabrina McEntire , have made the following changes in my deposition:

| PAGE | LINE # | FROM | TO |
|------|--------|------|-----|
| 59 | 19 | it does the not refresh it | it does not Refresh it |
| 71 | 8 | can you -- | can you restate that |
| 78 | 1 | it was -- yes | it was there yes |
| 78 | 3 | here when ever -- | here whenever I seen it |
| 78 | 25 | The -- oh | the yellow lights oh |
| 85 | 4 | The visitor -- or the employee off loading | the visitor parking or the employee off loading |
| 89 | 9 | there was -- AJ told me that there was a | there was or AJ told me that there was a |
| 9 | 6 | been a -- over a year now | been a while over a year now |

SIGNATURE OF WITNESS: _____  DATE: 5-25-2016

160

1   **<u>FEDERAL COURT PROOF OF SERVICE</u>**

2   Jimmie R. Brooks v. Leon's Quality Adjusters, Inc. - Case No. 1:15-CV-00965-JLT

3   STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

4       At the time of service, I was over 18 years of age and not a party to the action.
My business address is 633 West 5th Street, Suite 4000, Los Angeles, CA 90071.  I

5   am employed in the office of a member of the bar of this Court at whose direction
the service was made.

6       On July 1, 2016, I served the following document(s):  **DECLARATION OF**

7   **ANKUR TARNEJA WITH EXHIBITS A TO G IN SUPPORT OF
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, OR,**

8   **ALTERNATIVELY, PARTIAL SUMMARY JUDGMENT**

9

10      The documents were served by the following means:

11  ☒    (BY COURT'S CM/ECF SYSTEM)  I electronically filed the document(s)
with the Clerk of the Court by using the CM/ECF system.  Participants in the

12      case who are registered CM/ECF users will be served by the CM/ECF system.
Participants in the case who are not registered CM/ECF users will be served

13      by mail or by other means permitted by the court rules.

14      I declare under penalty of perjury under the laws of the United States of
America and the State of California that the foregoing is true and correct.

15

16      Executed on July 1, 2016, at Los Angeles, California.

17



18      MONIQUE TALAMANTE

19

20

21

22

23

24

25

26

27

28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4837-2181-6372.1