1  ALEXANDER B. TRUEBLOOD (Cal. Bar No. 150897)
   TRUEBLOOD LAW FIRM
2  10940 Wilshire Boulevard, Suite 1600
   Los Angeles, California 90024
3  Telephone:  (310) 443-4139
   Facsimile:  (310) 943-2255
4
   Attorneys for Plaintiff
5  JIMMIE BROOKS

6

7

8              UNITED STATES DISTRICT COURT

9             EASTERN DISTRICT OF CALIFORNIA

10

11  JIMMIE R. BROOKS,                    ) Case No:  1:15−CV−00965−LJO−JLT
                                         )
12          Plaintiff,                   )
                                         ) **PLAINTIFF'S MEMORANDUM OF**
13      vs.                              ) **POINTS AND AUTHORITIES IN**
                                         ) **OPPOSITION TO MOTION FOR**
14                                       ) **SUMMARY JUDGMENT**
                                         )
15  LEON'S QUALITY ADJUSTERS,            )
    INC., TONY RODRIGUEZ, and DOES       ) Date:  August 9, 2016
16  1 through 10, inclusive,             ) Time:  9:30 a.m.
                                         ) Judge:  Hon. Jennifer L. Thurston
17                                       )
            Defendants.                  )
18                                       )
                                         )
19                                       )
                                         )
20                                       )
                                         )
21                                       )
                                         )
22                                       )
                                         )
23                                       )
                                         )
24  _____ )

25

26

27

28

I.  INTRODUCTION

The present motion asks the Court to assume the role of the jury, weigh scores of disputed facts, and then decide the ultimate issue in the case – whether a breach of the peace occurred during the repossession of plaintiff's vehicle. A breach of the peace is determined under a "reasonableness" standard, and is a question of fact for the jury. <u>Marcus v. McCollum</u>, 394 F.3d 818, 820 (10th Cir. 2004)("The circumstances of each case must be considered in determining whether or not a breach of peace has taken place, and the jury is the judge of the facts"). In this case, where 54 of the defendants' 124 material facts are disputed, summary judgment just isn't available. The other legal issues which defendants raise – whether defendants are "debt collectors" under the FDCPA and RFDCPA, and whether a cause of action lies for conversion for a breach of the peace – will not detain the Court for long.  The law is already well developed against defendant's positions on these topics, and indeed, defendants' own cited cases and statutes dispose of their arguments.

Defendants' version of events leaves out so many important and damaging facts that, with all due respect for advocacy, it comes close to being a fairy tale. Leon's tow-truck driver, Tony Rodriguez, was a trainee with only one week on the job, who had been fired at his only other job repossessing cars. MF 128-129. He received two GPS hits on plaintiff's vehicle on the day of the repossession, at plaintiff's home. MF 136-137. Instead of going there and making a peaceable repossession from plaintiff's open driveway, he ignored the GPS hits, spent five hours doing other jobs, and then attempted a dangerous nighttime "hook and book," or quick snatch, at a heavily guarded and fenced industrial plant. MF 137. The plant was ubiquitously posted with "No Repo Vehicles," "No Trespassing," "Private Property," and "Check With Guard Before Entering Plant" signs. MF 124-127. Two security shacks sat monitoring the entrance. Rodriguez admits his plan from the beginning was to suddenly rush in under the very noses of the security guards,

1

snatch plaintiff's vehicle, and get out before the guards could catch him. MF 61, 67. Having scouted the location on foot, he knew he would have to turn right in front of the security shack, and then exit at a high speed the wrong way against traffic, to get out before the guards reached him. MF 22, 63, 67, 124.  Rodriguez was so nervous about attempting this maneuver, that he called the President of Leon's first, while sitting in the dark outside the plant in his truck, to ask if he would be breaking any laws. MF 141. Amazingly, his boss told him "If you can get that unit before they stop you, go ahead and take it." MF 142. In other words, go ahead and commit criminal trespass, as long as you get away with it. Rodriguez admits this is even what he was trained: "If it's open, it's game." MF 131.

The unsurprising result was a criminal trespass, reckless driving that risked injury to innocent bystanders, and an actual confrontation and disturbance of the peace. According to the surveillance video, Rodriguez *reversed* his tow truck into Bolthouse Farms at a "very quick" speed, on the *wrong* side of traffic as he came in. MF 143-144. The security guard in the front shack immediately sent out the alarm, and her supervisor sprinted to try and stop Rodriguez, shouting and waving her arms. MF 51-52, 55, 146. Pressed for time as the guard ran toward him, Rodriguez provisionally attached plaintiff's vehicle in four seconds flat, then booked out the employee lot through the same one-way driveway he had entered, now against traffic for the *second* time. MF 22, 144. He was confronted in this lane by the security guard yelling and waving her arms, but increased his speed and turned right in front of her. MF 146-147.  He then picked up even more speed, and rushed out the main driveway, with the security guard chasing him all the way to the property line, still yelling and waving. MF 147.

All of this took place at night during a Bolthouse Farms shift change, with many employees walking around the lot, and cars going in and out. MF 143, 145. The security manager testified that under the circumstances, the incident was "a huge safety concern," that the high-speed reverse entry against traffic was a "very

1  dangerous maneuver," and that "this guy had no regard for anybody who is coming

2  out of Bolthouse." MF 143-145. Rodriguez's vehicle was unmarked, and no one

3  was sure if this was a repossession or simply a theft. MF 52, 139, 148. Plaintiff

4  called 911, and Bolthouse security would have called the police too, if the security

5  supervisor had not felt nervous about angering her boss with a late night phone call.

6  MF 81, 88, 146. Rodriguez himself, with guilty mind, was so sure the police had

7  been called, that he parked just outside the Bolthouse Farms gate after the

8  repossession, to wait for them. MF 150.

9      In summary, this is a rather easy case of breach of the peace. Although the

10 doctrine requires only a *risk* of disturbance, confrontation, or injury, here there was

11 an actual public disturbance. Moreover, California law finds a breach of the peace

12 if there is either an unlawful entry, or an objection during the repossession. This

13 case involves both, with the aggravating factor that innocent bystanders were put at

14 risk for physical injury. MF 148. On this record, defendants cross a bridge too far in

15 asking the court to adjudicate plaintiff's claims on summary judgment. With 54 of

16 124 material facts in dispute, this is, pretty plainly, a case for the jury.

17                          II.   THE FACTS

18      Due to space limitations, and given the summary in the Introduction, plaintiff

19 respectfully refers the Court to plaintiff's Separate Statement of Additional

20 Material Facts (Fact Nos. 124-151), for the details of the repossession.

21                          III.   ARGUMENT

22 A.    Defendants Are "Debt Collectors" Under The FDCPA

23      The FDCPA is Congress's response to "the abusive, deceptive, and unfair

24 debt collection practices [used] by many debt collectors." 15 U.S.C. § 1692(a). The

25 FDCPA serves to protect consumers who have been victimized by debt collectors,

26 regardless of whether a valid debt exists. Baker v. G.C. Servs. Corp., 677 F.2d 775,

27 777 (9th Cir. 1982); see 15 U.S.C. § 1692(e).

28      Plaintiff alleges in his first cause of action that defendants violated the

                                  3

FDCPA, at 15 U.S.C. § 1692f(6)(A). That section provides as follows:

> A debt collector may not use unfair or unconscionable means to collect or attempt to collect any debt. Without limiting the general application of the foregoing, the following conduct is a violation of this section:...
>
> (6) Taking or threatening to take any nonjudicial action to effect dispossession or disablement of property if –
>
> (A) there is no present right of possession of the property claimed as collateral through an enforceable security interest.

Congress expressly included repossession companies within the definition of "debt collector" for purposes of 15 U.S.C. § 1692f(6). See 15 U.S.C. § 1692a(6). Section 1692a(6) provides: "For the purpose of section 1692f(6) of this title, such term also includes any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the enforcement of security interests."  Defendants do not dispute that they are licensed repossession agents, engaged in a business whose principal purpose is the enforcement of security interests.  MF No 123.  Not surprisingly, FDCPA law is very well-established that repossession agencies and their employees are "debt collectors" for purposes of 15 U.S.C. § 1692f(6), which prohibits a breach of the peace during a repossession. James v. Ford Motor Credit Co., 842 F.Supp. 1202, 1207 (D. Minn. 1994); Clark v. Auto Recovery Bureau, Inc., 889 F.Supp. 543, 546 (D. Conn. 1994); Jordan v. Kent Recovery Serv., Inc., 731 F.Supp. 652, 656-658 (D. Del. 1990). Even defendant's own cited case, Pflueger v. Auto Fin. Group, Inc., 1999 WL 33740813 (C.D. Cal. April 26, 1999), denied a repossession agency's summary judgment motion on the plaintiff's § 1692f(6) claim, finding that the repossession company was a "debt collector" for purposes of 15 U.S.C. § 1692f(6), and that there were material issues of disputed fact concerning whether a breach of the peace occurred.

Since plaintiff is not alleging any violation of the FDCPA other than

section 1692f(6)(see 1AC, ¶ 15), he need not prove that defendants fall under the

*general* definition of "debt collector" in the FDCPA, i.e. that the defendant's

"principal purpose" is "debt collection," or that defendant(s) "regularly collects or

attempts to collect, directly or indirectly, debts owed or due or asserted to be owed

or due another." 15 U.S.C. § 1692a(6). However, Leon's does still satisfy this

general definition. Unlike the repossession agents in Pflueger, who only

repossessed collateral without seeking payment, Leon's *does* "indirectly" collect

payments from borrowers, and is paid for doing so, even if a repossession is not

accomplished.  Leon's policy is to have its repossession agents knock on the door,

and tell the consumer to either surrender their vehicle or make a payment to the

bank.  MF 123.  If the consumer makes the payment, the bank considers Leon's as

having done its job, and pays Leon's a "closing fee," even without a repossession.

MF 123. Leon's in turns pays a percentage of the closing fee to its repo man who

made the contact. Rodriguez attempted to get a closing fee as to plaintiff, when he

knocked on plaintiff's door with the intention of stating that he would take

plaintiff's vehicle unless plaintiff made a payment to his bank. MF 123.

    By adopting this policy of enforcing payments for the bank, and profiting

from it, Leon's collects money "directly or indirectly" for others (15 U.S.C.

§ 1692a(6)), and has made itself the exception to the usual finding (such as in the

Pflueger, Jordan, and Clark cases) that a repossession agency performing only

repossessions does not fall within the general FDCPA definition of "debt

collector."  For example, in Shannon v. Windsor Equity Group, Inc., 2014 U.S.

Dist. LEXIS 32259 (Mar. 12, 2014), Judge Whelan of the Southern District of

California held that a repossession company which aided and facilitated the

collections process of automobile finance companies through skip-tracing and other

activities fell within the *general* definition of a debt collector under § 1692a(6) (i.e.,

as being in business the principal purpose of which is debt collection). See id., 14-

21. Relying on Romine v. Diversified Collection Servs., Inc., 155 F.3d 1142 (9th

5

1    Cir. 1998), Judge Whelan noted that courts must ignore "disingenuous

2    organizational labels" and look to the substance of the defendant's alleged conduct,

3    in order to foster the consumer protection purpose of the FDCPA. <u>See</u> <u>id.</u> Thus,

4    under <u>Shannon</u>, a repossession company like Leon's who deliberately involves

5    itself in coercing payments and gets paid for it, falls under general definition of

6    "debt collector" in the FDCPA.

7       In summary, whether the Court looks to the FDCPA's specific language

8    enumerating repossession agencies as debt collectors, or to the FDCPA's general

9    definition of "debt collector," Leon's is covered by the Act.

10    B.     <u>Defendants Violated The FDCPA, If They Breached The Peace</u>

11       That a breach of the peace terminates the "present right" of possession of

12    collateral under 15 U.S.C. § 1692f(6), resulting in a violation of the FDCPA, is so

13    well-established, that defendants appear to concede the point. <u>See, e.g.</u>, <u>Clark v.</u>

14    <u>Auto Recovery Bureau</u>, <u>supra</u>, 889 F.Supp. 543 (if a breach of the peace occurs

15    under state law, there is no present right of possession to the collateral under

16    § 1692f(6)(A)); <u>Vantu v. Echo Recovery LLC</u>, 2015 WL 571102 (N.D. Ohio 2015)

17    (denying a repossession agency's motion to dismiss because, where there was an

18    alleged breach of the peace, the agency "had no right to present possession of the

19    collateral, and its conduct (if true) violated the FDCPA"); <u>Alexander v. Blackhawk</u>

20    <u>Recovery & Investigation, LLC</u>, 731 F.Supp.2d 674 (E.D. Mich. 2010) (denying a

21    repossessor's motion for summary judgment based on its alleged breach of the

22    peace, which "is the type of abusive practice Congress sought to prevent in

23    enacting FDCPA and specifically § 1692f(6)"); <u>Williams v. Republic Recovery</u>

24    <u>Servs., Inc.</u>, 2010 U.S. Dist. LEXIS 54827 (N.D. Ill. May 27, 2010) (denying a

25    repossession agency's motion to dismiss plaintiff's claim under § 1692f(6) because

26    the plaintiff alleged that the agency breached the peace in attempting to repossess

27    his car); <u>Fleming-Dudley v. Legal Investigations, Inc.</u>, 2007 WL 952026 (N.D. Ill.

28    March 22, 2007) (denying a repossession company's motion to dismiss the

1 plaintiffs' § 1692f(6) claim because they alleged a breach of the peace, and

2 therefore that the repossessor did not have a "present right" of possession of the

3 collateral); Purkett v. Key Bank USA, N.A., 2001 WL 503050 (N.D. Ill. May 10,

4 2001) (holding that the plaintiff stated a claim under § 1692f(6) by alleging a

5 repossession company breached the peace in taking the collateral); Pflueger v. Auto

6 Fin. Group, Inc., 1999 WL 33740813 (C.D. Cal. April 26, 1999) (denying a

7 repossession agency's summary judgment motion on plaintiff's § 1692f(6) claim

8 because there were material issues of disputed fact concerning whether a breach of

9 the peace occurred); Vitale v. First Fidelity Leasing Group, 35 F.Supp.2d 78 (D.

10 Conn. 1998) (holding that a repossession company violates § 1692f(6) when the

11 repossession is in breach of the peace); James v. Ford Motor Credit Co., 842

12 F.Supp. 1202 (D. Minn. 1994) (same).

13 C.    The Definition of "Breach of The Peace"

14      *1.  The General Definition of Breach of The Peace*

15      Whether a repossession agency breaches the peace depends on state law,

16 principally the UCC § 9-609.  Alexander, 731 F.Supp.2d at 679; Fleming-Dudley,

17 2007 WL 952026, at *5; Purkett, 2001 WL 503050, at *2-3. The UCC permits self-

18 help repossession ***only if*** the repossession agency "proceeds without breach of the

19 peace." Cal. Comm. Code § 9609(b)(2). The statute "does not define or explain the

20 conduct that will constitute a breach of the peace, leaving that matter for continuing

21 development by the courts." 4 Witkin, Summary of Cal. Law (10th ed. 2005),

22 Secured Transactions in Personal Property, § 178, p. 745.

23      California has not yet set out a general standard for "breach of the peace"

24 under the UCC, and therefore one must look to UCC jurisprudence across the 50

25 states for guidance.  UCC section 9-609 is the same in all 50 states.

26      Self-help repossession is a harsh remedy which should be strictly construed

27 to prevent abuse, because consumers often lack knowledge of their rights in this

28 area.  Moyer v. Int'l State Bank, 385 N.W.2d 38, 40 (Minn. 1986).  It is a

7

delegation of the power to resolve disputes by the sovereign, and not a <u>carte blanche</u> power, such that its exercise is strictly limited to those *rare* situations when a repossession can be done peacefully.  <u>Hilliman v. Cobado</u>, 499 N.Y.S.2d 610, 614 (1981); <u>Quest v. Barnett Bank of Pensacola</u>, 397 So.2d 1020, 1023 (Fla. 1981)(self-help repossession is "a very limited right of possession").  The UCC imposes a duty on the secured party to take precautions for public safety when repossessing property, to protect both the debtor and bystanders. <u>Clark v. Associates Comm. Corp.</u>, 877 F.Supp. 1439, 1446-1447 (D. Kan. 1994); <u>Robinson v. Citicorp. Nat. Servs., Inc.</u>, 921 S.W.2d 52, 54 (Mo. App. 1996)(duty is intended to protect third parties equally as the debtor). A breach of the peace occurs if there is a "risk" of injury to innocent bystanders. <u>Gen'l Finance Corp. v. Smith</u>, 505 So. 2d 1045, 1048 (Ala. 1987)(repossession must proceed "without risk of injury to the secured party, the debtor, or any innocent bystanders"); <u>Ruffin v. Nissan Motor Accept. Corp.</u>, 953 F.Supp. 373, 376 (M.D. Ala. 1996); <u>Pleasant v. Warrick</u>, 590 So.2d 214, 216 (Ala. 1991). Thus, the secured party who "anticipates difficulty" should use judicial process rather than self-help. <u>Unicut, Inc. v. Texas Commerce Bank-Chemical</u>, 704 S.W.2d 442, 445 (Tex. 1986).

The debtor possesses a privilege to retain possession of his car, and may properly refuse to surrender it and force the secured party to use judicial methods. <u>Greene v. The First National Exch. Bank of Va.</u>, 348 F.Supp. 672, 675 (W.D. Va. 1972); <u>In Re Manderson</u>, 121 B.R. 617, 621 (N.D. Ala 1990); <u>Waisner v. Jones</u>, 107 N.M. 260, 264 (1988). The debtor has no duty to make the collateral available to the secured party. <u>Cobb v. Gen'l Motors Acceptance Corp.</u>, 589 So.2d 728, 731 (Ala. 1991).

A "breach of the peace" can occur even if the peace is not actually disturbed, if what is done is unjustifiable and unlawful, tending with sufficient directness to break the peace.  <u>Ragde v. Peoples Bank</u>, 767 P.2d 949, 951 (Wa. 1989).  There is no requirement of force, violence, or threat of violence.  <u>Bloomquist v. First Nat'l</u>

8

Bank of Elk River, 378 N.W.2d 81, 85-86 (Minn. 1985); Hilliman v. Cobado, 499 N.Y.S.2d 610, 614 (1981)(no requirement of physical confrontation or threat thereof); Davenport v. Chrysler Credit Corp., 818 S.W.2d 23, 28-29 (Tenn. 1991)("neither violence, the threat of violence, nor personal confrontation is necessary in order for a secured party's conduct to amount to a breach of the peace"); Thompson v. Ford Motor Credit Co., 324 F.Supp. 108, 115 (D.S.C. 1971)(no element of violence is needed to constitute a breach of the peace); Laurel Coal Co. v. Walter E. Heller & Co., Inc., 539 F.Supp. 1006, 1008 (W.D.Penn.1982) ("even non-forceful repossessions may be found unlawful").

In light of the lack of a specific statutory standard in the UCC, many courts have adopted a fact-intensive "reasonableness" standard to analyze an alleged breach of the peace. Davenport v. Chrysler Credit Corp., 818 S.W.2d 23 (Tenn. 1991); Giles v. First Virginia Credit Svcs., 560 S.E.2d 557, 565-566 (2002). Determining whether a particular secured creditor's conduct amounts to a breach of the peace requires a review of the reasonableness of the secured party's conduct in light of the facts of the case. Davenport, at 29; Giles, at 565.  Following Professors White and Summers in 2 J. White & R. Summers, Uniform Commercial Code § 27-6 (3d ed. 1988), these courts have recommended that the inquiry should take into consideration five factors: (1) where the repossession took place, (2) the debtor's express or constructive consent, (3) the reactions of third parties, (4) the type of premises entered, and (5) the creditor's use of deception. See White & Summers § 27-6, at 575-76; Davenport, 818 S.W.2d at 29; Giles, at 565.

Plaintiff will use this accepted "reasonableness" standard with the five factors, to analyze the breach of the peace issue here, as further informed by specific California law on the topic (see next subsection, III-C-2).

*2. In California, There Are Two Established Breaches of The Peace: (1) Any Unlawful Entry Onto Property, And (2) An Objection Made At The Time of Repossession*

Although California courts have not yet set out a general standard for "breach of the peace," they have established at a minimum that two situations constitute a breach of the peace: unlawful entries onto property, and objections at the time of repossession.

The seminal California case is <u>Henderson v. Security Nat'l Bank</u>, 72 Cal.App.3d 764, 770 (1977). <u>Henderson</u> held that the right of the secured party, who "is otherwise entitled to take possession of property," terminates upon a breach of the peace. The rule is simple: "If the mortgagee finds that he cannot get possession without committing a breach of the peace, he must stay his hand, ***and resort to the law*** [i.e., file a lawsuit for possession], for the preservation of the public peace is of more importance to society than the right of the owner of a chattel to get possession of it." <u>Id</u>.

<u>Henderson</u> involved the repossession company breaking a lock to enter the plaintiff's garage.  The <u>Henderson</u> court didn't attempt a general definition of a breach of the peace, but at least made clear that "any unlawful entry" will be a breach of the peace, including the breaking of a lock. <u>Henderson</u>, 72 Cal.App.3d at 770. In the case of defendants, the unlawful entry was the criminal trespass onto a heavily signed and guarded industrial property, with signs specifically prohibiting repossession vehicles, in violation of Penal Code § 602(n).

Under California law, an objection by a debtor or third party, made and ignored, is also a breach of the peace. In <u>Hartford Financial Corp. v. Burns</u>, 96 Cal.App.3d 591 (1979), the court held that under the UCC, if there is a refusal to turn over the vehicle, it is "apparent" that self-help repossession will produce a breach of the peace. <u>Id</u>. at 600.

<u>Deevy v. Tassi,</u> 21 Cal.2d 109 (1942), though not a UCC breach of the peace

10

case, stands for the proposition that an objection to a repossession in progress, even if the collateral is already secured, requires the secured party to resort to the courts. Id. at 119. The court held that even if the debtor were found to have been deprived of possession of the repossessed livestock at the time he physically attacked the repossessors, the defendants were still liable for assault and battery. Id.; see also Ivy v. General Motors Acceptance Corp., 612 So.2d 1108 (Miss. 1992)(breach of the peace occurred when tow-truck driver peaceably took vehicle, ignored debtor's subsequent objections, then debtor gave chase on a public street, and blocked tow-truck, causing it to crash).

An overwhelming number of courts across the country agree that if a debtor or third party makes an objection during the repossession, the repossessor must leave and resort to the courts. Marcus v. McCollum, 394 F.3d 818, 820 (10th Cir. 2004)(debtor's request to leave car alone in own driveway must be obeyed, and resistance need not be strong); Wade v. Ford Motor Credit Co., 8 Kan.App.2d 737, 744 (Kan. App., 1983)("[E]ven in the attempted repossession of a chattel off a street, parking lot or unenclosed space, if the repossession is verbally or otherwise contested at the actual time of and in the immediate vicinity of the attempted repossession by the defaulting party or other person in control of the chattel, the secured party must desist and pursue his remedy in court"); Morris v. First Natl. Bank & Trust Co., 21 Ohio St.2d 25, 30 (1970)("[W]e are constrained to hold that when appellee's agents were physically confronted by appellant's representative, disregarded his request to desist their efforts at repossession and refused to depart from the private premises upon which the collateral was kept, they committed a breach of the peace"); Pruitt v. Pernell, 360 F.Supp.2d 738, 747 (E.D. N.C. 2005) (well settled that if there is a confrontation at the time of a repossession, the secured party must cease the repossession and proceed by court action); Seibel v. Society Lease, Inc., 969 F.Supp. 713, 718 (M.D. Fla 1997)(entry onto property after objection is a breach of the peace); Ivy v. General Motors Acceptance Corp., 612

11

So.2d 1108 (Miss. 1992)(breach of peace when debtor gave chase after securing collateral); First & Farmers Bank of Somerset, Inc. v. Henderson, 763 S.W.2d 137, 139-140 (Ky. App. 1988)(objection valid though made after securing of collateral); Everett v. U.S. Life Credit Corp., 74 N.C.App. 142, 144 (1985)("[o]f course, if there is confrontation at the time of the attempted repossession, the secured party must cease the attempted repossession and proceed by court action in order to avoid a `breach of the peace.'"); Fulton v. Anchor Sav. Bank, FSB, 452 S.E.2d 208, 213 (Ga. 1994) (a breach of the peace can be created by an unequivocal oral protest); Census Federal Credit Union v. Wann, 403 N.E.2d 348, 352 (Ind.App.1980) ("if a repossession is ... contested at the actual time ... of the attempted repossession by the defaulting party or other person in control of the chattel, the secured party must desist and pursue his remedy in court"); Hollibush v. Ford Motor Credit Co., 179 Wis.2d 799, 508 N.W.2d 449, 453-55 (Wis.App.1993) (in the face of an oral protest, the repossessing creditor must desist); 2 J. White & R. Summers, Uniform Commercial Code § 27-6, at 580 (3d ed. 1988)("When the creditor repossesses in disregard of the debtor's unequivocal oral protest, most courts find the creditor guilty of a breach of the peace").

D.   Defendants Breached The Peace Under All The Applicable Legal Factors

   *1.  Unlawful Entry Through A Gauntlet Of Security Guards And Signs*

      Under California law, any unlawful entry onto property constitutes a breach of the peace. Henderson v. Security Nat'l Bank, 72 Cal.App.3d 764, 770 (1977). In this case, Rodriguez committed trespass by violating Penal Code § 602(n), which prohibits: "Driving any vehicle, as defined in Section 670 of the Vehicle Code, upon real property belonging to, or lawfully occupied by, another and known not to be open to the general public, without the consent of the owner, the owner's agent, or the person in lawful possession."

      It is undisputed that Rodriguez drove a vehicle onto Bolthouse Farms' property without permission. The premises were not open to the general public. The

1   property was fenced, and extensively signed with "No Trespassing," "Private

2   Property," and "No Repo Vehicles" signs. It was also guarded by several security

3   guards and shacks, and all visitors were required to check in with the guards. It is

4   not a defense to Penal Code § 602(n) that Bolthouse's gates were physically open at

5   the time of entry.  All that is required under the Penal Code is that the property not

6   be open to the general public.

7       *2.  Objections At The Time of Repossession*

8       On the night of the repossession, at 9:30 p.m., Rodriguez suddenly entered

9   Bolthouse Farms, driving in *reverse* and *against traffic* on the main driveway. MF

10  143-144. He was spotted immediately by security, and the supervisor Sabrina

11  McEntire ran out of the central monitoring station to stop the repossession. MF 51-

12  52, 55, 146. McEntire sprinted towards Rodriguez and reached him while he was

13  still well inside Bolthouse property, just leaving the employee parking lot driveway

14  onto the main driveway. MF 146-147. He was going (again) the wrong way against

15  traffic, out of the parking lot. MF 144. This all occurred on a shift change, with lots

16  of people milling about, a situation that the security manager noted was "very

17  dangerous" and "a huge safety concern." MF 143, 145.

18      McEntire was waving her hands, and yelling loudly at Rodriguez to stop.

19  MF 146. According to several witnesses, Rodriguez surely saw McEntire, as she

20  was in front of him and to his side, but he ignored her, turned right in front of her,

21  and continued driving even faster to escape her. MF 147. McEntire chased him all

22  the way to the property line, yelling and gesturing, to no avail. MF 147.

23      Rodriguez committed a breach of the peace by ignoring the objections. In

24  order to protect bystanders and avoid a confrontation, he had to stop the

25  repossession, and advise the finance company to resort to the courts. See Hartford

26  Financial Corp. v. Burns, 96 Cal.App.3d 591 (1979), and other cases cited at

27  section III-C-2. His disregard of the loud objections of the security guard, whom he

28  clearly saw despite his denial (MF 63), and his continued driving the wrong way

13

1   down a one-way lane, could have easily led to violence or an injury to bystanders,

2   since this all occurred on a shift change.  The testimony is that he actually sped up

3   once he encountered McEntire in the driveway, and then sped up some more – or as

4   he called it, "hook and book." MF 147, 149.

5        Defendant claims that since Rodriguez had plaintiff's truck already hooked

6   up, he had somehow "completed" the repossession. But there is a disputed issue of

7   fact as to whether the truck was completely connected. He had only made a very

8   provisional attachment, which took only four seconds to do, and left off the straps,

9   chains, and running lights, in his haste to avoid the security guards.  MF 61.

10  Rodriguez's slapdash attachment job, whatever it was, should not be considered a

11  completed connection to the tow truck, in the absence of connection of the safety

12  straps, chains, and running lights.  The question of whether the truck was actually

13  "connected" under Bus. & Prof. Code § 7507.12(a) is thus one for the jury.

14       In addition, the "No Repo Vehicles" and other signs were *themselves* an

15  objection. Rodriguez's entry onto Bolthouse Farms in defiance of those signs, was

16  at least as serious as ignoring an oral objection. Seibel v. Society Lease, Inc., 969

17  F.Supp. 713, 718 (M.D. Fla 1997)(entry onto property after objection is a breach of

18  the peace). Rodriguez had not connected plaintiff's vehicle at the time of he saw the

19  signs objecting specifically to any repossession. He walked right next to those signs

20  as he scouted the premises on foot, just before the repossession. MF 124.

21       Even if plaintiff's vehicle were considered "connected," Rodriguez does not

22  escape liability for his dangerous acts just because McEntire's objection occurred

23  after he supposedly had the vehicle in tow. If the objection occurs while the

24  repossessor is still in the vicinity of the debtor's private property, the repossessor

25  must cease and desist. First & Farmers Bank of Somerset, Inc. v. Henderson, 763

26  S.W.2d 137, 140 (Ky. App. 1988).  And even an objection made *after* the

27  repossessor takes custody of the collateral, still counts as an objection: the secured

28  party must stop and resort to the courts. First & Farmers Bank, supra, 763 S.W.2d

14

1   at 139 (confrontation occurred after bank's employees had entered open garage and

2   hitched up boat, and were leaving); <u>Deevy v. Tassi,</u> 21 Cal.2d 109, 119 (1942); <u>Ivy</u>

3   <u>v. General Motors Acceptance Corp</u>., 612 So.2d 1108 (Miss. 1992)(plaintiff's

4   verdict upheld when repossessor peaceably hitched vehicle and confrontation

5   occurred at end of debtor's driveway as repossessor was leaving).

6         Finally, defendants cannot rely on Bus. & Prof. Code § 7507.12(b), which

7   provides: "No person other than the legal owner may direct a repossessor to release

8   a vehicle without legal authority to do so."  This provision was obviously intended

9   to prevent vehicles being released to borrowers (or strangers) at the tow yard *after*

10  repossession, without the *lender's* (legal owner's) approval. California consumers

11  have a right to reinstate their contracts and get back the collateral after

12  repossession, but must pay current to do so. <u>See</u> Civil Code § 2983.2(a). Read in

13  conjunction with this provision, B&P § 7507.12(b) was intended to protect lenders

14  from unauthorized or unpaid redemptions of their property. Interpreting this statute

15  to strip away a *third-party property owner's* right to *object* to an illegal trespass and

16  unauthorized tow truck on their own property, is an unreasonable interpretation,

17  and contrary to the consumer protection purposes of the Collateral Recovery Act.

18  In any event, McEntire was not "directing a release" of the vehicle, she was

19  objecting to the tow truck's presence on the property.

20         *3. Where The Repossession Took Place: A Secured, Guarded Industrial Plant*

21         The location of the repossession is one factor to consider when determining

22  if the repossessor breached the peace.  <u>Davenport</u>, 818 S.W.2d at 29.  The court

23  should analyze not only whether a disturbance occurred, but whether the attempted

24  repossession carried with it a *risk* of confrontation or injury. <u>Clark v. Associates</u>

25  <u>Comm. Corp</u>., 877 F.Supp. 1439, 1446-1447 (D. Kan. 1994); <u>Robinson v. Citicorp.</u>

26  <u>Nat. Servs., Inc</u>., 921 S.W.2d 52, 54 (Mo. App. 1996)(secured party's duty is

27  intended to protect third parties equally as the debtor); <u>Gen'l Finance Corp. v.</u>

28  <u>Smith</u>, 505 So. 2d 1045, 1048 (Ala. 1987)(repossession must proceed "without risk

15

1  of injury to the secured party, the debtor, or any innocent bystanders"); Ruffin v.

2  Nissan Motor Accept. Corp., 953 F.Supp. 373, 376 (M.D. Ala. 1996); Pleasant v.

3  Warrick, 590 So.2d 214, 216 (Ala. 1991). Thus, the secured party who "anticipates

4  difficulty" should use judicial process rather than self-help. Unicut, Inc. v. Texas

5  Commerce Bank-Chemical, 704 S.W.2d 442, 445 (Tex. 1986).

6          Leon's repossession of plaintiff's truck took place at night, at the highly

7  secure and guarded manufacturing plant where plaintiff worked, Bolthouse Farms,

8  and during an employee shift change. The property is fenced and one cannot see

9  inside while driving by. MF 23, 127.  There are security cameras in various

10  locations.  The property is off-limits to anyone except authorized personnel and

11  vehicles.  MF 20, 124-127. The property is heavily posted with warning signs in all

12  locations, including "No Repo Vehicles – No Unauthorized Towing," "No

13  Trespassing," "Private Property," "Check With Guard Before Entering Plant," and

14  "All Vehicles Subject to Search." MF 124-127. There is only one entrance, and a

15  guard shack posted near that entrance has responsibility to stop and turn away any

16  tow vehicles entering the property. MF 20. The main entrance from Brundage Lane

17  has a "No Repo Vehicles – No Unauthorized Towing" sign facing out at a 45

18  degree angle, which Rodriguez could not have failed to miss, since he had scouted

19  the location on foot (and had driven by every day for seven years on his regular

20  commute).  MF 124, 126, 140.

21          There are two driveways leading off the main entrance lane once you are

22  inside the property. Trueblood Decl., Exh. 11. These lead into the employee-only

23  parking lot on the left, where plaintiff's truck was parked that night. To use these

24  driveways, a vehicle must turn left directly in front of the guard shack, whose

25  responsibility it is to monitor these driveways for unauthorized entries. Id. The

26  parking lot entrances do not have control arms, but entry is nevertheless barred by

27  the prominent signs posted in front of them, and the presence of the guard shack

28  nearby. MF 20, 124-127. These are one-way entrance driveways, and the only exit

16

1   from the parking lot sits a long way at the other end of the lot, going out onto

2   Brundage through a control gate. MF 19, Trueblood Decl., Exh. 11. Because

3   Rodriguez knew he would be confronted by security guards the minute he entered

4   the lot, and that leaving the long way at the proper exit gate might have resulted in

5   his getting caught, he planned (and executed) his hasty departure going out the

6   same one-way lane he had entered, *against traffic*. MF 22. The security manager

7   who viewed the surveillance video stated that this was "a very dangerous

8   maneuver" during the shift change, with many people walking around, and cars

9   exiting and entering. MF 22.

10          Rodriguez also planned and executed another very dangerous maneuver in

11  order to get in and out as fast as possible:  he *reversed* his vehicle the whole way

12  into Bolthouse Farms, going (again) the *wrong way* against traffic in the main

13  entrance lane, before he turned into the employee parking lot lanes. MF 22. This

14  enabled him to back up his vehicle to plaintiff's truck and exit forwards (now

15  against traffic), before the security guards could reach him, without losing time for

16  having to turn around. MF 61. The security manager who saw the surveillance

17  video testified that Rodriguez's reversing maneuver during the shift change was "a

18  huge safety concern," and "this guy had no regard for anybody who is coming out

19  of Bolthouse." MF No. 47, 143.

20          Rodriguez was so concerned about the Bolthouse Farms security measures

21  before doing the repossession, that he parked in the dark on Brundage, outside the

22  view of the security guards, and called his boss Leon Scroggins to ask whether he

23  would be breaking any laws. MF 138, 141. He had never called Scroggins before

24  on any job. Scroggins told him: "If you can get that unit before they stop you, go

25  ahead and take it."  In other words, go ahead and run the security gauntlet, just get

26  out before you are caught. MF 142.

27          Scroggins' utterly reckless advice is not a surprise, since Leon's had trained

28  Rodriguez to disregard no trespassing or other signs at urban locations, and that "if

17

it's open, it's game." MF 131. Rodriguez was a trainee doing his first repossessions for Leon's, and possibly operating without the required temporary license, which both he and Scroggins claim to have lost. MF 129, 134-135. Leon's also failed to train Rodriguez at all on Leon's main regulatory statute, the Collateral Recovery Act. MF 130; see Steichen v. First Bank Grand, 372 N.W.2d 768, 773 (Minn. 1985)(collector must supervise its employees and provide proper policy and instruction on lawful self-help repossession, and not allow employees to act with a free hand).

This risky night repossession, under the nose of chasing security guards at a secured facility during a shift change, was entirely unnecessary. Rodriguez received electronic messages from the finance company the afternoon of the repossession, informing him that its GPS system showed the vehicle was at that moment, at plaintiff's home, and that he should call plaintiff there. MF 136-137. Plaintiff always parked in his open driveway, since his truck was too big for the garage. MF 25. Inexplicably, Rodriguez ignored these messages, pottered around for another five hours doing other jobs, and instead chose to run the security gauntlet that night. MF 136-137.

The fact that the parking lot entrance driveways were ungated, is not dispositive of the breach of the peace issue.  Defendant ignores that these entrances were heavily signed and guarded, and that this was the property of a third party. In Salisbury Livestock Co. v. Colorado Cent. Credit Union, 793 P.2d 470 (Wyo. 1990), the repo men entered an ungated, secluded ranch, spotted the vehicles, and repossessed them without encountering anyone.  The court held that it was error to direct a verdict on breach of the peace, because this was an entry onto the premises of a third party, who had no knowledge of the debtor's default. The entry therefore had the potential to "trigger a breach of the peace."  Id. at 475. See also First & Farmers Bank of Somerset, Inc. v. Henderson, 763 S.W.2d 137, 139-140 (Ky. App. 1988)(breach of peace when repossessors entered through open garage and secured

1  collateral, and debtor objected afterwards without violence); <u>McNeil v. Higgins</u>, 86
2  Cal.App.2d 723, 725 (1948) (entry through open window in occupant's absence
3  amounted to constructive use of unlawful force).

4      While a repossessor may enter a debtor's open driveway and take a car
5  peaceably, that is "the limit of the right to repossess without instituting legal
6  action." <u>Hester v. Bandy</u>, 627 So.2d 833, 840 (Miss. 1993).

7      *4. Brooks' Lack of Consent*
8      Another factor to consider in determining a breach of the peace is whether
9  the debtor consented. <u>See</u> White & Summers § 27-6, at 575-76; <u>Davenport</u>, 818
10  S.W.2d at 29; <u>Giles</u>, at 565.

11      This was an involuntary repossession, and Jimmie Brooks did not consent to
12  any repossession, entry onto Bolthouse Farms, or a breach of the peace.  MF No.
13  13.  Rodriguez admits that an involuntary repossession is riskier to everyone than a
14  voluntary one. MF No. 13. Indeed, defendants claim that plaintiff was concealing
15  the vehicle, which though untrue, would tend to prove a lack of consent. MF Nos.
16  25, 26, 28.

17      *5. The Reactions of Third Parties*
18      Another factor to consider in determining a breach of the peace is the
19  reactions of third parties. <u>See</u> White & Summers § 27-6, at 575-76; <u>Davenport</u>, 818
20  S.W.2d at 29; <u>Giles</u>, at 565.

21      Here, the reaction was acute alarm. <u>Hilliman</u>, <u>supra</u>, 499 N.Y.S.2d at 614
22  (breach of the peace includes any act "which by causing consternation and alarm,
23  disturbs the peace and quiet of the community"); <u>Wade</u>, <u>supra</u>, at 744. Within
24  seconds of seeing Rodriguez enter, Bolthouse Farms' uniformed security guards
25  tried to stop the repossession. Security guard McEntire rushed from the central
26  monitoring station and directly confronted Rodriguez as he was leaving the
27  employee parking lot and still on the property. MF 51-52, 55, 146-147. McEntire
28  yelled for Rodriguez to stop and was waving her hands, and when he did not, she

1   chased the tow truck all the way to the property line. MF 146-147. A roving

2   security guard then tried to find the tow truck. MF 20, 55. Plaintiff reacted by

3   calling the police, but was convinced not to by McEntire, who was afraid her boss

4   would get mad at her if awakened. MF 81. McEntire herself would have called the

5   police but for this concern. MF 81, 88, 146. Plaintiff later did call the police, and

6   only ended the 911 call when he finally spotted his vehicle with the tow truck. MF

7   89.

8          One reason Bolthouse Farms has a strict "no tow trucks" policy, which is

9   posted on the premises, is that there is a risk of a thief using a tow truck to simply

10  steal vehicles.  MF 148. Not being advised by Leon's that a tow truck was coming,

11  Bolthouse Farms had no way of knowing who Rodriguez was.  His truck was

12  unmarked. MF 52, 139. Plaintiff also was concerned his vehicle had been stolen,

13  and called 911. MF 88. Even Rodriguez thought the police would be called, and

14  waited just outside the Bolthouse Farms entrance for a while, in case he needed to

15  explain himself. MF 150.

16         The risk of confrontation, violence, or injury was high in this repossession.

17  The startled reaction of the Bolthouse Farms security team and everyone else

18  confirms it, and that breach of the peace occurred.

19         6.  *The Creditor's Use of Stealth or Deception: The Hook and Book*

20         Another factor to consider in determining a breach of the peace is the

21  creditor's use of stealth or deception. Big Three Motors, Inc. v. Rutherford, 432

22  So.2d 483, 485 (Ala. 1983); White & Summers § 27-6, at 575-76; Davenport, 818

23  S.W.2d at 29; Giles, at 565.

24         Rodriguez was well familiar with the high security at Bolthouse Farms for

25  several reasons.  He drove by the premises every day on his commute, for seven

26  years. MF 23. The day before the repo, he scouted the premises, driving by in his

27  car to look inside. MF 18-19.. He again scouted the entrance and employee parking

28  lot, this time on foot, just before the repossession. MF 124-127. He could not have

1   failed to see the "No Repossession Vehicles" and other ubiquitous warning signs.

2   MF 140.

3       Rodriguez waited until nighttime, even though the bank had told him during

4   the day that plaintiff's vehicle was at home where it could have been easily

5   repossessed in the open driveway.  Instead of simply asking permission to enter

6   Bolthouse Farms, Rodriguez decided on a stealthy grab of plaintiff's vehicle, under

7   the noses of the security guards – before they could react, he testified. MF 144. He

8   first lay in wait in the darkness, parked just outside the entrance in an unmarked

9   truck, out of view of the security guards. He then stealthily entered the premises on

10  foot, and succeeded in not being seen on the video cameras at the central

11  monitoring station.  MF 140.

12      After his scout on foot, and his nervous phone call to Scroggins to ask if he

13  would be breaking laws, and knowing that speed would be of the essence so the

14  security guards would not catch up with him, he suddenly reversed into the lot at a

15  "very quick" speed, hooked up the vehicle in four seconds, and then left the lot over

16  McEntire's objections, going the wrong way against traffic. His departure only took

17  "seconds."  MF 143-144.

18      Rodriguez referred to this gambit as a "hook and book."  MF 149. A "hook

19  and book" is not a legal repossession, because it is full of risk.  As stated in <u>Hester</u>

20  <u>v. Bandy</u>, 627 So.2d 833, 841 (Miss. 1993):

21

22      Evans' decision to repossess the van in the early morning
        hours from the Hester residence was deliberate. His purpose,
23      of course, was to make a "quick snatch" of the van and get
        away, all without the knowledge of the Hesters. This was a
24      tactic which guaranteed generating fright or anger, or both, if
        discovered in progress by the Hesters. It was fraught with the
25      peril of provoking a breach of the peace of the most serious
        kind. When Evans was in fact discovered and Hester
26      attempted to physically resist the repossession, this terminated
        Evans' right to continue, because in doing so he caused a
27      breach of the peace. Evans did not cease, but carried his
        repossession on out, and this was without legal authority.
28

21

Rodriguez practiced stealth, and thereby committed a breach of the peace: (1) using an unmarked truck; (2) laying in wait in the dark; (3) not asking permission to enter a highly secure industrial plant; (4) scouting the premises without being seen; and (5) entering without warning at high speed in reverse to avoid security guards.

E.  Defendants Are "Debt Collectors" Under The Rosenthal Fair Debt Collection Practices Act

The Rosenthal Fair Debt Collection Practices Act incorporates any violation of the FDCPA as a violation of state law.  Civil Code § 1788.17.  It also employs a sweeping definition of "debt collector," even broader than the FDCPA: "Any person who, in the ordinary course of business, regularly, on behalf of himself or others, engages in debt collection." Civ. Code § 1788.2(c). The Act then defines "debt collection" as "**any act or practice** in connection with the collection of consumer debts." Id. § 1788.2(b) (emphasis added). In turn, the term "consumer debt" means "money, **property**, or their equivalent which is due or owing or alleged to be due or owing from a natural person by reason of a consumer credit transaction." Id. § 1788.2(f) (emphasis added).

Leon's and Rodriguez clearly performed "any act or practice in connection with" the collection of collateral ("property"). Leon's is a licensed repossession agency who enters into contracts with lenders such as Gateway Lending & Finance to accomplish repossessions of property on their behalf.  Leon's repossessed plaintiff's vehicle. The definition of "debt" is not limited to money, but includes "property." The word "property" in the definition cannot be ignored. Duncan, supra, 533 U.S. at 174.

Defendants also performed "any act or practice in connection with" the collection of "money."  As explained above, Leon's has a policy of presenting the borrower with the choice of paying the bank, or getting their vehicle repossessed. Leon's gets a fee, even if there is no repossession. MF 123.

22

1    The Rosenthal Act exempts only attorneys. <u>See</u> Cal. Civ. Code § 1788.2(c).

2    There are no other exemptions, and certainly none for entities engaged in the

3    repossession business. <u>Imperial Merchant Services, Inc. v. Hunt</u>, 47 Cal.4th 381,

4    389 (2009) ("[I]f exemptions are specified in a statute, [courts] may not imply

5    additional exemptions unless there is a clear legislative intent to the contrary."

6        The Rosenthal Act is consumer protection legislation, and was specifically

7    intended to provide a shield against unfair debt collection practices. Civ. Code §

8    1788.1(b). The Legislature found that "unfair or deceptive debt collection practices

9    undermine the public confidence which is essential to the continued functioning of

10   the banking and credit system and sound extensions of credit to consumers." Id. §

11   1788.1(a)(2). The Rosenthal Act must be liberally construed to effect its purposes.

12   <u>See</u> <u>Donohue v. Quick Collect</u>, <u>supra</u>, 592 F.3d at 1033-34; <u>Pitney Bowes, Inc. v.</u>

13   <u>State of California</u>, 108 Cal.App.3d 307, 324 (1980). Arbitrarily exempting an

14   entire class of debt collectors from the Act's coverage – repossession agencies --

15   who earn money from collection work that inherently presents a risk to consumers

16   – would be totally contrary to the Rosenthal Act's purpose and intent, and its

17   legislatively enumerated list of exempt entities.

18       Moreover, as noted, the Rosenthal Act incorporates most of the FDCPA as a

19   violation of state law, <u>including</u> 15 U.S.C. § 1692f(6). <u>See</u> Cal. Civ. Code §

20   1788.17. Since § 1692f(6) applies only to repossessions, there can be no doubt that

21   the repossession business is covered by the Rosenthal Act.  Otherwise, the

22   Legislature's specific adoption of § 1692f(6) as a violation of state law, would be

23   mere surplusage and an idle act. The secured parties, the lenders, are already

24   statutorily immune under the Collateral Recovery Act for their repossessors'

25   misconduct. <u>See</u> Bus. & Prof. Code § 7507.13(b).

26       Finally, the lone case cited by defendants – <u>Pflueger v. Auto Finance Group</u>,

27   <u>supra</u>, 1999 WL 33740813 –is poorly reasoned, and has been criticized for its

28   holdings on the Rosenthal Act. The case summarily concludes that repossession

23

1   agencies are not debt collectors under the Rosenthal Act, without ever analyzing the

2   statute's broad definition of that term. The case instead conflates the definition of

3   "debt" under the FDCPA with the definition of "debt" under the Rosenthal Act,

4   when the Rosenthal Act's definition is far broader. As stated in <u>Izenberg v. ETS</u>

5   <u>Services, LLC</u>, 589 F. Supp. 2d 1193, 1199 (C.D. Cal. 2008), "[T]he definition of

6   'debt collector' found in the [RFDCPA] is broader than that contained in the

7   FDCPA."

8       The flaws in <u>Pflueger</u> were recently acknowledged in <u>Shannon v. Windsor</u>

9   <u>Equity Group</u>, <u>supra</u>, 2014 U.S. Dist. LEXIS 32259, where the court declined to

10  follow <u>Pflueger</u>, and held that the Rosenthal Act covered a repossession agency.

11  <u>Id</u>., at 24-26. The <u>Shannon</u> court emphasized that the Rosenthal Act defines a

12  "debt" to include "property," and thus repossession agencies (which attempt to

13  collect property) are within its purview. <u>Id</u>., at 26.

14  F.   <u>Plaintiff's Conversion Claim Is Valid Under Established Law</u>

15      Defendant's odd argument that plaintiff had no right of possession of the

16  truck, and therefore cannot sue for conversion, is unsupported by any authority, and

17  simply contradicts <u>Henderson v. Security Nat'l Bank</u>, 72 Cal.App.3d 764 (1977),

18  which held "[W]e are of the opinion that where one is otherwise entitled to take

19  possession of property, its repossession by such means [breach of the peace]

20  constitutes a conversion." <u>Id</u>. at 770; <u>see</u> <u>also</u> <u>Varela v. Wells Fargo Bank</u>, 15 Cal.

21  App.3d 741 (1971)(affirming judgment of conversion against lender who

22  repossessed vehicle while loan was in default, under estoppel theory).[1]

23

24

25

26  ─────────────────
    [1] <u>Moore v. Regents of University of California</u>, 51 Cal.3d 120 (1990) is far afield.  The
27  court held that a medical patient who voluntarily had some tissue removed, which was
    then used in lucrative research, had no claim of conversion against the doctors for
28  using his cells. The court held that plaintiff had neither title nor possession of the
    tissue, having allowed the procedure.  By contrast, plaintiff Brooks had both equitable
    title and possession of the vehicle.

                                    24

G.     Defendants Fail To Address Part of Plaintiff's Rosenthal Act Claim

        Defendants fail to address paragraphs 3 and 24 of the First Amended Complaint, in which plaintiff alleges that Rodriguez committed extortion, and violated the RFDCPA, by holding plaintiff's personal items in the vehicle hostage to his handing over the car keys.  The burden of proof to produce evidence therefore did not shift to plaintiff. However, it is clear that this is a hotly disputed factual issue on which summary judgment cannot be granted.  MF Nos. 102-103.

IV.  CONCLUSION

        For all of the foregoing reasons, plaintiff respectfully requests that the motion for summary judgment/adjudication be denied.


Dated: July 26, 2016                    Respectfully Submitted,

                                        TRUEBLOOD LAW FIRM



                                        By:  _____/s/_____
                                             Alexander B. Trueblood

                                        Attorneys for Plaintiff
                                        JIMMIE R. BROOKS

25